Dale Cendali
Claudia Ray
Courtney L. Farkas
Joshua L. Simmons
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
dale.cendali@kirkland.com
claudia.ray@kirkland.com
courtney.farkas@kirkland.com
joshua.simmons@kirkland.com

*Attorneys for Defendants and Counterclaim-Plaintiffs*
*8 Legged Productions, LLC, Goodbye*
*Entertainment, LLC, Savior Productions, LLC,*
*Michael Cohl and Jeremiah Harris*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JULIE TAYMOR AND LOH, INC., | Case No.  11 Civ. 8002 (RJH) |
| Plaintiffs, | ECF Case |
| - against - | |
| 8 LEGGED PRODUCTIONS, LLC; HELLO ENTERTAINMENT, LLC; GOODBYE ENTERTAINMENT, LLC; SAVIOR PRODUCTIONS, LLC; MICHAEL COHL; JEREMIAH HARRIS; AND GLEN BERGER, | |
| Defendants. | |

8 LEGGED PRODUCTIONS, LLC; GOODBYE
ENTERTAINMENT, LLC; SAVIOR
PRODUCTIONS, LLC; MICHAEL COHL; AND
JEREMIAH HARRIS,

                Counterclaim-Plaintiffs,

  -against-

JULIE TAYMOR AND LOH, INC.

                Counterclaim-Defendants.

**DEFENDANTS 8 LEGGED PRODUCTIONS, LLC, GOODBYE ENTERTAINMENT,
LLC, SAVIOR PRODUCTIONS, LLC, MICHAEL COHL AND JEREMIAH HARRIS'S
<u>ANSWER AND COUNTERCLAIMS</u>**

Defendants 8 Legged Productions, LLC ("8 Legged"), Goodbye Entertainment, LLC ("Goodbye"), Savior Productions, LLC ("Savior"), Michael Cohl ("Cohl") and Jeremiah Harris ("Harris") (collectively, "Answering Defendants" or "Counterclaim Plaintiffs"), by and through their attorneys, Kirkland & Ellis LLP, hereby answer the Complaint of Plaintiffs Julie Taymor ("Taymor") and LOH, Inc. ("LOH") (collectively, "Plaintiffs"), dated November 8, 2011, as follows:

## NATURE OF THE ACTION

1.      State that the allegations set forth in Paragraph 1 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, admit that *Spider-Man: Turn Off the Dark* (the "*Spider-Man* Musical" or "Musical") is a hit Broadway musical.

2.      State that the allegations set forth in Paragraph 2 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, deny the allegations set forth in Paragraph 2 of the Complaint, except admit that Taymor ceased work on the Musical in early 2011.

3.      State that the allegations set forth in Paragraph 3 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

## PARTIES

4.      Deny the allegations set forth in Paragraph 4 of the Complaint, except admit that Taymor is domiciled in this District and that she was contracted to serve as director, collaborator, co-bookwriter and mask designer for the Musical.

5.      Admit the allegations set forth in Paragraph 5 of the Complaint.

6.      Deny the allegations set forth in Paragraph 6 of the Complaint, except admit that 8 Legged is a domestic limited liability company organized under the laws of the State of New York and having its principal place of business in the State of New York, and further admit that 8 Legged was formed by Hello and Goodbye in or around August 2010.

7.      Admit the allegations set forth in Paragraph 7 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations contained in the first and third sentences of Paragraph 7.

8.      Deny the allegations set forth in Paragraph 8 of the Complaint, except admit that Goodbye is a limited liability company organized and existing under the laws of the State of Delaware formed by Michael Cohl ("Cohl") and Jeremiah Harris ("Harris") in November 2009, and Goodbye is a manger of 8 Legged, as well as a producer of the *Spider-Man* Musical.

9.      Deny the allegations set forth in Paragraph 9 of the Complaint, except admit that Savior is a domestic limited liability company organized and existing under the laws of the State of New York and having its principal place of business in New York formed by Cohl and Harris in 2009.

10.      Deny the allegations set forth in Paragraph 10 of the Complaint, except admit that Cohl and Harris are managers and board members of Goodbye and Savior.

11.      Deny the allegations set forth in Paragraph 11, except admit that Glen Berger ("Berger") wrote the book of the *Spider-Man* Musical.

## JURISDICTION & VENUE

12.      State that the allegations set forth in Paragraph 12 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, admit that this Court has subject matter and supplemental jurisdiction over Plaintiffs' Complaint.

13.     State that the allegations set forth in Paragraph 13 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, admit that venue is proper in this District.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

14.     Deny the allegations set forth in Paragraph 14 of the Complaint, except admit that Taymor directed *The Lion King*, which was a faithful recreation of the hit film and became a successful Broadway musical, and further admit that Taymor received two Tony Awards for her work on *The Lion King* and that Taymor and *The Lion King* won other awards as well, but that Taymor has not achieved the same level of commercial success with any other projects.

15.     Deny knowledge or information sufficient to form a belief as to the allegations set forth in Paragraph 15 of the Complaint, except admit that Taymor has directed Broadway productions, motion pictures, including *Frida*, and operas, and further admit that Taymor has asserted in her Playbill submission that she has won various awards, which Answering Defendants have no basis to believe is incorrect.

16.     Admit the allegations set forth in Paragraph 16 of the Complaint.

17.     Admit the allegations set forth in Paragraph 17 of the Complaint.

18.     Admit the allegations set forth in Paragraph 18 of the Complaint.

19.     Admit the allegations set forth in Paragraph 19 of the Complaint, except deny the allegations set forth in the second sentence of Paragraph 19 of the Complaint to as Plaintiffs improperly define the book of a musical.

20.     Deny the allegations set forth in Paragraph 20 of the Complaint.

21.     Deny the allegations set forth in Paragraph 21 of the Complaint, except Answering Defendants admit that Taymor authored a three-page document titled "Spiderman/Caught," which Plaintiffs refer to as a "Treatment."

22.     Deny the allegations set forth in Paragraph 22 of the Complaint.

23.     Deny the allegations set forth in Paragraph 23 of the Complaint, except admit that "Neil Jordan ceased working as bookwriter on the Musical" in or around 2004 and further admit that Taymor was contracted to direct, collaborate on, and co-write the book of the Musical.

24.     Deny the allegations set forth in Paragraph 24 of the Complaint, except Answering Defendants admit that Berger wrote the book of the Musical.

25.     Admit the allegations set forth in Paragraph 25 of the Complaint.

26.     Deny the allegations set for in Paragraph 26 of the Complaint, except admit that Seth Gelblum ("Gelblum"), Taymor's lawyer from the firm of Loeb & Loeb LLP, sent an e-mail on March 28, 2005 stating that Taymor would be a co-bookwriter, and further admit that the Complaint accurately quotes a portion of one sentence in such e-mail.

27.     Deny the allegations set forth in Paragraph 27 of the Complaint.

28.     Deny knowledge or information sufficient to form a belief as to the allegations set forth in Paragraph 28 of the Complaint, except admit that the document attached as Exhibit B to the Complaint is an agreement between Berger and Hello, dated June 22, 2005, which is accurately quoted in Paragraph 11 of Exhibit B to the Complaint.

29.     State that the allegations set forth in Paragraph 29 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the allegations set forth in Paragraph 29 of the Complaint, except deny knowledge or information sufficient to form a belief as to the June 28, 2005 e-mail from Gelblum to David Garfinkle ("Garfinkle") referenced in Paragraph 29 of the Complaint.

30.     Deny the allegations set forth in Paragraph 30 of the Complaint, except deny knowledge or information sufficient to form a belief as to the alleged conversation between Garfinkle and Gelblum described in Paragraph 30 of the Complaint.

31.     Deny the allegations set forth in Paragraph 31 of the Complaint, except admit that the document attached as Exhibit C to the Complaint is an agreement between Hello and LOH.

32.     Deny the allegations set forth in Paragraph 32 of the Complaint, except admit that Paragraph 32 of the Complaint accurately quotes from a portion of the document attached as Exhibit C to the Complaint.

33.     Admit the allegations set forth in Paragraph 33 of the Complaint.

34.     Deny the allegations set forth in Paragraph 34 of the Complaint, except admit that the document, dated July 12, 2005, that is attached as Exhibit D to the Complaint, appears to be the agreement that governed Taymor's services as director and collaborator of the Musical, and further admit that aspects of the agreement are currently the subject of an ongoing arbitration between the Stage Directors and Choreographers Society and 8 Legged.

35.     Admit the allegations set forth in Paragraph 35 of the Complaint.

36.     Deny the allegations set forth in Paragraph 36 of the Complaint, except admit that Berger began to work on the book of the Musical in or around 2005.

37.     Deny the allegations set forth in Paragraph 37 of the Complaint, except deny knowledge or information sufficient to form a belief as to the allegations in Paragraph 37 concerning workshops and staged readings of the Musical.

38.     Deny the allegations set forth in Paragraph 38 of the Complaint, except admit that there were negotiations of a draft long-form authors agreement, which agreement was never

finalized or executed, and further admit that the complaint appears to accurately quote portions of one version of the draft agreement but omits other portions.

39.     State that the allegations set forth in Paragraph 39 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the allegations set forth in Paragraph 39 of the Complaint.

40.     State that the allegations set forth in Paragraph 40 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the allegations set forth in Paragraph 40 of the Complaint, except admit that the characters of "Swiss Miss" and "Arachne" were "works made for hire for Marvel under the Copyright Act."

41.     Admit the allegations set forth in Paragraph 41 of the Complaint.

42.     Admit the allegations set forth in Paragraph 42 of the Complaint.

43.     Deny the allegations set forth in Paragraph 43 of the Complaint.

44.     Admit the allegations set forth in Paragraph 44 of the Complaint, and further admit that Taymor was to receive royalties as set forth in Paragraph 44 if she performed her role as a co-bookwriter.

45.     Deny the allegations set forth in Paragraph 45 of the Complaint, except admit that rehearsals of the *Spider-Man* Musical began in or around mid-August 2010, Berger continued to write the book of the Musical, and that Taymor and Berger worked together in connection with the Musical.

46.     Deny the allegations set forth in Paragraph 46 of the Complaint.

47.     Admit the allegations set forth in Paragraph 47 of the Complaint.

48.     Deny the allegations set forth in Paragraph 48 of the Complaint, except admit that during the preview period of the show, Taymor and Berger worked together in connection with the Musical and that Berger made changes to the book of the Musical.

49.     Deny the allegations set forth in Paragraph 49 of the Complaint.

50.     Deny the allegations set forth in Paragraph 50 of the Complaint, except admit that Taymor—along with other senior royalty participants, including Cohl and Harris—was not paid royalty payments between November 28, 2010 and February 20, 2011 in order to assist with cash flow issues in connection with operating the show and further admit that Gelblum sent Cohl and Harris an e-mail on February 20, 2011.

51.     Deny the allegations set forth in Paragraph 51 of the Complaint, except admit that in or around February 2011 Gelblum suggested having a meeting at his office, where no one other than Taymor was represented by counsel despite the fact that Gelblum was aware that all of the other participants were represented by lawyers, and further admit that on February 26, 2011, Taymor and Gelblum met with Cohl, Berger, and The Edge, with Bono and Harris participating by conference call.

52.     Deny the allegations set forth in Paragraph 52 of the Complaint, except admit that on March 1, 2011, Gelblum e-mailed Cohl and Harris regarding Taymor's waiver of her alleged approval rights over the Musical.

53.     Deny the allegations set forth in Paragraph 53 of the Complaint, except admit that the document attached as Exhibit G to the Complaint appears to be a Certificate of Registration from the United States Copyright Office for a work titled *Spider-Man: Turn Off the Dark* ("Old Book") and to have an effective date of October 11, 2011, and deny knowledge or information sufficient to form a belief as to what work is the subject of such registration.

54.     Deny the allegations set forth in Paragraph 54 of the Complaint, except admit that a meeting took place on March 4, 2011 between Taymor, Gelblum, Cohl, Harris, Bono, and Edge in Manhattan.

55.     Deny the allegations set forth in Paragraph 55 of the Complaint, except admit that on March 9, 2011, it was announced in a press release that Phillip W. McKinley ("McKinley") and Roberto Aguirre-Sacasa ("Aguirre-Sacasa") were joining the Musical's creative team and that the press release included the quotation: "to help implement new staging and book rewrites, respectively," and further admit that Taymor's consent was not obtained but deny that Taymor's consent was required.

56.     Deny the allegations set forth in Paragraph 56 of the Complaint, except admit that on March 29, 2011 Taymor's counsel wrote to Answering Defendants' counsel concerning various matters, including Taymor's assertion of creative and approval rights over the Musical.

57.     Deny the allegations set forth in Paragraph 57 of the Complaint, except admit that on April 17, 2011 the *Spider-Man* Musical closed for three-and-a-half weeks and that Berger and Aguirre-Sacasa wrote a new book for the Musical based on the original *Spider-Man* comic books and films owned by Marvel ("New Book").

58.     Deny the allegations set forth in Paragraph 58 of the Complaint, except admit that the *Spider-Man* Musical reopened in previews on May 12, 2011.

59.     State that the allegations set forth in Paragraph 59 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the allegations set forth in Paragraph 59 of the Complaint.

60.     Deny the allegations set forth in Paragraph 60 of the Complaint, except admit that as an accommodation to Taymor and at Taymor's request, Taymor has been billed as co-

bookwriter of the *Spider-Man* Musical since it opened in previews in November 2010 and state that if Taymor has changed her mind and would no longer like to be billed as co-bookwriter or "original direction by," Answering Defendants would be happy to cease billing her as such.

61.   Deny the allegations set forth in Paragraph 61 of the Complaint, except admit that on November 8, 2011 Taymor was billed as a co-bookwriter on the *Spider-Man* Musical website and on a billboard outside the Foxwoods Theater, both as an accommodation to Taymor and with her knowledge, however, Taymor's biography no longer appears on the website for the *Spider-Man* Musical.

62.   Deny the allegations set forth in Paragraph 62 of the Complaint, except admit that the *Spider-Man* Musical opened on Broadway on June 14, 2011.

63.   Deny the allegations set forth in Paragraph 63 of the Complaint, except Answering Defendants admit that as an accommodation to Taymor and at Taymor's request, Taymor has been billed in the *Spider-Man* playbill as co-bookwriter of the *Spider-Man* Musical since it opened in previews in November 2010 and state that if Taymor has changed her mind and would no longer like to be billed as co-bookwriter or "original direction by," Answering Defendants would be happy to cease billing her as such.

64.   Deny the allegations set forth in Paragraph 64 of the Complaint, except admit that on November 3, 2011 the Tony Awards Administration Committee stated that Taymor was eligible to be nominated for a 2012 Tony Award for Best Direction of a musical.

65.   Admit the allegations set forth in Paragraph 65 of the Complaint.

66.   Deny the allegations set forth in Paragraph 66 of the Complaint, except admit that Answering Defendants have deferred receipt of any royalties from the Musical to ensure that the Musical has sufficient cash to meet its obligations and give it a chance to succeed.

67.     Deny the allegations set forth in Paragraph 67 of the Complaint, except admit that although Answering Defendants did not believe Taymor was owed any money in connection with the book of the Musical, because Answering Defendants believed it would be more costly to litigate this issue, 8 Legged paid Taymor $52,880 on November 4, 2011, which was the amount Taymor would have been owed under her contract through April 17, 2011 had she performed under that contract.

68.     Deny the allegations set forth in Paragraph 68 of the Complaint.

69.     State that the allegations set forth in Paragraph 69 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the allegations set forth in Paragraph 69 of the Complaint.

70.     Deny the allegations set forth in Paragraph 70 of the Complaint, except admit that the Arachne character was a pre-existing character that was first referenced in Marvel's comic books, and further admit that the table included in Paragraph 70 appears to quote selectively from the Old Book's and New Book's recitation of the classic Greek Arachne myth, but also appears to omit text from both quotations.

71.     Deny the allegations set forth in Paragraph 71 of the Complaint, except admit that Paragraph 71 appears to inaccurately quote from both the Old Book and the New Book.

72.     Deny the allegations set forth in Paragraph 72 of the Complaint, except admit that Paragraph 72 appears to quote from the scenes in the Old Book and the New Book that are taken from scenes in the *Spider-Man* comic books and *Spider-Man* film in which Peter Parker fights with Flash Thompson and other bullies.

73.     Deny the allegations set forth in Paragraph 73 of the Complaint, except admit that Paragraph 73 appears to quote inaccurately from scenes in the Old Book and the New Book—

containing dialogue between classic *Spider-Man* characters, Peter Parker, Flash Thompson and their teacher—including by omitting text and altering text from both quotations.

74.     Deny the allegations set forth in Paragraph 74 of the Complaint, except admit that Paragraph 74 appears to quote from scenes in the Old Book and the New Book, containing dialogue between classic *Spider-Man* character Norman Osborn and his wife, Emily.

75.     Deny the allegations set forth in Paragraph 75 of the Complaint, except admit that Paragraph 75 appears to quote from scenes in the Old Book and the New Book that contain dialogue between classic *Spider-Man* character J. Jonah Jameson and his reporters from the *Daily Bugle*.

76.     Deny the allegations set forth in Paragraph 76 of the Complaint.

77.     State that the allegations set forth in Paragraph 77 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

78.     State that the allegations set forth in Paragraph 78 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

79.     Deny the allegations set forth in Paragraph 79 of the Complaint, except admit that Paragraph 79 appears to selectively quote from the New Book, including by omitting text from the quotation.

80.     Deny the allegations set forth in Paragraph 80 of the Complaint, except admit that Paragraph 80 appears to quote from the Treatment.

81.     Deny the allegations set forth in Paragraph 81 of the Complaint.

82.     Deny the allegations set forth in Paragraph 82 of the Complaint.

83.     Deny the allegations set forth in Paragraph 83 of the Complaint.

84.     Deny the allegations set forth in Paragraph 84 of the Complaint.

85.     Deny the allegations set forth in Paragraph 85 of the Complaint.

## FIRST CLAIM FOR RELIEF

**Copyright Infringement, 17 U.S.C. § 501 – Original Book
(Against 8 Legged, Hello, Goodbye, Savior, Cohl, and
Harris)**

86.     Repeat and reallege each and every response to Paragraphs 1 through 85 above as if fully set forth herein.

87.     State that the allegations set forth in Paragraph 85 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

88.     Deny the allegations set forth in Paragraph 88 of the Complaint, except admit that Taymor appears to have received a Certificate of Registration, Serial No. PAu 3-576-391, from the United States Copyright Office with an effective date of October 11, 2001.

89.     State that the allegations set forth in Paragraph 89 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

90.     State that the allegations set forth in Paragraph 90 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

91.     State that the allegations set forth in Paragraph 91 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

92.     State that the allegations set forth in Paragraph 92 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

93.     State that the allegations set forth in Paragraph 93 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

94.     State that the allegations set forth in Paragraph 94 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

95.     State that the allegations set forth in Paragraph 95 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

96.     State that the allegations set forth in Paragraph 96 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same, except admit that the *Spider-Man* Musical is usually performed eight times per week.

97.     State that the allegations set forth in Paragraph 97 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

98.     State that the allegations set forth in Paragraph 98 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

99.    State that the allegations set forth in Paragraph 99 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

100.    State that the allegations set forth in Paragraph 100 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

101.    State that the allegations set forth in Paragraph 101 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

102.    State that the allegations set forth in Paragraph 102 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

## SECOND CLAIM FOR RELIEF

### Copyright Infringement, 17 U.S.C. § 501 – Treatment
### (Against 8 Legged, Hello, Goodbye, Savior, Cohl, and Harris)

103.    Repeat and reallege each and every response to Paragraphs 1 through 102 above as if fully set forth herein.

104.    Answering Defendants intend to move to dismiss this claim and thus no answer is due pending the resolution of Answering Defendants' motion.

105.    Answering Defendants intend to move to dismiss this claim and thus no answer is due pending the resolution of Answering Defendants' motion.

106.    Answering Defendants intend to move to dismiss this claim and thus no answer is due pending the resolution of Answering Defendants' motion.

107.    Answering Defendants intend to move to dismiss this claim and thus no answer is due pending the resolution of Answering Defendants' motion.

108.    Answering Defendants intend to move to dismiss this claim and thus no answer is due pending the resolution of Answering Defendants' motion.

109.    Answering Defendants intend to move to dismiss this claim and thus no answer is due pending the resolution of Answering Defendants' motion.

110.    Answering Defendants intend to move to dismiss this claim and thus no answer is due pending the resolution of Answering Defendants' motion.

111.    Answering Defendants intend to move to dismiss this claim and thus no answer is due pending the resolution of Answering Defendants' motion.

112.    Answering Defendants intend to move to dismiss this claim and thus no answer is due pending the resolution of Answering Defendants' motion.

113.    Answering Defendants intend to move to dismiss this claim and thus no answer is due pending the resolution of Answering Defendants' motion.

114.    Answering Defendants intend to move to dismiss this claim and thus no answer is due pending the resolution of Answering Defendants' motion.

115.    Answering Defendants intend to move to dismiss this claim and thus no answer is due pending the resolution of Answering Defendants' motion.

### THIRD CLAIM FOR RELIEF

**Breach of Contract**
**(Against Hello and 8 Legged)**

116.    Repeat and reallege each and every response to Paragraphs 1 through 115 above as if fully set forth herein.

117.     State that the allegations set forth in Paragraph 117 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

118.     State that the allegations set forth in Paragraph 118 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

119.     State that the allegations set forth in Paragraph 119 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

120.     Admit the allegations set forth in Paragraph 120 of the Complaint

121.     State that the allegations set forth in Paragraph 121 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

122.     State that the allegations set forth in Paragraph 122 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

123.     State that the allegations set forth in Paragraph 123 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

124.     State that the allegations set forth in Paragraph 124 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

## FOURTH CLAIM FOR RELIEF

### Declaratory Judgment and Injunction – Non-Broadway Productions
### (Against Hello and 8 Legged)

125.    Repeat and reallege each and every response to Paragraphs 1 through 124 above as if fully set forth herein.

126.    State that the allegations set forth in Paragraph 126 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

127.    State that the allegations set forth in Paragraph 127 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

128.    State that the allegations set forth in Paragraph 128 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same, except admit that, as Taymor is aware, the Producers intend to perform the *Spider-Man* Musical in non-Broadway venues.

129.    State that the allegations set forth in Paragraph 129 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

130.    State that the allegations set forth in Paragraph 130 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

131.    State that the allegations set forth in Paragraph 131 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

132.    State that the allegations set forth in Paragraph 132 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

### FIFTH CLAIM FOR RELIEF

**Declaratory Judgment and Injunction – NY Civil Rights Law §§ 50 and 51
(Against 8 Legged, Cohl, and Harris)**

133.    Repeat and reallege each and every response to Paragraphs 1 through 132 above as if fully set forth herein.

134.    State that the allegations set forth in Paragraph 134 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same, except admit that 8 Legged is producing a documentary film regarding the making of the *Spider-Man* Musical.

135.    State that the allegations set forth in Paragraph 135 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

136.    State that the allegations set forth in Paragraph 135 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

137.    State that the allegations set forth in Paragraph 137 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

138.    State that the allegations set forth in Paragraph 138 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

139.    State that the allegations set forth in Paragraph 139 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

140.    State that the allegations set forth in Paragraph 140 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

141.    State that the allegations set forth in Paragraph 141 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, deny the same.

## SIXTH CLAIM FOR RELIEF

### Copyright Accounting
### (Against Berger)

142.    Repeat and reallege each and every response to Paragraphs 1 through 141 above as if fully set forth herein.

143.    State that no answer to Paragraphs 144 through 146 of the Complaint is necessary as Plaintiffs' Sixth Claim for Relief is not against Answering Defendants, but to the extent any response is required, deny the same..

## ANSWERING DEFENDANTS' AFFIRMATIVE DEFENSES

### FIRST DEFENSE

144.    Plaintiffs' claims fail in whole or in part because the Complaint, and each and every claim stated therein, fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

145.    Plaintiffs' First Claim for Relief fails because Taymor's alleged copyright registration for the Old Book is invalid or unenforceable as Taymor failed to comply with the

Copyright Office's registration requirements or other necessary formalities in that Taymor, at a

minimum, (1) made the intentional, material misrepresentation that Taymor is a joint author of

the Old Book, (2) intentionally failed to disclose that the Old Book is based on the *Spider-Man*

and *Spider-Man 2* films, and (3) intentionally misrepresented that the only copyrightable

material copied from the *Spider-Man* comic books was their characters and setting, when, upon

information and belief, the Old Book's plot, premise and various scenes, among other elements,

are copied from the pre-existing *Spider-Man* comic books and therefore are not copyrightable

material authored by Taymor.

<u>THIRD DEFENSE</u>

146.    Even if Taymor's copyright registration in the Old Book is found to be

enforceable, Plaintiffs' First Claim for Relief fails because the Old Book is not a joint work and

Taymor is not an author of the Old Book, as she did not make an independently copyrightable

contribution to the Old Book.  Rather, Berger is the sole author of the Old Book.

<u>FOURTH DEFENSE</u>

147.    Even if Taymor is found to be a joint author of the Old Book, which she is not,

Plaintiffs' First Claim for Relief fails as there is no substantial similarity between the Old Book

and the New Book.  Any similarities between the Old Book and the New Book exist by virtue of

the fact that they are both based on the same pre-existing works in which Taymor cannot claim

copyrights, including, but not limited to, the *Spider-Man* comic books and the *Spider-Man* and

*Spider-Man 2* films, which originated all of the main characters in the works at issue in this case,

their settings, the *Spider-Man* origin story premise, and the plot elements that appear in the

works.

148.    The *Spider-Man* origin story has been depicted in Marvel's comic books since the

character's first appearance in *Amazing Fantasy #15* (1962).  That issue tells the story of a timid,

teenage bookworm and science prodigy named Peter Parker, who is regularly harassed by his schoolmates.  Parker is an orphan living with his loving uncle and aunt, Ben and May Parker.  One day, while visiting a science laboratory, Peter is bitten by a spider that gives him super strength and agility, as well as other spider powers.  At first, he uses his powers to win a wrestling contest, but later in the story, Parker allows a thief to get away, only to learn that the thief subsequently shoots and kills his Uncle Ben.  Peter blames himself, finally realizing that "with great power there must also come—great responsibility!"  As a result, Peter decides to use his powers to fight crime and his alter ego, Spider-Man, is born.

149.    Over the years, the *Spider-Man* story told in the comic books has grown to include other characters, including Peter's love interest, Mary Jane Watson; J. Jonah Jameson, a gruff newspaper publisher who refuses to treat Spider-Man as anything other than a criminal; and various villains, including Green Goblin, who begins as a scientist and businessman named Norman Osborn and becomes a villain after a lab experience goes wrong, and a group of super villains called the Sinister Six.

150.    In 2002, the comic book's *Spider-Man* story was adapted for the *Spider-Man* film, which again follows Peter Parker as he becomes Spider-Man and learns what it means to be a hero, falls in love with his neighbor and schoolmate, Mary Jane Watson, and battles the Green Goblin to the death.  In the *Spider-Man* sequel, *Spider-Man 2*, additional stories were adapted from the comic books.

151.    Moreover, the Arachne character—which Plaintiffs admit was created as a work made for hire for Marvel—is based on the public domain classic Greek myth, as well as, upon information and belief, references and appearances in the *Spider-Man* comic books.  In fact, Taymor has admitted that her interest in incorporating Arachne into the Musical was based on

reading *Ultimate Spider-Man #1* (2000), the first page of which depicts Norman Osborn reciting the Arachne myth to his assistant.

FIFTH DEFENSE

152.    Even if the Old Book and the New Book are found to be substantially similar, which they are not, Plaintiffs' First Claim for Relief is barred in whole or in part by license, as Berger is the author, or at a minimum co-author, of the Old Book, and Berger granted the Answering Defendants a license to use the Old Book.

153.    Plaintiffs admit in Taymor's copyright registration for the Old Book that Berger is, at a minimum, a joint author of the Old Book.  As a joint author, if not the sole author, of the Old Book, Berger had the right to use or to license it the Old Book, subject only to the obligation to account to any joint authors.

154.    In 2005, Hello, the then-producer of the *Spider-Man* Musical, entered into an agreement with Berger, which is attached as Exhibit B to Plaintiffs' Complaint.  Pursuant to that agreement, Berger agreed to "co-write" the book for the musical and "grant Hello the right to produce and present the Musical."  Nothing in his agreement with Hello in any way limits Berger's right to license the Old Book.  Thus, Hello held a license to make use of the Old Book.

155.    In 2009, when 8 Legged took over as the producer of the *Spider-Man* Musical, all of Hello's agreements concerning *Spider-Man* transferred to 8 Legged.  As such, Berger's license to Hello also transferred to 8 Legged.

156.    The existence of a license from Berger to 8 Legged immunizes Answering Defendants from liability for copyright infringement based on use of the Old Book.

## SIXTH DEFENSE

157.    Even if Berger is not found to have granted the Answering Defendants a license to use the Old Book, Plaintiffs' First Claim for Relief is barred in whole or in part by license, as Taymor granted the Answering Defendants a license to use the Old Book.

## SEVENTH DEFENSE

158.    Plaintiffs' Second Claim for Relief fails because Taymor's alleged copyright registration for the Treatment is invalid or unenforceable as Taymor failed to comply with the Copyright Office's registration requirements or other necessary formalities.  At a minimum, Taymor made the intentional, material misrepresentation that the only copyrightable material copied from the *Spider-Man* comic books was their characters and setting, when in fact, upon information and belief, the Treatment's plot, premise and various scenes, among other elements, are copied from the pre-existing storyline of the *Spider-Man* comic books as well as the *Spider-Man* film and other materials.

159.    Taymor admits in the Treatment that the proposed first act "covers the origins Peter's spider power (the terrain of the first film): Peter's bullied school days, how he was bitten, his transformation, wrestling scenes, love for Mary Jane, loss of Uncle Ben, transformation of Norman Osborne to the Green Goblin, newspaper woes etc."

160.    Moreover, Taymor also failed to disclose that much of the Treatment's Arachne plot elements were based on the storyline from the *Spider-Man* comic books.

## EIGHTH DEFENSE

161.    Even if Taymor's copyright registration in the Treatment is found to be valid, Plaintiffs' Second Claim for Relief fails as there is no substantial similarity between the Treatment and the New Book as any similarities between the Treatment and the New Book exist by virtue of the fact that they are both based on the same pre-existing works in which Taymor

cannot claim copyrights, including, but not limited to, the *Spider-Man* comic books and the *Spider-Man* film, which originated all of the main characters in the works at issue in this case, their settings, the *Spider-Man* origin story premise, and the plot elements that appear in the works.

162.    As described in Paragraphs 147–151 above, the *Spider-Man* characters, settings, origin story and plot elements originated in the *Spider-Man* comic books.  Moreover, the *Spider-Man* films adapted the then existing *Spider-Man* story.

163.    In the Treatment, Taymor admits that the entire proposed first act is intended to cover "the terrain of the first film."  Further, the summary of the proposed first act found in the Treatment follows the *Spider-Man* film in all relevant respects.

164.    Additionally, the Treatment's proposed second act bears little resemblance to the New Book.  For example, in the Treatment, Arachne is Spider-Man's nemesis who tries to rape, attack and devour him, in the New Book, in contrast, Arachne merely encourages Spider-Man to accept his responsibilities and use his powers for the good of the world.

<u>NINTH DEFENSE</u>

165.    Even if the Treatment and New Book are found to be substantially similar, which they are not, Plaintiffs' Second Claim for Relief is barred in whole or in part by license, as Taymor granted the Answering Defendants a license to use the Treatment.

<u>TENTH DEFENSE</u>

166.    Plaintiffs' Third and Fourth Claims for Relief fail in whole or in part to the extent Plaintiffs breached their obligations under any contract between the parties and therefore excused Answering Defendants from their obligations, by, among other things, (1) failing to actually write a book for the *Spider-Man* Musical; (2) failing to produce a finished book prior to the first public performance of *Spider-Man* or any time thereafter; (3) insisting—despite the protestations

of Answering Defendants, the Musical's other collaborators and Marvel—that the *Spider-Man*

Musical focus on the character of Arachne and relegating the *Spider-Man* character to a minor

role; (4) refusing—due to unwillingness or inability—to re-write or complete the Old Book

despite multiple requests that Taymor do so; and (5) acting to prevent others from making

necessary changes to the Old Book.  Moreover, Taymor failed to perform her obligations as a co-

bookwriter by failing to write any of the text contained in the Old Book.  Further, Taymor

received notice of her failure to perform her obligations under the contract, and yet continued to

refuse to perform.

<u>ELEVENTH DEFENSE</u>

167.    Even if Plaintiffs are not found to have breached their obligations under a contract

between the parties excusing Answering Defendants from their obligations, Plaintiffs' Third and

Fourth Claims for Relief fail in whole or in part as Answering Defendants have satisfied their

obligations under the co-bookwriter agreement.

168.    Taymor was contracted to perform the services of co-bookwriter.  Plaintiffs claim

that Taymor satisfied her obligation by producing the Old Book, but that Answering Defendants

did not satisfy their obligation to compensate Taymor.

169.    As Answering Defendants have communicated to Taymor, although they do not

believe that Taymor is owed any money as a co-bookwriter, because Answering Defendants

believed it would be more costly to litigate this issue, Answering Defendants sent Taymor a

check for $52,880 for her services through April 17, 2011, when the Musical was closed and the

Old Book was replaced with the New Book.  Thus, Taymor has been paid in full as if she had

fully performed her obligations as a co-bookwriter of the Old Book, despite the fact that, in

actuality, Taymor breached her co-bookwriter agreement and, as a result, the production had to

incur the additional costs of paying of new bookwriter to work with Berger to write a New Book for the Musical.

170.    Since April 17, 2011, the Musical has used the New Book, which Taymor did not author.  As such, Taymor is not owed any additional monetary compensation.

TWELFTH DEFENSE

171.    Plaintiffs' Fifth Claim for Relief fails in whole or in part as New York Civil Rights Law §§ 50–51 only prohibit primarily commercial misappropriation of a person's likeness, and the "making-of" film ("Documentary") is not primarily commercial.  Moreover, to the extent Taymor's name or likeness may be used in connection with the Documentary, such use falls within the newsworthiness exception, which permits the unauthorized use of a person's name or likeness in advertising matters of public interest.

172.    Here, the proposed Documentary is a behind the scenes look at the hit Broadway musical *Spider-Man: Turn Off the Dark* and, as such, it observes and depicts those individuals who were contracted to perform roles related to the Musical.  As a former member of the Musical's creative team, the use of Taymor's name or likeness has a real relationship to the purpose of the Documentary.

173.    Taymor's attempt to stop the Documentary apparently because she is fearful that it may portray her in an unflattering light is a classic prior restraint in violation of the First Amendment.

THIRTEENTH DEFENSE

174.    Plaintiffs' causes of action are barred in whole or in part by the doctrines of waiver, estoppel or acquiescence, as although Plaintiffs were aware of all of the steps that Answering Defendants were taking to improve the Musical, Plaintiffs took no action move to

stop Answering Defendants from proceeding, and Answering Defendants relied upon Plaintiffs' inaction.

175.     Taymor was aware that in March 2011 the production had to hire a new co-bookwriter, Mr. Roberto Aguirre-Sacasa ("Aguirre-Sacasa").  Taymor was also aware that Aguirre-Sacasa worked with Berger to write a New Book for the Musical.  In addition, Taymor was aware that the Producers of the Musical had to raise additional funds for the show, and that the show was going dark in April 2011 in order to implement the New Book and make other changes to the show.  In fact, Taymor was a member of a board that on April 8, 2011 approved the decision to bring in Aguirre-Sacasa as the new co-bookwriter and close the show so as to make changes to the production.  Taymor was also aware that on May 12, 2011, the Musical went into previews performing the New Book.  Taymor also knew that on June 14, 2011 the Musical had its first official opening night performing the New Book as Taymor attended the opening.  Further, Taymor was aware that a Documentary was being filmed and she actively participated in it.

176.     Nevertheless, until the filing of this lawsuit, Plaintiffs never took any actions to stop the New Book from being written, rehearsed or performed, or to stop the Documentary from being filmed.  Also, Plaintiffs did not object to a new co-bookwriter being hired to co-write the New Book.  Moreover, until the filing of this lawsuit, Plaintiffs never asserted that the New Book, which Taymor saw performed on at least one occasion, having attended its opening night, infringed her rights.  Additionally, Plaintiffs insisted that Taymor's billing not change after she was removed from the Musical because Taymor wanted to preserve her reputation and to be part of the Musical's success, even though the Musical was a success in spite of her actions, not because of them.

177.     Answering Defendants relied on the foregoing inaction by Plaintiffs to their detriment by investing millions of dollars in creating, developing and performing the New Book, including millions of dollars of their own companies' money.  Moreover, Answering Defendants invested time and money in the creation of the Documentary.  Further, Answering Defendants agreed, at Taymor's request, not to change the show's billing, even though Taymor did not author the New Book.

178.     Answering Defendants would be happy to remove all mention of Taymor from the playbill if Plaintiffs so request.

<u>FOURTEENTH DEFENSE</u>

179.     Plaintiffs' causes of action are barred in whole or in part by the doctrine of laches, as Plaintiffs inexcusably delayed in instituting this suit and that delay has prejudiced Answering Defendants.

180.     As described in Paragraph 175, Plaintiffs were well aware that the New Book was being written, rehearsed and performed and that the Documentary was being filmed.  Among other things, upon information and belief, Taymor was aware that a new book was being written for the Musical; that a new co-bookwriter was being hired to write it; that rehearsals were underway while the Old Book was still being performed; that the Musical closed for three-and-a-half weeks to implement the New Book; that the Musical reopened on June 14, 2011 and performed the New Book; and that the Musical continues to perform the New Book.  In fact, Taymor was a member of a board that approved of a new co-bookwriter being brought in to help write the New Book and also approved of the show being shut down to implement the New Book.  Moreover, Plaintiffs were aware that Taymor was being filmed for the Documentary.

181.     Yet, Plaintiffs inexcusably delayed for months before filing this lawsuit, while Answering Defendants invested millions of dollars in the Musical.

- 28 -

<u>FIFTEENTH DEFENSE</u>

182.    Plaintiffs' causes of action are barred in whole or in part by the doctrine of unclean hands, as Plaintiffs have engaged in significant misconduct by, among other things, misrepresenting the scope of Taymor's copyrights and breaching her duties under her agreement to serve as a co-bookwriter for the show.

183.    As described in Paragraphs 145, 147–151 and 158–164, the Old Book and the Treatment are both based on multiple pre-existing works, including, but not limited to, the *Spider-Man* comic books, the Greek Arachne myth, and the *Spider-Man* films.  Given that the Old Book and the Treatment incorporate characters, settings, premises, and plot lines, among other elements, that Taymor did not independently create and elements that are not afforded copyright protection under 17 U.S.C. § 102, Taymor's copyrights in both works are limited to those elements that are original to Taymor.  Yet, Plaintiffs have misrepresented to the Copyright Office, Answering Defendants and this Court that Taymor's copyrights extend beyond those elements to the very elements of the New Book that are based on the pre-existing works, including the *Spider-Man* characters, settings, premises, and plots, among other elements.

184.    In addition, Plaintiffs have also engaged in unclean hands as Taymor has breached her duties under her contract to serve as a co-bookwriter, and yet Plaintiffs seek full payment under this contract as though Taymor had fully performed.

**<u>DEFENDANTS' COUNTERCLAIMS</u>**

<u>NATURE OF THE ACTION AND RELIEF SOUGHT</u>

1.    In 2005, Taymor was contracted to "co-write" and "collaborate" on a musical about the classic comic book hero, *Spider-Man* that could open on Broadway in a first-class theater.  Counterclaim Plaintiffs' causes of action arise as a result of Taymor's refusal to fulfill her contractual obligations, declaring that she could not and would not do the jobs that she was

contracted to do, thereby causing significant unnecessary expense, delay and other harm to the Counterclaim Plaintiffs.

2.      Taymor refused to develop a musical that followed the original, family-friendly "*Spider-Man*" story, which was depicted in the Marvel comic books and the hugely successful motion picture trilogy based on them.  Instead, Taymor, who admits that she was not a fan of the *Spider-Man* story prior to her involvement with the Musical, insisted on developing a dark, disjointed and hallucinogenic musical involving suicide, sex and death.

3.      Moreover, Taymor's "*Spider-Man*" Musical did not even star Spider-Man.  Rather, Spider-Man was relegated to a supporting role, while the character Arachne—a character from the *Spider-Man* comics as well as a figure from Greek mythology—took center stage.  Many saw the character of Arachne—a young woman who was so full of hubris that she boasted that her skills were greater than those of the gods and declared, "I'm the only real artist working today"—as a way for Taymor to insert herself into the show.

4.      In addition, although Taymor was well aware that the *Spider-Man* Musical was a commercial, for-profit venture that was intended to appeal to a broad audience, Taymor made it clear that she did not care about ticket sales or the public appeal of the show.  Rather, Taymor's attitude was summed up by her statement that, "I don't give a f#*! about audience reaction!"

5.      Due to Taymor's actions, which caused numerous delays and tremendous cost overruns, by 2009, it looked like the *Spider-Man* Musical would close before it had even one preview performance.  During this dire time for the Musical, the show's then lead producers turned to Cohl and Harris of 8 Legged (the "Producers") to see if they could save the show.  Although many producers would have simply given up on the production, the Producers engaged in superhuman efforts to save the Musical, including raising tens of millions of dollars—much of

it their own—to fund the ever-increasing costs of the production.  As a result, the Musical was able to begin preview performances on November 28, 2010.

6.     After the first preview performance, however, it was apparent that the show continued to have serious problems: the book of the Musical did not work, as, among other things, it did not have an ending and audiences found the storyline confusing and difficult to follow.  In fact, focus group surveys conducted in early 2011, as well as preemptive reviews published in February 2011, confirmed the fears of the Producers and other members of the creative team that the Old Book was hurting the show.

7.     Although the Producers, acclaimed musicians Bono and The Edge—the Musical's composers and lyricists—and other award-winning members of the production team recognized that dramatic changes to the show needed to be made, Taymor refused to listen to or collaborate with them on proposed changes.  Instead, she stormed out of meetings if changes were even hinted at and stopped talking to any member of the production who suggested that changes should be made.  In her view, changes to the story could not be made, and she would not make them.

8.     Despite Taymor's insistence, the Producers and other members of the creative team recognized that unless something was done to improve the public appeal of the Musical, the show would run out of money and close by the end of March 2011.  Thus, the Producers and other members of the production team repeatedly met with Taymor in an effort to get her to collaborate on the changes, as she was contractually obligated to do.  Taymor, however, continued to refuse to collaborate on or to cooperate in making changes to the Old Book.

9.     Because of Taymor's refusal and inability to perform her roles as co-bookwriter or collaborator, the Producers were forced to bring in a new writer, Roberto Aguirre-Sacasa, who

is a well-known writer of *Spider-Man* comics as well as an award-winning playwright and television writer.  Aguirre-Sacasa was hired to co-write a new book for the Musical and to perform the services that Taymor was originally contracted to do.  The Producers also had to bring in experienced Broadway director Philip Wm. McKinley to implement the New Book and other changes to the show, again at additional expense.

10.     As a result of all of the changes that Taymor could not or would not make, the *Spider-Man* Musical is now a hit.  The show is a success despite Taymor, not because of her.

11.     Yet, ironically, it is because the Musical is a success and did not close in March 2011 that Taymor is now belatedly seeking to compel payment for the use of the New Book, which she did not write, even though she has already been paid in full for the use of the Old Book, which she did not write either.  Moreover, Taymor—after refusing to perform her contractual obligations necessitating the hiring of a new writer to do the work she would not and could not do—is now attempting to further injure the Musical's investors and its cast and crew by seeking to enjoin future productions, even though she has long been aware that other venues for the Musical had been contemplated.  If successful, Taymor will stop hundreds of performers and technicians from getting jobs working on the Musical and will prevent new audience members from seeing the show.  Similarly, Taymor is seeking to stop a documentary about the show from being aired in violation of the First Amendment, because she anticipates that it will portray her in an unflattering (yet truthful) light.

12.     Thus, as a result of Taymor's willful conduct, Counterclaim Plaintiffs have no choice but to seek damages for Taymor's breach of her co-bookwriter agreement, her collaborator agreement, and her fiduciary duties to the Musical, as well as to seek a declaratory

judgment that (1) Taymor is not a joint author of the original book of the *Spider-Man* Musical, and (2) 8 Legged has the right to bring the *Spider-Man* Musical to non-Broadway venues.

PARTIES

13.     Counterclaim Plaintiff 8 Legged Productions LLC is a limited liability company having its principal place of business in the State of New York and is qualified to do business and is doing business in the State of New York and in this judicial district.  8 Legged currently holds the exclusive rights to produce the *Spider-Man* Musical.

14.     Counterclaim Plaintiff Goodbye Entertainment, LLC is a Delaware limited liability company that is qualified to do business and is doing business in the State of New York and in this judicial district.  Goodbye is a manager of 8 Legged.

15.     Counterclaim Plaintiff Savior Productions, LLC is a limited liability company having its principal place of business in the State of New York and is qualified to do business and is doing business in the State of New York and in this judicial district.  Savior is also a member of 8 Legged.

16.     Counterclaim Plaintiff Michael Cohl is an investor in the *Spider-Man* Musical.  In addition, Cohl, along with Jeremiah Harris, formed Goodbye for the purpose of assisting in the completion of the production of the Musical.  As a managing member of Goodbye, Cohl has helped the production raise the necessary funds to keep the show going.

17.     Counterclaim Plaintiff Jeremiah Harris is an investor in the *Spider-Man* Musical. In addition, Harris, along with Michael Cohl, formed Goodbye for the purpose of assisting in the completion of the production of the Musical.  As a managing member of Goodbye, Cohl has helped the production raise the necessary funds to keep the show going.

18.     Counterclaim Defendant Julie Taymor is domiciled in this District.

19.     Counterclaim Defendant LOH, Inc. is a domestic business corporation organized and existing under the laws of the State of New York and having its principal place of business in this District.

## JURISDICTION AND VENUE

20.     These counterclaims arise under the Copyright Act, 17 U.S.C. § 101 *et seq.*, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and New York state law.  This Court has jurisdiction under 28 U.S.C. §§ 1331, 1338 and 1367.

21.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400.

## FACTUAL BACKGROUND

**Development of *Spider-Man: Turn Off the Dark***

22.     In 1962, Stan Lee and Steve Ditko created the *Spider-Man* character and his bookish, awkward alter ego, Peter Parker.  Peter is an orphan who lives with his elderly, loving Aunt May and Uncle Ben.  During a visit to a science laboratory, Peter is bitten by a radioactive spider and, as a result, Peter acquires superhuman strength and agility, as well as other distinctly spider-like qualities.  At first he uses his newfound powers for personal gain by competing in a wrestling match for a cash prize.  But when he fails to stop a thief who ends up murdering Uncle Ben, Peter realizes that "with great power there must also come—great responsibility."  Disguised as Spider-Man, Peter dedicates his life to serving the public good and using his powers to fight crime.  Peter has had many crushes, but his longest-term love interest is Mary Jane Watson, his neighbor's niece, who he eventually marries.  Peter also finds a way to make money by selling photographs of Spider-Man to J. Jonah Jameson, the editor-in-chief of the *Daily Bugle*.

23.     Over the years, Spider-Man has fought a slew of super villains, including the Green Goblin (who is really Norman Osborn), the Sinister Six and even Arachne.  In fact, on the

first page of *Ultimate Spider-Man #1*, which was published in 2000, before Taymor wrote her Treatment, Norman Osborn discusses the "myth of Arachne."  According to Osborn, "[t]he story goes that Athena . . . she heard there was this woman on earth -- a mere mortal . . . who happened to be a better spinstress than she was. . . .  Athena wasn't too happy to hear this and she came down to earth and destroyed the woman's creations. . . .When this mortal girl saw what had happened -- that she had insulted the gods and that her life's work had been destroyed -- she hanged herself.  Athena took pity on this poor girl, and touched her on the forehead with a magic liquid and said: 'You shall not die, Arachne.  Instead you shall be transformed and weave your web forever.'"

24.     In 2002, the first of three movies based on the successful comic book series was released.  The film retold the popular *Spider-Man* origin story, including how Peter is bitten by a spider and wakes up the next day with newfound strength, reflexes, and spiderlike qualities.  When Peter goes to school the next day, he fights Mary Jane Watson's bullying boyfriend, Flash, and for the first time, actually wins.  Peter then enters a wrestling tournament, hoping to win the cash prize so that he can buy a car to impress Mary Jane.  He defeats his opponent, "Bonesaw McGraw."  After the fight, Peter lets a thief get away, only to learn later that the same thief killed his Uncle Ben.  Overwhelmed with guilt, Peter dedicates himself to fighting crime as Spider-Man.  He also realizes he can make money by selling pictures of himself as Spider-Man to the *Daily Bugle* newspaper's editor J. Johan Jameson, who believes that Spider-Man as a menace to New York.  Meanwhile, Dr. Norman Osborn, the president of the Oscorp Manufacturing Corporation, tests Oscorp's new performance-enhancing chemical on himself, turning himself into a villain who is dubbed the "Green Goblin."  After several fierce battles, Spider-Man

ultimately saves his love interest, Mary Jane Watson, from Green Goblin, and defeats Green Goblin during a climatic fight that results in Green Goblin's accidental death.

25.     In 2003, Marvel, the owner of the rights to the *Spider-Man* character, approached producers Tony Adams ("Adams") and Garfinkle of Hello and inquired about whether they were interested in doing a musical about Spider-Man.

26.     Excited to bring the beloved web-slinger to the Broadway stage, Adams and Garfinkle negotiated a rights agreement with Marvel to make use of the *Spider-Man* character as well as the popular *Spider-Man* story.

27.     Adams and Garfinkle also sought out Bono and The Edge from the famed band U2, which has won 22 Grammy awards, sold more than 150 million records worldwide, and was inducted into the Rock and Roll Hall of Fame in 2005, to compose the music for the show.

28.     Bono and The Edge suggested including Taymor in the project to serve as the director of the Musical.

29.     By 2004, however, Taymor's only experience working on a large-scale Broadway production was in connection with *The Lion King*—a show which closely followed the pre-existing story and songs of the already tremendously successful film of the same name.  *The Lion King* was also Taymor's only work to have significant commercial success.

30.     Nevertheless, in or around 2004, Taymor agreed to join the production team and wrote what she now calls a "Treatment" for the *Spider-Man* Musical, although it consists of only three pages of text without any dialogue.

31.     Taymor's Treatment conveys a dark and disturbing story made up of the classic *Spider-Man* origin story mixed with the classical Greek myth of Arachne.

32.     For example, the Treatment admits that its proposed first act would simply track the film: "Act One covers the origins [of] Peter's spider power (*the terrain of the first film*): Peter's bullied school days, how he was bitten, his transformation, wrestling scene, love for Mary Jane, loss of uncle Ben, transformation of Norman Osborne to the Green Goblin, newspaper woes etc." (emphasis added).

33.     The Treatment also focuses on the "myth of Arachne in the beginning – how she was transformed into [sic] spider and doomed to the shadows in eternity to weave webs that no one would see."  The Treatment goes on to explain that in the second act, Arachne "is the weaver of the World's Wide Web and her ultimate goal is to come out from the shadows and shine once more."  It states that Arachne "lure[s] Peter into her web to dance a dance of seduction.  She needs to possess him, devour him for her light to shine again."  According to the Treatment, Arachne is "in love with Spiderman and sees him as her ultimate savior.  Like the spider that she is, she will mate with Peter and then, we will find out, devour him."  Then the Treatment states, "[j]ust as it looks like Peter is about to kiss Arachne in a full, sexual human embrace, he flips upside down, suspended by a thread, and kisses Mary Jane in the familiar spider style" (i.e., just as in the *Spider-Man* movie).  Arachne is then "furious" and "attacks him with her hidden spider/wasp stinger," but then Spider-Man "bites MJ."  With her new spider powers, Mary Jane "leaps in an attack on Arachne."  The Treatment does not appear to have an ending, but rather concludes by asking, "Will she be able to save Peter? . . . Are we left dangling by a thread?"

34.     In 2005, Taymor registered this Treatment with the Copyright Office.  In doing so, however, Taymor failed to properly identify all of the preexisting material which is unoriginal to Taymor and which is incorporated into the Treatment.

35.     For example, Taymor's registration only identifies the "[c]haracters and setting from 'Spiderman' comic books" as preexisting.  The Treatment, however, clearly makes use of several other elements from the classic *Spider-Man* story which Taymor has failed to identify in her copyright registration, such as plot elements from the *Spider-Man* comic books as well as the *Spider-Man* movie.  As such, Ms. Taymor's copyright registration in the Treatment is invalid.

**Taymor Could Not And Would Not Fulfill Her Obligations As A Co-Bookwriter Or A Collaborator**

36.     Upon information and belief, having written the three-page "Treatment," Taymor insisted that her role with respect to the *Spider-Man* Musical not be limited solely to that of director.  Rather, Taymor also wanted to serve as, and be compensated, as a co-bookwriter of the book of the Musical, a collaborator on the Musical, and as a mask designer for the Musical.

37.     In 2005, Adams and Garfinkle, on behalf of Hello, and Taymor, on behalf of her loan-out company, LOH entered into an agreement for Taymor's services as a "collaborator" on the *Spider-Man* Musical.

38.     As a collaborator, Taymor was to "collaborate on the creation of a dramatico-musical work for the legitimate stage presently entitled 'Spider-Man: A Musical Web' (the "Musical) and grant Hello the right to produce and present the Musical" (the "Collaborator Agreement").  A true and accurate copy of the Collaborator Agreement is attached as **Exhibit 1**.

39.     In 2005, Adams and Garfinkle, on behalf of Hello, and Taymor, on behalf of LOH, also entered into an agreement for Taymor's services as a "co-owner/co-writer of the book of the Musical" ("Co-Bookwriter Agreement").  A true and accurate copy of the Co-Bookwriter Agreement is attached as **Exhibit 2**.

40.     As a co-bookwriter, it was understood that Taymor would co-write the treatment and the book for the *Spider-Man* Musical.

- 38 -

41.     Adams and Garfinkle, on behalf of Hello, contracted with Berger to serve as the

other co-bookwriter of the *Spider-Man* Musical (the "Berger Agreement").  A true and accurate

copy of the Berger Agreement is attached as **Exhibit 3**.

42.     Pursuant to the Berger Agreement, Berger would co-write the "treatment and/or

book for a dramatico-musical work for the legitimate stage presently entitled 'Spider-Man: A

Musical Web' (the 'Musical') and grant Hello the right to produce and present the Musical."

43.     As both the co-bookwriter and collaborator of the Musical, Taymor was also

obligated to work with Berger to develop a basic treatment for the Old Book of the Musical that

would be approved by Marvel, as, pursuant to Hello's license to use the underlying *Spider-Man*

property (the "Agreement"), Marvel had approval rights over the "story, basic treatment, overall

concept and music-style contained in the Musical (e.g. rock vs. hip-hop), including but not

limited to the basic storyline, character descriptions, portrayal of the powers, basic personal

traits, physical appearance and the living habitat environment and setting thereof" (collectively,

the "Expanded Treatment").

44.     Upon information and belief, while Taymor conveyed high-level ideas for the

Expanded Treatment to Berger, it was Berger who expressed those ideas in writing.  Taymor was

also contractually bound to collaborate with Berger and the other members of the production.  In

June 2005, the Expanded Treatment was submitted to Marvel.

45.     Marvel, however, found the Expanded Treatment to be "wholly unsatisfactory"

and "contrary to the spirit and letter of the Agreement.  The concept is entirely wrong and the

tone of the [Expanded] Treatment, which is quite dark, is not what Marvel anticipated receiving

at all."

46.     Marvel specifically pointed to the Arachne character and stressed, "The Arachne myth has no place in the *Spider-Man* legend, despite being recounted by Norman Osborn in one of the *Ultimate Spider-Man* comic books."  Marvel went on to state, "We feel the inclusion of Arachne as a motivator and companion to Peter Parker and consequently Spider-Man is unnecessary.  Indeed, it detracts from the ability to tell a story through Peter Parker's eyes."

47.     Marvel was also shocked by some of the elements in Taymor's Expanded Treatment: "Frankly, having J. Jonah Jameson's head bitten off, whether that is supposed to be real or a dream sequence, is simply appalling.  Similarly, having Aunt May murdered and what appears to be a suicide by Arachne are all inappropriate elements."

48.     Moreover, Marvel clearly stated, "We would like this musical to be *true to source material*, to concentrate on Peter Parker's journey and to appeal to all audiences."  (emphasis added).

49.     Upon information and belief, Taymor assured both Marvel and the producers, Garfinkle and Adams, that such concerns would be addressed in the Old Book for the Musical.

50.     Upon information and belief, although Taymor was contracted to serve as a co-writer, it was Berger who performed all of the actual writing in developing the Old Book of the Musical.  While Taymor would tell Berger the general ideas that she wanted incorporated into the story for the show or make comments on Berger's work, Taymor herself did not write any scenes or contribute any lines of dialogue to the Old Book.  Rather, Berger was the one who put pen to paper—or fingers to a keyboard as the case may be—and actually did the writing.

51.     In any case, even after Marvel had seen the Old Book performed at a stage reading, Marvel continued to have many of the same concerns with respect to the Musical.

52.     For example, in August 2007, Marvel informed the production that if unchanged, "the Musical will adversely affect Marvel's brand," as a result of the "level of sexuality and extreme adult themes that are inappropriate both for the character and the musical.  Second, the supporting characters must not overshadow the main character, Peter Parker/Spider-Man."

53.     In response to Marvel's continued concerns, Garfinkle and then-executive producer, Martin McCallum, on behalf of Hello, wrote to Marvel in December 2007, requesting that Marvel reserve judgment until it could see the Musical performed in rehearsals and previews.

54.     Marvel agreed, stating that, "We understand you would prefer to defer a detailed discussion of those issues until rehearsals and previews.  We have no objection to doing so, provided that such discussion occurs sufficiently in advance of the opening for Marvel's concerns to be effectively addressed.  In the meantime, we must reserve all of Marvel's rights."

55.     Thus, Marvel agreed to wait to see the show in rehearsals and previews before commenting further, hoping that its concerns, including the Old Book's dark, adult themes and the fact that the show's main character, Spider-Man, was being overshadowed by what it viewed as an irrelevant detour into the myth of Arachne, would be addressed.

**Cohl and Harris Take Over as Lead Producers And Raise The Funds Needed To Save the** ***Spider-Man*** **Musical**

56.     By the summer of 2009, however, before the show had even started in previews, the *Spider-Man* Musical had encountered numerous set-backs, not the least of which was the fact that the budget for the show had risen well beyond original expectations and the show's construction loan had fallen through.  As a result, the show was in dire need of additional funds. Without such funding, the production would be unable to continue and the *Spider-Man* Musical would never see the stage.

- 41 -

57.     Faced with what appeared to be a hopeless situation, Bono reached out to Michael Cohl, former chairman of Live Nation, founder and chairman of S2BN Entertainment Corporation, and producer of critically acclaimed Broadway shows, including the Tony award-winning shows *Spamalot*, *The Producers*, and *Hairspray*, among many others, as well as award-winning television shows, including the Emmy award-winning show *Pete Seeger: Power of Son*, and films, including *Live at the Max* and *Shine a Light*.  Cohl has also been inducted into the Canadian Music Hall of Fame, has received a star on Canada's Walk of Fame, and has been honored with the Billboard Legend of Live Award and a JUNO Award for Special Achievement.

58.     Cohl and his producing partner, Jeremiah Harris, Chairman and CEO of Production Resource Group, a global supplier of entertainment technologies, whose family has been in the theatre industry for four generations and who has provided production management services for more than 500 productions, including *Beauty and the Beast*, *Starlight Express* and *Sweet Charity*, agreed to take on the challenge of saving the *Spider-Man* Musical and they formed Goodbye for the purpose of assisting in the completion of the production of the Musical.

59.     Although most shows in *Spider-Man's* position would have had no chance of ever opening, the Producers raised tens of millions of dollars to keep the show going.  In addition, both Cohl's and Harris's companies contributed over $20 million dollars to support the show. Taymor, however, refused to contribute any of her own money to help the show.

**Cohl And Harris Work To Fix The Story Of The *Spider-Man* Musical**

60.     On November 28, 2011, the night of the first preview performance, the show had its first full run-through of the story, songs, and staging.  The performance was a disaster: the show ran for over five hours, suffered from numerous technical problems, and had no ending.  It

also became apparent to the Producers and other members of the production team that the Old Book did not work.

61.     The first act of the show loosely followed the classic *Spider-Man* origin story as told in the comic books and the first *Spider-Man* film.  For example, in act one, Peter Parker is introduced as a bookish teenager who is secretly in love with his neighbor, Mary Jane Watson. After visiting a science laboratory and being bitten by a spider, Peter wakes up to find that he has newfound strength and spider-like abilities, which he uses first to fight Mary Jane's boyfriend and school bully, Flash, and also to win a cash prize by defeating "Bonesaw Magraw" in a wrestling match.  Following the death of his Uncle Ben, however, Peter fights crime and ultimately defeats the Sinister Six and the Green Goblin at the end of act one.

62.     Among the concerns of the Producers as well as members of the production, however, was the fact that act one of the show rushed through key moments in the story, failed to develop the characters, and marginalized significant events.  For example, act one did little to show the close relationship that Peter had with his Aunt May and Uncle Ben, failed to articulate Peter's feelings for Mary Jane Watson and show their developing romance, and did not convey to audiences the significance of Uncle Ben's death and the impact it had on Peter.  Act one also strayed from the classic *Spider-Man* origin story as it emphasized the Greek myth of Arachne and also featured a "Geek Chorus," a group of four adolescent comic book fans that represented Taymor, Bono, The Edge and Berger, who appeared to be narrating the story.  This device distanced the audience from the characters and made the plot difficult to understand.

63.     The Producers and other members of the production team also had grave concerns regarding act two, which disregarded the classic *Spider-Man* story completely in favor of a story that focused on Arachne.  For example, in the second act of the Old Book, Peter renounces his

role as Spider-Man altogether and an angered Arachne then takes center stage.  In an effort to convince Peter to put back on his Spidey suit and join her in the Astral Plane, Arachne, who is in love with Peter and yet also wants to devour him, causes a blackout and creates a post-apocalyptic world with illusions of cybervillians that run rampant, provoking terror and destruction.  When Peter does not return to his role of Spider-Man, but rather proposes to Mary Jane, a jealous Arachne is furious, screaming that Spider-Man "was supposed to reclaim his power and then return to Arachne, his perfect mate! . . . What does that little Mary Jane have that I don't have.  Two legs and a pair of shoes.  Well I have eight legs and . . . Get me the shoes!"  The show then takes another detour as Arachne's eight-legged spider minions don stilettos and sing about shoes they stole from various stores.  In the final scene, Arachne literally catches Mary Jane and Peter in her web and declares to Peter, "[h]ere's how we spiders choose our mate . . . by attacking!"  Arachne then lunges for Peter in an attempt to both devour him and possess him.  In an effort to save Mary Jane, Peter gives in to Arachne.  Arachne then inexplicably releases both Mary Jane and Peter.  The show then ends abruptly as the curtain comes down with no real finale.

       64.     The Producers repeatedly raised with Taymor their concerns regarding the Old Book, including their concerns that: the Old Book veered away from a faithful retelling of the *Spider-Man* story as depicted in the comic books and the films, including Peter's relationship with Aunt May and Uncle Ben and his romance with Mary Jane, choosing instead to overemphasize Arachne; the Musical reached its climax at the end of act one when Spider-Man battled with Green Goblin; the story was very hard to understand and not believable; and the Musical emphasized many adult themes that were inappropriate for a large portion of the Musical's intended audience, namely children.  In addition, the Producers tried to discuss with

Taymor the idea of moving the battle between Spider-Man and the Green Goblin to the end of the show.  Taymor, however, argued that such an idea would not work and assured the Producers that the show was not yet done and that changes would be made to address their concerns.

65.     Believing that Taymor, as the show's co-bookwriter and collaborator, would make the necessary changes to the Old Book and that she would collaborate with the other members of the production—as she was contractually obligated to do—the Producers continued to support the Musical and waited to see the Musical in its completed form, after the changes that Taymor had promised to make.

66.     By December 2011, however, it became apparent to the Producers that the changes that Taymor had promised had not been made and that Taymor had no intention of making any significant alterations to the Old Book of the Musical.  Even worse, as the show continued in previews, it also became apparent to the Producers, Berger, Bono, The Edge, and many other members of the production that audiences were not connecting with the story.

67.     As Berger recounted in an interview:

"There was a moment right before that Christmas break . . . I was watching a mother and her young boy walking back from the bathroom sometime in the middle of Act Two.  And the expression of the boy's face told me everything that I needed to know.  He just seemed disheartened.  And it was so sad.  At intermission, we had a show that left people a-buzz . . . And you could see over the course of the second act that we gradually lost the audience bit by bit. . . The show felt like it was meandering off into just a whole irrelevant territory. . . . And so in my mind, the narrative, the structure, had to change."

68.     Determined to find a way to fix the show, Berger conceived of several plans.  His first plan, "Plan A," involved a ten-minute cut to the second act of the show.  Although Bono and The Edge and other members of the production supported the plan, Taymor refused to consider Berger's idea, calling Plan A "a mastectomy."

69.     Berger then proposed what he called "Plan C," which he saw as a compromise and which entailed only a 4-minute cut to act two.  Taymor rejected this idea as well.  Taymor even told Berger that if he continued to push for changes, she could no longer work with him.

70.     On December 30, 2010, the show's scenic designer, George Tsypin ("Tsypin"), an award-winning sculptor, architect and designer of musical theatre, including *The Little Mermaid*, as well as operas all over the world, including the Salzburg Festival, Opera de Bastille in Paris, Covent Garden in London and the Metropolitan Opera in New York, told Cohl in an email that:

> I can't keep quiet, I just have to express my strong conviction that executing Glen's idea for a major cut in Act 2 is our only chance at saving the show.  What he is suggesting represents a brilliant breakthrough that would intensify and give great urgency to the storytelling in the second act, eliminating a couple of truly embarrassing and unnecessary numbers at the same time.  It is the only idea I heard so far that has real muscle, everything else is just tinkering at the edges. EVERYONE agrees except Julie.  I felt (I told Glen Berger) you are the only one who can come up with a smart strategy to convince Julie.  I've known her for twenty years, you met her relatively recently, but you know very well how she can dig her heels in.  It will be a major battle, but it has to be done.  It is truly a matter of life and death of this production.

71.     As Taymor told *The New York Times* in January 2011, however, she was "not changing the story."

72.     In fact, when a cast member questioned a single line in the Book of the Musical because he felt it was not being well-received by the audience, Taymor responded, "I don't give a f#*! about audience reaction!"

73.     On January 7, 2011, Bono wrote an email to Berger, criticizing Taymor for "shooting ideas down before taking time to understand them."

74.     Frustrated with Taymor's refusal to collaborate on the *Spider-Man* Musical, on

January 20, 2011, Berger wrote an email to the show's then choreographer, Daniel Ezralow,

stating:

> I was hired to do a job.  My job at this stage is to use every skill I possess to
> figure out how to make this show work.  And if I'm told by my collaborator [Julie
> Taymor] that disagreement with her won't be tolerated, if I'm told my ideas and
> opinions aren't worth careful consideration, if I'm told to just shut up and do what
> I'm told, then yes, maybe I should have just walked away three weeks ago.  But I
> don't believe in walking away.  And besides, Michael [Cohl] and Jere [Harris]
> brought this show back from the dead last year.  BACK FROM THE DEAD.
> Years of our lives would have been completely wasted if not for Michael's
> incredible efforts to raise another 50 MILLION DOLLARS.  If they want to know
> what my ideas are, damn straight I'm going to tell them my ideas -- they have
> every right in the world to know.  And yeah, Julie forbade me from telling them,
> and said she wouldn't be able to work with me if I started telling other people my
> ideas, or if I even started bringing them up to her.  That was wrong of her … And
> believe me, the choice I've made is to keep trying to get all sides to come
> together, and -- most of all -- to be reality-based.  Danny--the evidence is
> Overwhelming--the show is failing.  Word of mouth is poor.  Very poor.  Is that
> Julie's fault?  Actually, No.  But word of mouth is poor because of the
> bookwriting.  And if she refuses to listen to her co-bookwriter, and if she refuses
> to substantively improve the book, and the show consequently closes, then yes, it
> will be completely her fault, and I'll definitely be of the mind that as both an artist
> and a friend, she dropped the ball.

75.     Unable to bear the audience's lackluster response night after night, Berger

continued to look for ways to fix the show.  In or around January 2011, he developed a third

plan, which he called "Plan X."  As Berger later explained in an interview, "Plan A was rejected.

And then of course there was Plan C, which was a compromise of Plan A, and that was rejected.

And that's why Plan X was Plan X, because Plan X wasn't just Plan D or E or F, this was a

radical jump."

76.     Under this plan, a new book for the show would be developed that followed the

classic *Spider-Man* storyline, rather than Taymor's convoluted, post-apocalyptic Arachne story.

Most importantly, Spider-Man would finally take his rightful place as the central focus of the

show, with Arachne receding into the backdrop as a guardian angel-like figure, and the Green

Goblin would serve as Spider-Man's primary foe, as he had in the films.  In addition, the show's

distracting "Geek Chorus" would be eliminated completely.  Moreover, the themes and plot lines

from the comic books and films would be emphasized, including Peter and Mary Jane's

romance, Peter's relationship with Uncle Ben and Aunt May, and the tragic loss of Uncle Ben.

Finally, the show would culminate in a battle between Spider-Man and the Green Goblin.

77.     When Berger tried to discuss Plan X with Taymor, however, she again refused to

talk to him and again threatened that if he pushed to change the show, he would be terminated.

Nonetheless, in or around February 2011, Berger emailed Taymor an outline of Plan X.

78.     Similarly, other production members were also pushing for changes to the show.

For example, on January 31, 2011, Tsypin wrote another email to the Producers, this time on

behalf of the "people who created the show and invested an inordinate amount of time and

creative energy, committing huge chunks of their lives into the project."  Tsypin stressed to the

Producers:

> [A]mong this second group of investors, there is a strong consensus that the show
> should be drastically revamped . . . Tweaking the script here and there, finessing
> music and acting, while necessary, doesn't address the fundamental problem.  We
> feel that the right plan is to de-emphasize Arachne and shift the focus from a
> pseudo-feminist, somewhat artificial take on the story back to Spiderman; the
> super hero.  This is the story that the whole world loves and wants to see.

79.     After Taymor became aware that Tsypin supported such changes to the Book, she

stopped speaking to him altogether, in breach of her duties as a collaborator.

80.     During this same period, the Producers hired a company to conduct focus group

surveys, in an effort to better assess how audiences felt about the show.  The survey results only

confirmed the instincts of the production's theatre professionals that the Old Book was not

working: survey respondents scored the show well below the industry average along several

measures.  In particular, the surveys plainly showed that "the story" was the element that audiences liked least about the Musical, as they found it difficult to understand and "not engaging enough."  Many audience members indicated that they wanted more story development, a greater sense of the characters, and a "better story flow."  As one audience member stated,

> I don't think there was enough attention paid to the story line.  I developed no emotional attachment to the characters.  A more dramatic conclusive fight sequence would have provided a more powerful feeling at the end.

81.     Audience members also felt that the role of Arachne was unclear and undeveloped and they did not understand her relevance to the overall story.  Respondents were confused by Arachne's ambiguous relationship with Peter and raised questions such as, "Who was she and where did she come from?  How was she 'related' to Peter Parker?  What was the Astral Plane?  What was the 'shoes' song about?"  In addition, respondents felt that the relationship between Peter and Arachne lacked conflict, intrigue, and suspense.

82.     As the focus groups confirmed what the Producers and members of the production had been saying, the Producers knew that unless something was done to fix the show, the show would close.  The Producers sent Taymor a copy of the results.

83.     In a February 24, 2011 email to Cohl, however, Berger explained the challenges that he was facing in trying to co-bookwrite and collaborate with Taymor, stating:

> There's a difference between "A production of spider-man, directed by julie taymor" and "A julie taymor production."  7 years of circumstances have allowed what should have been the former to become the latter.  Seeking changes to a show about spider-man?  Not a problem.  It's a freaking show.  about spider-man. It shouldn't be a problem.  But Seeking changes to a show that is primarily about "the vision of julie taymor" -- It's perceived (by her) as, at best, 'not worthy of being heard" and, at worst, as a personal attack.  Almost by definition, the only person who can have any input into a "julie taymor production" is julie taymor. And therein lies the rub…

- 49 -

84.     Thus, it became increasingly clear that Taymor would not consider changes to the show that at all reduced the role of the hubris-filled Arachne, nor would she consider revising the story so that it was true to the source material.

**The Early Reviews Of The Show Were Uniformly Negative**

85.     Although the Musical was originally scheduled to open on 2010, the Producers, Taymor, and the rest of the production team realized that the show was not ready to open and the opening had to be pushed back.  Then, as problems continued to mount, the opening was postponed several more times and the show continued in previews.  In February 2011, although the show was still in previews, the critics decided to review the show anyway.  The reviews were scathing.

86.     The *Philadelphia Inquirer* reported that the *Spider-Man* Musical was "like a beautifully drawn comic without much thought as to what's in the balloons above everyone's heads.  The show's book, by Taymor and Glen Berger, has too much plot, too much padding, and almost no wit.  Its laugh lines almost all fall flat - and start out that way.  Its draggy framework - four actors playing teens . . . trying to create a *Spider-Man* story - pulls everything down, forget the flying."

87.     According to the *Telegraph*, "[t]he director Julie Taymor, who was responsible for the hugely enjoyable stage version of Disney's *The Lion King*, has come up with a dire script in collaboration with Glen Berger.  Not only does she drag the ancient Greek myth of Arachne into the storyline, a brilliant weaver who was turned into a spider by the goddess Athena, she has also added a Geek Chorus (geddit?) of nerdy comic-book fans who are supposed to be making up the narrative as the show progresses.  As a result the production often seems both baffling and

pretentious.  We are a long way here from the guilty pleasures of the Marvel comic-books and the terrific *Spider-Man* movies."

88.    The *Los Angeles Times* also criticized the show's storytelling, stating that "[t]he production, lacking the clarity that's born out of tough choices, adds when it should subtract, accelerates when it should slow down . . . The book, by Taymor and Glen Berger, is an absolute farrago, setting up layers and subplots before the main narrative line has been established."

89.    According to *The New York Times,* "'*Spider-Man*' is so grievously broken in every respect that it is beyond repair. . . . For a story that has also inspired hit action movies, it is remarkably static in this telling."

90.    The *Windsor Star* reported that, "[t]his time, Taymor, who wrote the excuse for a book with Glen Berger, has concocted an incoherent mess and stylistic mishmash."

91.    According to *Hollywood Reporter*, "[w]hat really sinks [the show] is the borderline incoherence of its storytelling."

92.    *Backstage* stated that, "Arachne's motives are never clearly laid out and her whole story arc is a head-scratcher."

93.    Such reviews reflected the concerns that members of the production team had been voicing to Taymor for months, but that Taymor had refused to hear.  Moreover, despite the appeals of even Taymor's own personal assistant, who hoped that Taymor would "ultimately understand that with great power (and great budgets) comes great responsibility," Taymor refused to even read the reviews.

**Because Taymor Refused To Do The Jobs She Was Contracted To Do, The Producers Had No Choice But To Terminate Her**

94.    After the poor focus group results and the bad reviews confirmed what the Producers and other members of the production had been saying about the show, conventional

- 51 -

wisdom would have been to close the show rather than throw good money after bad.  The

Producers, however, believed in the concept of a *Spider-Man* musical and that the show could be

saved if it became true to the *Spider-Man* story.  But if changes were not made, the *Spider-Man*

Musical would close by the end of March, and investments in the show would be lost and the

cast and crew of the show would be out of work.

95.     Thus, on February 16, 2011, Cohl met with Taymor in an effort to find a path

forward for the show.  He explained to Taymor that the show was failing in the two places that

mattered most -- the level of audience reaction and box office sales.  Unless something was done

to improve both, the show would have to close.  The only path forward was to implement serious

changes to the Old Book of the Musical to help turn things around.

96.     Cohl then had another two hour conversation with Taymor on February 20, 2011,

when he again reiterated that the story of the Musical did not work and that the show needed to

be fixed or else it would close.  Taymor, however, continued to resist any significant changes to

the Musical.

97.     On February 26, 2011, the Producers met with Taymor again, this time along with

Bono, The Edge, Berger and Taymor's attorney, Seth Gelblum, to consider the Musical's

options.  The Producers once again made it clear that if the show were to continue in its current

state, the production would run out of money within a month and it would close.

98.     The Producers pleaded with Taymor, begging her to support Plan X so that the

show would have a chance at continuing to run and hopefully being successful.

99.     Taymor, however, argued that Plan X would not work and, once again, she

assured the Producers, as well as Bono, The Edge, and Berger, that she was making significant

changes to the show.  Taymor convinced them to continue to withhold their judgment until they

- 52 -

could see the show again.  Shortly following that meeting, however, the Producers found out that no significant changes were planned and that Taymor had misled them to believe that anything more than *de minimis* changes were being made.

100.    On March 4, 2011, the Producers met with Taymor again.  Despite the fact that the Producers, Bono, The Edge and Berger were in favor of saving the show by implementing a New Book based on Plan X, Taymor stated that she would not be a part of Plan X.

101.    Because Taymor would not collaborate with the other members of the production or agree to co-write the new version of the Musical, the Producers had no choice but to terminate Taymor as both a collaborator and a co-bookwriter.  In addition, Taymor was also terminated as the director of the Musical.

### The Production Incurred Significant Costs As A Result of Taymor's Failures

102.    As a result of Taymor's refusal to perform her duties, the Producers had to hire and pay a new co-writer, Roberto Aguirre-Sacasa, to assist Berger in writing a New Book for the show.  The Producers also hired a new director, Philip Wm. McKinley -- director of the five-time Tony-nominated Broadway musical *The Boy From Oz*, starring Hugh Jackman -- to direct the new show.

103.    Over the course of the next three months, Berger and Aguirre-Sacasa spent countless hours crafting a new storyline, writing new dialogue, and creating new scenes for what would be a New Book for the *Spider-Man* Musical.

104.    As Taymor was well aware, during this time, the cast of the show was also working around the clock, performing the old version of the show at night, while rehearsing the new version of the show during the day.

105.    In order to implement the New Book, the show had to close for three-and-a-half weeks, forgoing much-needed revenue from ticket sales and refunding previously sold tickets for the cancelled performances while continuing to incur the Musical's ongoing expenses.

106.    In order to cover the costs of closing the show and implementing the New Book, and to allow the *Spider-Man* Musical to keep going against all odds, the Producers on behalf of 8 Legged, once again, had to raise more money for the show.  Although many thought it could not be done, the Producers were able to raise nearly $13 million, in addition to what had already been invested, to keep the show alive.  It should be noted that although Taymor, upon information and belief, is a woman of means, she refused to invest any of her own money in the show.

107.    During this time, the Producers bent over backwards to allow Taymor to save face and make a graceful exit from the show, issuing a press release making it appear as if she was leaving the show as a result of a scheduling conflict.  The Producers also consulted Taymor on her credits, allowing her to be listed as co-bookwriter of the show along with Berger and Aguirre-Sacasa, and also allowing her credits, as she desired, as "original direction by Julie Taymor," while the new director, Philip McKinley, would be listed as the "creative consultant." Taymor knew of, agreed to and negotiated these billing arrangements.

**The New and Improved *Spider-Man* Musical Is A Success**

108.    The Musical went back into previews on May 12, 2011 with the New Book, which tracked the *Spider-Man* comic books and films, in place.

109.    The *Spider-Man* Musical finally had its official opening on June 14, 2011. Taymor insisted on attending.  Although the Producers initially thought that Taymor's

attendance would be distracting to the new creative team, they ultimately acquiesced and even arranged to call her onto the stage and embrace her.

110.     The New Book above all else is the classic story of how Peter Parker, a nerd fascinated by science and harassed by school bullies, was transformed by a spider bite into the super strong, fast and agile Spider-Man.  Central to the New Book's story are Peter's close relationship with his Aunt May and Uncle Ben and his romance with Mary Jane, which blossoms from a school crush to true love.  The New Book also follows the story of Peter's attempt to make some quick money by trading on his super powers only to learn that his inaction at a crucial moment cost his beloved uncle his life, which leads Peter to use his super powers for the good of people of New York.  Spider-Man's primary nemesis in the New Book is Green Goblin who, along with his "Sinister Six" crew of villians, is bent on destruction and terror.  The story also includes Arachne, but in the minor role of Spider-Man's guardian angel, appearing in his dreams just when he most needs encouragement to continue his super-heroic efforts as Spider-Man.  The New Book reaches its climax at the end of the second act when, as in the *Spider-Man* film, Spider-Man saves Mary Jane, and Green Goblin and Spider-Man engage in an epic battle that ends with Green Goblin's accidental death.  As the curtain falls, Mary Jane reveals, as she did in *Spider-Man 2*, that she knows Peter is Spider-Man, and they share the upside down kiss depicted in one of the signature scenes from the first film.

111.     As *The New York Post* reported in its review after the Musical opened, "[a]lmost every facet of the play has been completely transformed, from the opening act - in which Peter Parker now gives a book report instead of saving Mary Jane at the Brooklyn Bridge - to the original's underlying Greek tragedy theme.  In its newest incarnation, its mythical pretensions - which irked many critics and left audience members scratching their heads - have been stripped

out and replaced with a plot that hews more closely to Spidey's original comic-book sensibilities. Bono and the Edge contributed a handful of new songs. But perhaps the most symbolic change comes in the metamorphosis of the character Arachne, who many believed the original writer and director - the since-ousted Julie Taymor - had created to represent herself."

112.     According to *Newsday*, "The changes to the show involve wholesale deletions of scenes and characters . . . and a new emphasis on the human factor that has made Spider-Man so popular since Lee and artist co-conceptualizer Steve Ditko devised the character in 1962."

113.     The *Newsday* article went on to list just a few of the changes to the Musical, including:

"GONE: The Geek Chorus of four teenage Spider-Man fans who framed the story.

GONE: The mind-boggling musical number 'Deeply Furious,' in which Arachne and her spider-women minions do a dance with designer footwear that these powerful mythological beings have, well, stolen from New York City shoe stores.

REDUCED: The role of the spider-goddess Arachne, widely seen as a Taymor manqué, who manipulated the actions of the story and created illusions that only made a labyrinthine script even murkier.

EXPANDED: The role of Spider-Man's arch-nemesis the Green Goblin, played by Broadway wonder Patrick Page.

EXPANDED: The roles of such supporting characters as Peter Parker's Aunt May and Uncle Ben, and his sweetheart Mary Jane Watson.

CHANGED: The pivotal death that causes Peter Parker to realize that, 'With great power there must also come great responsibility.'"

114.     The production team could see for themselves that the audience was now enthusiastically responding to the show and understanding the story. The new show also received much improved reviews.

115.    Backstage.com wrote, "[w]hat an improvement.  The tangled plot threads that made the new musical 'Spider-Man: Turn Off the Dark' a sticky mess during its record-breaking preview period have been unraveled and woven into an exciting web of wonder."

116.    The *New York Daily News* stated, "Emerging from all that tangled drama, Spidey 2.0 is more cohesive and streamlined and funnier than before."

117.    According to WOR Radio, "[t]he pundits said it couldn't be done. *Spider-Man* is now fantastic -- in fact, sensational!  A spectacle for the ages!"

118.    MTV.com called the new *Spider-Man* show "[t]he show we all hoped it would be! A fun, high-flying adventure with New York City's favorite web-slinger."

119.    The *Philadelphia Inquirer* wrote, "The new *Spider-Man* is all for fun, a live-on-stage comic book, pure and simple - precisely what the last version wasn't, and what its team, on hiatus for several weeks of rewrites and rehearsals, reimagined."

120.    The *Los Angeles Times* wrote, "'Spidey 2.0,' as the once-pretentious, hitherto-arty, forever-costly musical called 'Spider-Man: Turn Off the Dark' is now colloquially known, is quite startlingly different from the disastrous original incarnation of the comic-book musical that humbled Bono and the Edge and ate Julie Taymor alive.  Given the limited amount of fix-'er-up time, and the depths of incoherence from which this show had to rise, 2.0 is a remarkable achievement for those who have toiled for coherence and a measure of absolution in this dangerously tangled web."

121.    Moreover, new focus group surveys, conducted in July 2011, showed a dramatic increase in audience satisfaction.

122.    It has since become clear that *Spider-Man* is now a hit.  At the end of December, it was reported that the Musical had the biggest weekly gross of any show in Broadway history.

Yet, in light of all of the delays and increased expense due to Taymor's actions, the show is not out of the woods.  Rather, in order for the show to survive, and for it to continue to provide jobs to the cast and crew and allow investors to recoup their investment, the show must continue to perform well.

**Taymor Is Attempting To Profit From The Work Of Others**

123.     Now that the show is a success, Taymor is trying to compel payment from the production as if she had fulfilled all of her contractual obligations.  However, as Taymor did not co-write anything, she did not fulfill her obligations under her Co-Bookwriter Agreement. Nevertheless, although the Producers do not believe Taymor was owed any money, in an effort to avoid litigating the issue, they made a payment on November 4, 2011 of the amount Taymor would have been owed during the time the Old Book was in use had she not breached her agreement.

124.     Taymor is not, however, entitled to profit from the *Spider-Man* Musical that is currently on Broadway, which is not the result of Taymor's work as co-bookwriter or collaborator.  Rather, the New Book of the current *Spider-Man* Musical was written by Berger and Aguirre-Sacasa, who had to be contracted to do the work that Taymor refused to do.

125.     Taymor also claims that she is a joint author of the Old Book of the *Spider-Man* Musical.  In October 2011, Taymor registered the Old Book with the Copyright Office as a joint work authored by herself and Berger, without informing anyone from the Musical, including Berger—her supposed co-author.  Taymor, however, is not a joint author of the Old Book, because she did not contribute any independently copyrightable expression to the Old Book.

126.     Further, Taymor misrepresented to the Copyright Office that the only copyrightable materials taken from the *Spider-Man* story in creating the Old Book were the

"[c]haracters and setting from the *Spider-Man* comic books" and the Swiss Miss and Arachne characters.  The Old Book's plot, premise, and various scenes, among other elements, however, are copied from the pre-existing *Spider-Man* comic books as well as the *Spider-Man* films.

127.    Due to Taymor's intentional material misrepresentations of her authorship of the Old Book and which pre-existing works the Old Book was based on, Taymor's copyright registration in the Old Book is invalid.  Moreover, the New Book is not substantially similar to the Old Book, nor is it substantially similar to Taymor's three-page "Treatment."

128.    On November 8, 2011, Taymor and LOH brought this action against the Counterclaim Plaintiffs, among others, demanding royalty payments for Taymor's work as a co-bookwriter for as long as the *Spider-Man* Musical runs, in an attempt to put Taymor in the same position she would have been had she fulfilled her obligations under her agreement and actually written a book for the *Spider-Man* Musical that could be opened on Broadway.  Plaintiffs' lawsuit also claims that the Old Book and the Treatment have been infringed by the New Book, which manifestly is not the case.  Further, Plaintiffs claim that Taymor's right of privacy has been violated, which again is not the case.

129.    By filing suit, Taymor and LOH are also attempting to prevent 8 Legged from bringing the Musical to non-Broadway venues regardless of the fact that Taymor herself originally did not want the show to be on Broadway, but rather, as she stated in an interview in February 2011, "wanted it to be in the circus down on Madison Square Garden or in some circus tent on the East River or across the East River in Central Park."  Moreover, although Taymor was well aware that 8 Legged planned to bring the show to non-Broadway venues so as to allow the show to be successful, at no time did Taymor object.  By trying to control the future of a show that she is no longer involved in, Taymor not only threatens to limit the public's ability to

enjoy the *Spider-Man* Musical, but she also attempts to impair the interest of the show's investors' and put the cast and crew of the show out of work.

130.    Taymor, however, was well aware that a New Book was being implemented for the Musical.  She knew that a new writer and a new director were hired, even negotiating what her billing would be.  She knew that the performers were rehearsing the New Book during the day, while still performing the Old Book at night.  She also knew that the show was closed for three-and-a-half weeks to implement the New Book, as well as other changes.  She even was present on opening night when the New Book was performed.  At no point during all of that time, however, did Taymor ever indicate that she thought the New Book violated her rights or seek to enjoin the show.  Instead, having waited five months after the opening night, she has filed this action.

131.    In light of Plaintiffs' actions, Counterclaim Plaintiffs had no choice but to assert the following counterclaims in order to prevent Taymor from profiting from the work of others and from undermining the *Spider-Man* Musical's ability to make money, provide jobs, and be shared with audiences throughout the world.

### FIRST COUNTERCLAIM

**Breach of Contract – Collaborator Agreement**
**(Brought by 8 Legged Against Taymor and LOH)**

132.    Counterclaim Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 131 as if fully set forth herein.

133.    On July 12, 2005, LOH, on behalf of Taymor, and Hello, on behalf of the then producers of the Musical, Adams and Garfinkle, entered into a valid and enforceable Collaborator Agreement whereby Taymor would "collaborate on the creation of a dramatic-musical work for the legitimate stage presently entitled 'Spider-Man: A Musical Web'."

134.    In or around August 20, 2011, this agreement was assumed by 8 Legged as the successor in interest to Hello.

135.    Taymor breached her obligations under the agreement by failing to perform her duties as a collaborator and refusing to collaborate with other members of the production, among other things.

136.    Taymor's nonperformance of her contractual promises justified treating the contract as rescinded and discharged the Counterclaim Plaintiffs' duties under the contract.

137.    As a direct and proximate result of Taymor's breach, 8 Legged has been damaged and has suffered actual damages in an amount to be proved at trial.

## SECOND COUNTERCLAIM

### Breach of Contract – Co-Bookwriter Agreement
### (Brought by 8 Legged Against Taymor and LOH)

138.    Counterclaim Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 137 as if fully set forth herein.

139.    On August 4, 2005, LOH, on behalf of Taymor, and Hello, on behalf of the then-producers of the Musical, Adams and Garfinkle, entered into a valid and enforceable Co-Bookwriter Agreement whereby Taymor would serve as "co-owner/co-writer" of the book for the *Spider-Man* Musical.

140.    In or around August 20, 2011, this agreement was transferred to 8 Legged as the successor in interest to Hello.

141.    Taymor breached her obligations under the agreement by refusing to perform her duties as a co-writer of the Book, including, among other things, (i) failing to actually write any text for the Book; (ii) failing to make the changes to the Book requested by the Producers; (iii) failing to produce a finished book prior to the first public performance of *Spider-Man* or any

time thereafter; (iv) insisting—despite the protestations of Answering Defendants, the Musical's other collaborators and Marvel—that the *Spider-Man* Musical focus on the character of Arachne and relegating the *Spider-Man* character to a minor role; and (v) preventing her co-bookwriter, Berger, from making the changes to the Book requested by the Producers.

142.    Taymor's nonperformance of her contractual promises justified treating the contract as rescinded and discharged the Counterclaim Plaintiffs' duties under the contract.

143.    As a direct and proximate result of Taymor's breach of the specific and implied terms of the Co-Bookwriter Agreement, 8 Legged has been damaged and has suffered actual damages in an amount to be proved at trial.

## THIRD COUNTERCLAIM

### Breach of Fiduciary Duty
### (Brought by Goodbye Against Taymor)

144.    Counterclaim Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 150 as if fully set forth herein.

145.    In October 2009, Hello and Goodbye as "Partners" entered into a joint venture agreement, which was then amended in August 2010 (the "Joint Venture Agreement").

146.    The purpose of the Joint Venture Agreement was to "produce and present the Musical throughout the world."  The Joint Venture Agreement also set out how profits arising out of the Musical were to be distributed.

147.    Pursuant to the Joint Venture Agreement, a six person board was established to make all major decisions in connection with the production.

148.    Taymor was designated as a member of that board and received notices of all board meetings.  When Taymor was unable to attend a board meeting, her attorney, Gelblum,

informed the board that Taymor would not be available to participate.  On at least one such occasion, Gelblum also attended a board meeting on Taymor's behalf.

149.    In or around December 2010, Taymor participated in a meeting of the board via telephone and cast her vote as a board member in favor of a proposal for refinancing the show.

150.    Taymor remained a member of the board until June 2011, when Gelblum communicated to Counterclaim Plaintiffs' counsel that Taymor was resigning from the board.

151.    As a member of the Joint Venture Agreement board, Hello and Goodbye placed trust and confidence in Taymor.  As such, Taymor owed a fiduciary duty of loyalty to act in the best interests of both Hello and Goodbye, and thus the production, rather than in her own personal interests, and not do anything to undermine the success of the show.

152.    Despite the evidence that the Old Book needed to changed in order to make the show commercially viable, Taymor put her own personal interests ahead of those of the show and refused to collaborate with members of the production or support changes to the show that would allow the show to be successful, all in breach of her duty of loyalty.

153.    As a direct and proximate result of Taymor's breach, Counterclaim Plaintiffs have been damaged and have suffered actual damages in an amount to be proved at trial.

## FOURTH COUNTERCLAIM

### Declaratory Judgment – Taymor Is Not a Joint Author of the Musical
### (Brought by 8 Legged, Goodbye, Savior, Cohl and Harris Against Taymor)

154.    Counterclaim Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 153 as if fully set forth herein.

155.    Although Taymor was employed to serve as a co-bookwriter of the book for the Musical, Taymor did not write any of the text in the Book.

156.    Rather, her co-bookwriter, Berger, performed the task of writing the book, while Taymor contributed only abstract, general ideas regarding the Musical's basic plot.

157.    Taymor did not make an independently copyrightable contribution to the Book of the Musical.  Thus, under the Copyright Act, 17 U.S.C. § 101 *et seq.*, the Book is not a joint work, and Taymor is neither a joint author of the Book nor a co-owner of the copyright in the Book.

158.    Although Taymor did not contribute any independently copyrightable material to the Book of the Musical, Taymor intentionally misrepresented to the Copyright Office that she is a joint author of the Book and registered the Book as such with the Copyright Office.

159.    An actual, present, and justiciable controversy exists as to whether Taymor can be considered a joint author of the book.

160.    Counterclaim Plaintiffs are entitled to a declaratory judgment under 28 U.S.C. § 2201 that Taymor is not a joint author of the book.  Moreover, Counterclaim Plaintiffs are entitled to a permanent injunction directing that copyright registration No. PAu 3-576-391 be cancelled.

## FIFTH COUNTERCLAIM

**Declaratory Judgment – Counterclaim Plaintiffs Have the Right to Produce the New Version of the *Spider-Man* Musical in Non-Broadway Productions (Brought by 8 Legged Against Taymor and LOH)**

161.    Counterclaim Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 160 as if fully set forth herein.

162.    From its inception, the Producers of the *Spider-Man* Musical have planned for the *Spider-Man* Musical to continue to run on Broadway, while the Musical is mounted in non-Broadway venues.

163.     Taymor, who has been aware of this plan, is now attempting to gain leverage over the Producers by seeking to enjoin any future non-Broadway productions of the Musical.

164.     Neither 8 Legged nor Hello are required to obtain Taymor's or LOH's approval to perform the *Spider-Man* Musical in other venues.

165.     Taymor would not suffer any irreparable harm as a result of the *Spider-Man* Musical's expansion to other venues.

166.     An actual, present, and justiciable controversy exists as to whether Taymor can obtain an injunction with respect to non-Broadway productions of *Spider-Man*.

167.     Counterclaim Plaintiffs are entitled to a declaratory judgment under 28 U.S.C. §2201 that 8 Legged has the right to produce or license a version of the Musical to be performed in a venue other than on Broadway.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Counterclaim Plaintiffs respectfully request judgment against Counterclaim Defendants as follows:

1.     Find that Taymor breached the Collaborator Agreement;

2.     Find that Taymor breached the Co-Bookwriter Agreement;

3.     Find that Taymor breached her fiduciary duties as a board member;

4.     Declare that Taymor is not a joint author of the Old Book;

5.     Declare that Taymor and LOH are barred from enjoining 8 Legged from producing or licensing a version of the Musical to be performed in a venue other than on Broadway;

6.     Grant a permanent injunction ordering Ms. Taymor to cancel copyright registration No. PAu 3-576-391;

7.     Grant an award of damages to be proved at trial for Taymor's breaches of contract and breaches of fiduciary duty;

8.     Grant an award of Counterclaim Plaintiffs' costs and disbursements in this action, including reasonable attorneys' fees, pursuant to 15 U.S.C. § 1117; and

9.     Grant such other, further, and different relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Counterclaim Plaintiffs demand a trial by jury on all issues so triable in this action.

Dated:  New York, New York
         January 17, 2012                    _/s/ Dale Cendali_
                                             Dale Cendali
                                             Claudia Ray
                                             Courtney L. Farkas
                                             Joshua L. Simmons
                                             KIRKLAND & ELLIS LLP
                                             601 Lexington Avenue
                                             New York, New York 10022
                                             Telephone: (212) 446-4800
                                             dale.cendali@kirkland.com
                                             claudia.ray@kirkland.com
                                             courtney.farkas@kirkland.com
                                             joshua.simmons@kirkland.com

                                             Attorneys for Defendants and
                                             Counterclaim-Plaintiffs
                                             8 LEGGED PRODUCTIONS, LLC,
                                             GOODBYE ENTERTAINMENT, LLC,
                                             SAVIOR PRODUCTIONS, LLC, MICHAEL
                                             COHL AND JEREMIAH HARRIS