Dale Cendali
Claudia Ray
Courtney L. Farkas
Joshua L. Simmons
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
dale.cendali@kirkland.com
claudia.ray@kirkland.com
courtney.farkas@kirkland.com
joshua.simmons@kirkland.com

*Attorneys for Defendants*
*8 Legged Productions, LLC; Goodbye*
*Entertainment, LLC; Savior Productions, LLC;*
*Michael Cohl and Jeremiah Harris*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JULIE TAYMOR AND LOH, INC.,<br><br>               Plaintiffs,<br><br>     - against -<br><br>8 LEGGED PRODUCTIONS, LLC; HELLO ENTERTAINMENT, LLC; GOODBYE ENTERTAINMENT, LLC; SAVIOR PRODUCTIONS, LLC; MICHAEL COHL; JEREMIAH HARRIS; AND GLEN BERGER,<br><br>              Defendants. | Case No.  11 Civ. 8002 (KBF)<br><br>       ECF Case<br><br>**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS BY DEFENDANTS 8 LEGGED PRODUCTIONS, LLC, GOODBYE ENTERTAINMENT, LLC, SAVIOR PRODUCTIONS, LLC, MICHAEL COHL AND JEREMIAH HARRIS** |

8 LEGGED PRODUCTIONS, LLC; GOODBYE
ENTERTAINMENT, LLC; SAVIOR
PRODUCTIONS, LLC; AND MICHAEL COHL;
JEREMIAH HARRIS,

               Counterclaim-Plaintiffs,

    - against -

JULIE TAYMOR AND LOH, INC.,

               Counterclaim-Defendants.

---

GLEN BERGER,

               Counterclaim-Plaintiff,

    - against -

JULIE TAYMOR AND LOH, INC.,

               Counterclaim-Defendant.

# TABLE OF CONTENTS

**Page**

**PRELIMINARY STATEMENT** ...................................................................................1

**FACTUAL BACKGROUND** ....................................................................................2

    I.    THE PREEXISTING WORKS........................................................................2

        A.    The *Spider-Man* Comic Books ...........................................................2

        B.    The *Spider-Man* Films .......................................................................3

    II.    THE *SPIDER-MAN* MUSICAL'S BOOK.....................................................4

    III.    TAYMOR'S "SPIDERMAN/CAUGHT" TREATMENT ...............................5

**ARGUMENT** .........................................................................................................6

    I.    LEGAL STANDARD...................................................................................6

    II.    PLAINTIFFS CANNOT STATE A CLAIM FOR COPYRIGHT
        INFRINGEMENT.........................................................................................7

        A.    Elements of a Copyright Infringement Claim.................................7

        B.    The New Book Is Not Substantially Similar to the Treatment .................10

            1.    The Characters Of The Works Are Not Similar ...........................11

            2.    The Works' Plot Elements Are Not Similar .................................14

            3.    The Settings Of The Works Are Not Substantially Similar..........22

            4.    The Themes Of The Works Are Not Similar.................................23

            5.    Total Concept and Feel Of The Works Differ ..............................24

**CONCLUSION** .....................................................................................................**25**

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alexander v. Murdoch*,
  No. 10 Civ. 5613, 2011 WL 2802899 (S.D.N.Y. May 27, 2011) ........................................ 9, 19

*Alexander v. Murdoch*,
  No. 10 Civ. 5613, 2011 WL 2802923 (S.D.N.Y. July 14, 2011).............................................. 9

*Allen v. Scholastic Inc.*,
  739 F. Supp. 2d 642 (S.D.N.Y. 2011) ................................................................... 8, 9, 14, 24

*Arden v. Columbia Pictures Industries, Inc.*,
  908 F. Supp. 1248 (S.D.N.Y. 1995) .................................................................................. 14

*Bevan v. Columbia Broad. Sys., Inc.*,
  329 F.Supp. 601 (S.D.N.Y. 1971) .................................................................................... 23

*Bissoon-Dath v. Sony Computer Entm't Am., Inc.*,
  694 F. Supp. 2d 1071 (N.D. Cal. 2010) ............................................................................ 12

*Blakeman v. The Walt Disney Co.*,
  613 F. Supp. 2d 288 (E.D.N.Y. 2009).............................................................................. 10

*Buckman v. Citicorp*,
  No. 95 Civ. 0773, 1996 WL 34158 (S.D.N.Y. Jan. 30, 1996) .................................................. 8

*Canal+ Image UK Ltd. v. Lutvak*,
  773 F. Supp. 2d 419 (S.D.N.Y. 2011) ...................................................................... passim

*Castorina v. Spike Cable Networks, Inc.*,
  784 F. Supp. 2d 107 (E.D.N.Y. 2011)............................................................................ 9, 24

*DiTocco v. Riordan*,
  No. 10 Civ. 4186, 2011 WL 4373943 (S.D.N.Y. Sept. 20, 2011) ............................ 9, 12, 22, 24

*Durham Industries, Inc. v. Tomy Corp.*,
  630 F.2d 905 (2d Cir.1980)............................................................................................ 12

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*,
  499 U.S. 340 (1991) ...................................................................................................... 7

*Hogan v. DC Comics*,
  48 F. Supp. 2d 298 (S.D.N.Y. 1999) ................................................................................ 14

*Jones v. CBS, Inc.*,
  748 F. Supp. 748 (S.D.N.Y. 1990) .................................................................................. 24

*Le Book Publ'g, Inc. v. Black Book Photography, Inc.*,
  418 F. Supp. 2d 305 (S.D.N.Y. 2005) ................................................................................ 9

*Lewinson v. Henry Holt & Co., LLC*,
    659 F. Supp. 2d 547 (S.D.N.Y. 2009) ............................................................. 10

*Little v. Twentieth Century Fox Film Corp.*,
    No. 89 Civ. 8526, 1995 WL 404939 (S.D.N.Y. July 7, 1995) ........................... 23

*LLB Corp. v. Lucas Distribution, Inc.*,
    No. 08 Civ. 4320, 2008 WL 2743751 (S.D.N.Y. July 14, 2008) ......................... 7

*Mallery v. NBC Universal, Inc.*,
    No. 07 Civ. 2250, 2007 WL 4258196 (S.D.N.Y. Dec. 3, 2007) ......................... 24

*Muller v. Twentieth Century Fox Film Corp.*,
    794 F.Supp. 2d 429 (S.D.N.Y. 2011) ......................................................... 19, 23

*Nichols v. Universal Pictures Corp.*,
    45 F.2d 119 (2d Cir. 1930) ............................................................................. 16

*Ollie v. Domino's Pizza, Inc.*,
    No. 95 Civ. 10333, 1997 WL 529049 (S.D.N.Y. Aug. 25, 1997) ....................... 12

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
    602 F.3d 57 (2d Cir. 2010) ............................................................................... 9

*Psihoyos v. John Wiley & Sons, Inc.*,
    No. 11 Civ. 1416, 2011 WL 5980423 (S.D.N.Y. Nov. 29, 2011) ....................... 10

*Reyher v. Children's Television Workshop*,
    533 F.2d 87 (2d Cir. 1976) .......................................................................... 8, 24

*Robinson v. Viacom Int'l, Inc.*,
    No. 93 Civ. 2539, 1995 WL 417076 (S.D.N.Y. July 13, 1995) ......................... 10

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000) ............................................................................... 7

*Sheldon Abend Revocable Trust v. Spielberg*,
    748 F. Supp. 2d 200 (S.D.N.Y. 2010) ............................................................. 22

*Silberstein v. Fox Entertainment Group, Inc.*,
    424 F. Supp. 2d 616 (S.D.N.Y. 2004) ............................................................. 12

*Silverman v. CBS Inc.*,
    870 F.2d 40 (2d Cir. 1989) ............................................................................... 8

*Walker v. Time Life Films, Inc.*,
    615 F. Supp. 430 (S.D.N.Y. 1985) ................................................................... 7

*Well-Made Toy Mfg. Corp. v. Goffa Int'l Corp.*,
    354 F.3d 112 (2d Cir. 2003) ........................................................................... 10

*Williams v. Chrichton*,
    84 F.3d 581 (2d Cir. 1996) ........................................................................... 10, 16, 23

**Statutes**

17 U.S.C. § 103(b) ........................................................................................................ 8

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) ........................................................................................ 1, 7, 11

Defendants 8 Legged Productions, LLC, Goodbye Entertainment, LLC, Savior Productions, LLC, Michael Cohl and Jeremiah Harris ("Defendants") submit this memorandum of law in support of their motion to dismiss Plaintiffs Julie Taymor and LOH, Inc.'s ("Plaintiffs") second cause of action pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

Plaintiffs' Second Claim asserts that the script or "book" of Defendants' hit musical *Spider-Man: Turn Off the Dark* (the "*Spider-Man* Musical") infringes Taymor's copyright in a two-and-a-half page "treatment" (the "Treatment").  To establish copyright infringement, however, Plaintiffs must prove, *inter alia*, that the Treatment and the book of the Musical are substantially similar.  In making that determination, a court must first filter out any similarities between the Treatment and the Musical derived from a preexisting work, namely the classic *Spider-Man* story, as such elements cannot form a basis for a finding of substantial similarity.  A court must then conduct a comparison based only on the remaining original elements.

There can be no doubt that the Treatment is based on the preexisting *Spider-Man* comic books and popular *Spider-Man* films as the Treatment admits on its face that it follows the "terrain of the first film" and Taymor's copyright registration states that the Treatment is derived from the "[c]haracters and setting from [the] 'Spiderman' comic books."  The *Spider-Man* Musical is, of course, also based on the *Spider-Man* comic books and films.  As a result, the similarities between the Treatment and the Musical stem from the preexisting *Spider-Man* works and thus cannot form the basis for Plaintiffs' claim.  Once the preexisting elements are excluded—including the *Spider-Man* origin story, its famous characters, such as Peter Parker, Spider-Man, Mary Jane Watson and Uncle Ben, and even the most detailed portions of the Treatment describing Spider-Man's fight with Arachne—the remaining elements simply do not appear in the book of the Musical.  For example, the main focus and primary villain of the

Treatment is the character Arachne, who, as the Treatment states, is "in love with Spiderman [sic] and sees him as her ultimate savior.  Like the spider that she is," she seeks to "mate with Peter and then . . . devour him."  Arachne then "lure[s] Peter into her web to dance a dance of seduction," catching both Peter and Mary Jane.  "Just as it looks like Peter is about to kiss Arachne in full, sexual human embrace," he kisses Mary Jane instead and an infuriated Arachne attacks him.  Peter then "bites [Mary Jane] on the neck," turning her into a spider-woman.  As a "stunned and drugged Peter . . .falls into the recesses of the web," Mary Jane, with her "new spider powers . . . leaps in an attack on Arachne."  None of these elements, however, appear in the book of the Musical.  Thus, as the Treatment and the book of the Musical are not substantially similar, Plaintiffs' Second Claim should be dismissed.

## FACTUAL BACKGROUND

### I.    THE PREEXISTING WORKS

#### A.    The *Spider-Man* Comic Books

The fictional superhero, Spider-Man, and his timid, bookworm alter ego, Peter Parker, were first brought to life by Stan Lee and Steve Ditko in the 1962 comic book *Amazing Fantasy #15*.  Simmons Decl. ¶ 7.[1]  In that issue, Peter is depicted as an orphan who lives with his elderly, loving Aunt May and Uncle Ben, and is bullied by his schoolmates.  *Id.*, Ex. 3, at 2–3, 9.  During a trip to a science laboratory, Peter is bitten by a radioactive spider and, as a result, acquires superhuman strength and agility, as well as other spider-like qualities.  *Id.* at 4–5.  At first he tests his powers in a wrestling match and wins a cash prize, *id.* at 5–7, but when he declines to stop a thief who later murders Uncle Ben, Peter realizes that "with great power there must also come—great responsibility."  *Id.* at 9–12.  Disguised as Spider-Man, Peter then

---

[1]    Defendants respectfully refer the Court to the declaration of Joshua L. Simmons, Esq., dated March 21, 2012, and the exhibits thereto ("Simmons Decl.") for more detailed descriptions of the works at issue.

dedicates his life to serving the public good and uses his powers to fight crime. *Id.* ¶ 7.

   While initially Peter falls in love with his classmate, Gwen Stacy, she dies when Green Goblin pushes her off a bridge. *Id.* ¶ 12. Peter later falls in love with Mary Jane Watson, his neighbor's niece, and Peter and Mary Jane eventually marry. *Id.* ¶ 14. Peter also makes money by selling photographs of Spider-Man to J. Jonah Jameson, the editor-in-chief of the *Daily Bugle* newspaper who insists on reporting in his paper that Spider-Man is a criminal. *Id.* ¶ 8. Spider-Man also fights various villains, including the group the Sinister Six (which includes Electro), as well as Arachne (a Spider-based super villain). *Id.* ¶¶ 9–11, 18. Spider-Man's recurring nemesis, however, is Green Goblin, with whom Spider-Man often has airborne battles. *Id.* ¶ 10. Green Goblin is, in actuality, Norman Osborn, a wealthy businessman and scientist, who accidentally turned himself into the Green Goblin when an experiment exploded. *Id.* ¶ 11.

   One of the primary themes of the *Spider-Man* comic books is the conflict between Peter's responsibilities as Spider-Man and his attempt to maintain his personal life. *Id.* ¶ 15. In fact, Peter frequently considers giving up his role as Spider-Man, and in one famous issue, he throws his costume in the trash, where it is discovered and delivered to Jameson. *Id.* A crime spree, however, forces Peter to resume his responsibilities as Spider-Man. *Id.*

   **B.    The *Spider-Man* Films**

   In 2002, the *Spider-Man* story was adapted for a film titled "*Spider-Man*," which again follows Peter Parker as he transforms into Spider-Man, learns what it means to be a hero, falls in love with his neighbor and schoolmate, Mary Jane, and battles Green Goblin to the death ("First *Spider-Man* Film"). *Id.* ¶¶ 20–42. In the film, Peter is bitten by a genetically altered spider during a school trip to Norman Osborn's laboratory, which gives him large muscles and spider-type abilities. *Id.* ¶¶ 20–22. Peter also wins a wrestling contest with "Bonesaw McGraw," but after the promoter refuses to give him all of the prize money, Peter refuses to stop a thief who

steals the promoter's money. *Id.* ¶¶ 24–25. Tragically, the thief later carjacks Uncle Ben and kills him. *Id.* ¶ 26. The loss leads Peter to realize that he must use his powers to protect others. *Id.*

The film also features Jameson depicting Spider-Man as a criminal in the *Daily Bugle*, as well as Peter selling photographs of Spider-Man to the paper. *Id.* ¶¶ 28–29. The film also focuses on the love story between Peter and Mary Jane, including a scene in which Spider-Man rescues Mary Jane and they share a kiss while Spider-Man hangs upside-down from a web. *Id.* ¶ 35.

The film's primary villain is Green Goblin, who was created when Osborn conducted an experiment on himself. *Id.* ¶ 27. In the film, Spider-Man and Green Goblin have a series of aerial battles, and Green Goblin tries to convince Spider-Man to join him. *Id.* ¶¶ 31, 34. When Spider-Man refuses, Green Goblin attacks his family, including trapping Mary Jane on a bridge. *Id.* ¶¶ 36–38. After Green Goblin throws Mary Jane off the bridge, Spider-Man rescues her. *Id.* ¶ 38. In the end, Spider-Man battles Green Goblin, during which Green Goblin attempts to use his glider to attack Spider-Man, but accidentally kills himself instead. *Id.* ¶ 39. The film ends with a kiss between Peter and Mary Jane, after which Mary Jane realizes Peter is Spider-Man. *Id.* ¶ 40.

In June 2004, "*Spider-Man 2*," the First *Spider-Man* Film's sequel was released ("Second *Spider-Man* Film"). *Id.* ¶ 5. In *Spider-Man 2*, Peter struggles to balance his responsibilities as Spider-Man with his desire to have a personal life as, for example, Peter's duties as Spider-Man cause him to miss Mary Jane's play. *Id.* ¶ 15. The stress proves too much for Peter and he gives up his role as Spider-Man and throws his costume in a trash can, where it is found and delivered to Jameson. *Id.* However, Spider-Man's absence leads to a crime spree that leads Peter to realize that the city needs Spider-Man. *Id.* Mary Jane also reveals in the Second *Spider-Man* Film that she knows Peter Parker is Spider-Man, and the pair decide to be together. *Id.* ¶ 42.

## II.   THE *SPIDER-MAN* MUSICAL'S BOOK

The current book of the *Spider-Man* Musical was written in the spring of 2011 (the "New

Book"). *Id.* ¶ 43. As in the preexisting works, the New Book tells the classic story of how Peter

Parker, a nerd fascinated by science and harassed by bullies, is transformed by a spider bite into

Spider-Man. *Id.* ¶¶ 45–47. Central to the New Book's story are Peter's close relationships with

his Aunt May and Uncle Ben and his romance with Mary Jane, which blossoms from a school

crush to true love. *Id.* ¶¶ 45–46, 49, 70. The New Book also contains the preexisting story of

Peter making some quick money in a wrestling match by trading on his super powers, only to

learn that using his powers for personal gain at a crucial moment cost his beloved uncle his life.

*Id.* ¶¶ 49–51. This leads Peter to use his super powers for the good of the people of New York.

*Id.* ¶ 52. Spider-Man's primary nemesis in the New Book is Green Goblin who, along with a

group of villains from the *Spider-Man* comic books called the "Sinister Six,"[2] is bent on

destruction and terror. *Id.* ¶¶ 56–69. Similarly, in the *Spider-Man* Musical, like the preexisting

works, Peter Parker gives up his role as Spider-Man, with his costume going to Jameson, only to

later realize that the city needs him. *Id.* ¶¶ 66, 68. The story also includes Arachne, but in a

minor role, not as a villain, but as someone who gives Peter encouragement. *Id.* ¶ 51. The New

Book reaches its climax at the end of Act Two when, as in the First *Spider-Man* Film, Spider-

Man saves Mary Jane, and Green Goblin and Spider-Man engage in an epic battle that ends with

Green Goblin's accidental death. *Id.* ¶ 69. As the curtain falls, Mary Jane reveals, as she did in

the Second *Spider-Man* Film, that she knows Peter is Spider-Man, and they share an upside

down kiss, as depicted in the signature scene from the First *Spider-Man* Film. *Id.* ¶ 70.

## III.   TAYMOR'S "SPIDERMAN/CAUGHT" TREATMENT

In 2005, Taymor registered a 2 ½ page treatment with the copyright office ("Treatment").

Compl. Ex. A (registration); Simmons Decl., Ex. 1 (treatment). The Treatment is confusing and

---

[2]     Green Goblin creates the Sinister Six from scientists that have quit Norman Osborn's company. *Id.* ¶ 56.

not linearly told, making it hard to follow.  It is clear, however, that it is based on the classic *Spider-Man* story and characters and the classic Greek myth of "Arachne."  Simmons Decl. ¶ 73. In fact, the Treatment admits that its proposed first act tracks the First *Spider-Man* Film:

> Act One covers the origins [of] Peter's spider power (*the terrain of the first film*): Peter's bullied school days, how he was bitten, his transformation, wrestling scene, love for Mary Jane, loss of uncle Ben, transformation of Norman Osborne to the Green Goblin, newspaper woes etc.

*Id.*, Ex. 1, at 1 (emphasis added).  The Treatment also focuses on the "myth of Arachne in the beginning – how she was transformed into [sic] spider and doomed to the shadows in eternity to weave webs that no one would see."  *Id.*  Its second act is dark and disturbing as it describes that Arachne, "the weaver of the World's Wide Web," determined to "to come out from the shadows and shine once more," seeks to "lure Peter into her web to dance a dance of seduction."  *Id.*  The Treatment states that Arachne "needs to possess [Peter], devour him for her light to shine again." *Id.* at 2.  According to the Treatment, Arachne is "in love with Spiderman [sic] and sees him as her ultimate savior.  Like the spider that she is, she will mate with Peter and then, we will find out, devour him."  *Id.*  Then it states, "[j]ust as it looks like Peter is about to kiss Arachne in a full, sexual human embrace, he flips upside down, suspended by a thread, and kisses Mary Jane in the familiar spider style" (just as in the First *Spider-Man* Film).  *Id.* at 3.  The Treatment then describes Arachne as "furious" as she "attacks him with her hidden spider/wasp stinger." According to the Treatment, Spider-Man then "bites MJ," and with her new spider powers, Mary Jane "leaps in an attack on Arachne."  *Id.*  The Treatment does not have an ending, and rather concludes by asking, "Will she be able to save Peter? . . . Are we left dangling by a thread?"  *Id.*

## ARGUMENT

## I.   LEGAL STANDARD

Dismissal is warranted where a complaint fails to state a claim upon which relief can be

granted.  *See* Fed. R. Civ. P. 12(b)(6).  Although the Court must accept a complaint's factual allegations as true, it need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness."  *LLB Corp. v. Lucas Distribution, Inc.*, No. 08 Civ. 4320, 2008 WL 2743751, at *1 (S.D.N.Y. July 14, 2008) (internal citations omitted).  Moreover, on a Rule 12(b)(6) motion, where, as here, "a plaintiff chooses not to attach to the complaint or incorporate by reference a document upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment."  *Canal+ Image UK Ltd. v. Lutvak*, 773 F. Supp. 2d 419, 427 (S.D.N.Y. 2011); *see also Rothman v. Gregor*, 220 F.3d 81, 88–89 (2d Cir. 2000) (finding that a complaint includes "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit").  Further, "the works themselves supersede and control contrary allegations and conclusions, or descriptions of the works as contained in the pleadings."  *Walker v. Time Life Films, Inc.*, 615 F. Supp. 430, 434 (S.D.N.Y. 1985).

## II.   PLAINTIFFS CANNOT STATE A CLAIM FOR COPYRIGHT INFRINGEMENT

### A.   <u>Elements of a Copyright Infringement Claim</u>

To prevail on their copyright infringement claim, Plaintiffs must establish (1) ownership of a valid copyright and (2) unauthorized copying of protectable material.  *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991).  In addition, "a plaintiff with a valid copyright must demonstrate that: (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiffs."[3]  *Canal+*, 773 F. Supp. 2d at 426.

---

[3]   Solely for the purposes of this motion, Defendants will assume that (1) Taymor alleged ownership of a copyright registration for the Treatment is valid and (2) Defendants had access to the Treatment.

"The standard test for substantial similarity between two items is whether an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same." *Allen v. Scholastic Inc.*, 739 F. Supp. 2d 642, 654 (S.D.N.Y. 2011).  However, where, as here, a work "contains both protectible and non-protectible elements," courts must conduct a "more discerning" ordinary observer test and "extract the unprotectible elements from consideration and ask whether the protectable elements, standing alone, are substantially similar." *Id.*  In determining what elements of a work are protectable, courts take into account the fact that "protection granted to a copyrightable work extends only to the particular expression of an idea and never to the idea itself." *Reyher v. Children's Television Workshop*, 533 F.2d 87, 90 (2d Cir. 1976).  Moreover, where, as here, the plaintiff's work is "based upon one or more preexisting works," and is thus a derivative work, the copyright "extends only to the material contributed by [the plaintiff], as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material."  17 U.S.C. § 103(b); *see also Silverman v. CBS Inc.*, 870 F.2d 40, 49 (2d Cir. 1989) ("copyrights in derivative works secure protection only for the incremental additions of originality contributed by the authors of the derivative works.").  Accordingly, to the extent that any similarities between the works are derived from preexisting works, those similarities are not protectable and thus cannot support a finding of substantial similarity.

If a court determines that no reasonable juror could find substantial similarity, or that any similarities only pertain to unprotected or preexisting elements, it should dismiss the action.  *See Buckman v. Citicorp*, No. 95 Civ. 0773, 1996 WL 34158, at *3 (S.D.N.Y. Jan. 30, 1996) (granting 12(b)(6) motion based on absence of substantial similarity).  In fact, "it is entirely appropriate for a district court to resolve [the] question [of substantial similarity] as a matter of

law, 'either because the similarity between two works concerns only non-copyrightable elements of the plaintiffs work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar.'" *Canal+*, 773 F. Supp. 2d at 427; *see Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) ("When a court is called upon to consider whether the works are substantially similar, no discovery or fact-finding is typically necessary, because what is required is only a . . . comparison of the works." (quotation marks omitted)); *DiTocco v. Riordan*, No. 10 Civ. 4186, 2011 WL 4373943, at *1 (S.D.N.Y. Sept. 20, 2011) (granting 12(b)(6) motion based on lack of substantial similarity); *Alexander v. Murdoch*, No. 10 Civ. 5613, 2011 WL 2802923, at *1 (S.D.N.Y. July 14, 2011) (dismissing copyright claim where no substantial similarity existed between treatment and television series), *adopt'g R&R*, 2011 WL 2802899 (S.D.N.Y. May 27, 2011); *Allen*, 739 F. Supp. 2d at 642 (granting motion to dismiss copyright claim where there was no substantial similarity); *Le Book Publ'g, Inc. v. Black Book Photography, Inc.*, 418 F. Supp. 2d 305, 310 (S.D.N.Y. 2005) (granting 12(b)(6) motion where works were not substantially similar).

Moreover, Plaintiffs cannot rely on the fact that the Treatment is short to save their claim. *See Castorina v. Spike Cable Networks, Inc.*, 784 F. Supp. 2d 107, 111–12 (E.D.N.Y. 2011) ("[T]he treatment's vagueness, however intentional, also undercuts its protectability . . . ."). For example, in *Alexander*, the court specifically rejected the plaintiff's attempt to establish substantial similarity by reading plot elements and character traits into his treatment that were not in the treatment's text. *See* 2011 WL 2802899, at *8–10. In addition, other courts in this Circuit have similarly compared treatments to longer works and found no substantial similarity. *See Castorina*, 784 F. Supp. 2d at 113 (rejecting plaintiffs' claim to "basic concept" of sports reality show; rather no substantial similarity between text of treatment and reality show);

*Blakeman v. The Walt Disney Co.*, 613 F. Supp. 2d 288, 309 n.8 (E.D.N.Y. 2009) (no substantial similarity despite limited development due to short form of plaintiff's treatment); *Robinson v. Viacom Int'l, Inc.*, No. 93 Civ. 2539, 1995 WL 417076, at *8 (S.D.N.Y. July 13, 1995) (treatment and television series not substantially similar as treatment's plot ideas "not developed sufficiently . . . especially in light of their derivative nature").  In addition, the law is clear that Taymor's registration governs this case.  *Well-Made Toy Mfg. Corp. v. Goffa Int'l Corp.*, 354 F.3d 112, 116 (2d Cir. 2003) (district court should consider only infringement of plaintiff's registered rag doll, not a later unregistered version); *Psihoyos v. John Wiley & Sons, Inc.*, No. 11 Civ. 1416, 2011 WL 5980423, at *2 (S.D.N.Y. Nov. 29, 2011) (plaintiff cannot pursue copyright infringement claims based on unregistered photographs); *Lewinson v. Henry Holt & Co., LLC*, 659 F. Supp. 2d 547, 560 (S.D.N.Y. 2009) (only registered manuscript of children's book, not unregistered revision with additional details, formed basis for infringement suit).

### B.    The New Book Is Not Substantially Similar to the Treatment

In assessing substantial similarity between literary works, courts commonly compare the plot, characters, settings, and themes, as well as the total concept and feel of the works.  *See Williams v. Crichton*, 84 F.3d 581, 588–91 (2d Cir. 1996) (no substantial similarity based on themes, characters, plot, sequence, pace, setting, and total concept and feel of works); *Blakeman*, 613 F. Supp. 2d at 306 (no substantial similarity between film treatment and movie given different plot, characters, themes, structure sequence, feel and pace).

Here, comparing the Treatment and the New Book shows that there is no substantial similarity between the works as the only elements of the Treatment that resemble the New Book are taken directly from the classic *Spider-Man* story that Taymor acknowledges she does not own.  *See* Compl. ¶ 16.  In fact, Taymor disclaimed the "[c]haracters and setting from 'Spiderman' [sic] comic books" in her copyright registration, *id.*, Ex. A, at 2, and the Treatment

itself explicitly states it is derived from the First *Spider-Man* Film.  Simmons Decl., Ex. 1, at 1.

This case is similar to the recently decided *Canal+* case.  In *Canal+*, the plaintiff asserted that its film, based on a preexisting novel, was substantially similar to the defendants' musical, based on the same novel.  *See Canal+*, 773 F. Supp. 2d at 425.  The defendants moved to dismiss under Rule 12(b)(6), and the court determined that any similarities between the film and the musical derived from the preexisting novel were not protectable.  *Id.* at 430.  For instance, "the basic skeleton of the story," wherein "[t]he protagonist learns of his disinheritance and…conceives and carries out a plan to murder the eight heirs between him and the noble title," came from the novel, and thus was not protectable.  *Id.* at 431.  Once the unprotectable preexisting elements were removed from consideration, the court determined that the "Film, as a derivative work, contains limited original elements, and most of those original elements are not similar to elements of the Musical."  *Id.* at 433.  One key difference was the works' endings: in the film, the patriarch dies naturally and another character blackmails and falsely accuses the protagonist of murder, but then exonerates the protagonist; in the musical, the patriarch is deliberately poisoned, the authorities falsely accuse the protagonist, and two characters exonerate the protagonist.  *Id.* at 434.  In analyzing the works' "total concept and feel," the court found that these "different endings . . . reflect the works' different comedic registers. . . . [T]he end of the Musical is absurd and light-heartedly scandalous; the end of the Film is cruel, dramatic, and hardly comedic at all."  *Id.* at 438.  As a result, the court dismissed the copyright claim.  *Id.* at 441.  Similarly, here, as Plaintiffs cannot rely on unprotectable preexisting elements and the works are otherwise different, Plaintiffs' copyright infringement claim fails.

1.    <u>The Characters Of The Works Are Not Similar</u>

The Treatment does not contain any original characters.  Rather, every character mentioned in the Treatment, including Peter/Spider-Man, Arachne, Mary Jane, Uncle Ben, Aunt

May, Norman Osborne/Green Goblin, and the Sinister Six/Seven (including Electro), comes

from the *Spider-Man* comic books and films.[4]   Simmons Decl. ¶ 71.  In fact, Taymor explicitly

disclaimed the "[c]haracters . . . from the 'Spiderman' comic books" in her copyright

registration.  Compl., Ex. A, at 2.  Moreover, the law is clear that substantial similarity cannot be

established by characters that share traits derived from preexisting characters.  *See Silberstein v.*

*Fox Entertainment Group, Inc.*, 424 F. Supp. 2d 616, 630 n.8 (S.D.N.Y. 2004) ("[T]he only

aspects of [derivative works] entitled to copyright protection are the non-trivial, original features,

if any, contributed by the author or creator of these derivative works." (quoting *Durham*

*Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 909 (2d Cir.1980)); *Ollie v. Domino's Pizza, Inc.*,

No. 95 Civ. 10333, 1997 WL 529049, at *1045–46 (S.D.N.Y. Aug. 25, 1997) (characters with

bodies consisting of "domino with one dot in the top square and two dots in the bottom square"

not substantially similar as similarity attributable to preexisting work).

     It should be noted that the Treatment's Arachne character is also not original.  As a

threshold matter, Arachne is a character from Greek mythology, *id.* ¶ 16, and, as this Court

recently made clear, "figures from Greek mythology are not copyrightable."  *DiTocco*, 2011 WL

4373943, at *12 (citing *Bissoon-Dath v. Sony Computer Entm't Am., Inc.*, 694 F. Supp. 2d 1071,

1088 (N.D. Cal. 2010) (Greek gods are "stock figures . . . of many contemporary stories . . .

[and] the Western collective unconsciousness.")).  Moreover, Arachne has long been a character

in Marvel comics.  In fact, on the first page of *Ultimate Spider-Man #1*, Norman Osborn retells

the Arachne myth.  *Id.* ¶ 17.  In 1973, Arachne appeared in *Vampire Tales #3* as a spider

creature, who stabs Morbius with her stinger.  *Id.* ¶ 18.  Morbius is a character from the *Spider-*

*Man* comic books and is referenced in the Treatment.  *Id.*  The Treatment also admits that

---

[4]    The Treatment incorrectly refers to Spider-Man as "Spiderman" and Norman Osborn as "Norman Osborne."

Arachne is based on Marvel's spider-women characters, as it states that Arachne is the "super 'she' villain and nemesis of Spiderman; Arachne a.k.a. Shathra, Shriek and Spiderwoman."  *Id.*  In the comic books, Spider-Woman is codenamed "Arachne" and first appeared in 1977 as a secret agent/assassin.  *Id.*  Shriek escaped from a psychological facility and embarks on a killing spree, but Spider-Man stops her.  *Id.*  Most tellingly, Shathra is a "spider-wasp" entity from the "Astral Plane" who, as a spider's natural predator, follows Spider-Man to earth and hunts him as her prey.  *Id.* ¶ 19.  The two characters battle throughout the city, until finally Spider-Man defeats Shathra in a battle in a massive spider-web.  *Id.*

In any case, the New Book's depiction of the Arachne character is different from the Treatment's depiction.  In the Treatment, Arachne is Spider-Man's nemesis, a frightening supervillain who "needs his humanity."  *Id.* ¶¶ 71, 81.  Moreover, the Treatment's Arachne terrorizes the physical world because she is "deeply bitter [and] alone."  *Id.* ¶ 75.  She is "a terror invading the minds of the populace," and "the super 'she' villain and nemesis of Spiderman [sic]," whose "ultimate goal is to come out from the shadows to shine once more."  *Id.* ¶ 75, 80.  Arachne is the focus of the Treatment's proposed Act Two, during which she attempts to "mate" with Spider-Man and have children with him so that she can be freed from her prison.  *Id.* ¶ 81.

By contrast, the New Book's Arachne plays a guardian angel-like role, supporting and encouraging Spider-Man.  *Id.* ¶ 51.  Rather than seeking to regain her humanity, in the New Book, Arachne is content with her transformation, which brings her "enlightenment" by "learning wisdom and humility," and she uses her knowledge to guide and to urge Peter to use his powers to protect the world from villains.  *Id.* ¶ 44.  This Arachne is not Peter's nemesis, nor is she bitter, tormented, or bent on terror and destruction.

In other situations—even where the two works are not based on preexisting works to which the plaintiff cannot claim ownership—courts have held that two characters sharing the same name and more common characteristics than the characters in the two works at issue here did not make them substantially similar.  For example, in *Hogan*, the court found that despite the fact that both works contained a half-human, half-vampire main character named "Nicholas Gaunt" who sought to uncover the truth about his origins through flashback memories, was faced with the choice of pursuing good or evil, was indoctrinated into the forces of evil by killing, and had a "sinister genealogy," the characters were not substantially similar.  *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 310 (S.D.N.Y. 1999).  Similarly, in *Allen*, two "protagonists [that] are famous male wizards, initiated late into wizarding (in pre/early adolescence), who receive formal education in wizardy, and are chosen to compete in year-long wizard competitions" were not substantially similar.  739 F. Supp. 2d at 659; *see also Arden v. Columbia Pictures Industries, Inc.*, 908 F. Supp. 1248, 1261 (S.D.N.Y. 1995) ("bachelors in their thirties" who "pursue love interests and are somewhat chauvinistic and self-centered" not substantially similar).

### 2.   The Works' Plot Elements Are Not Similar

In terms of plot, the only similarities between the works are because they are based on the preexisting *Spider-Man* story.  Beyond that, the works differ and are not substantially similar.

#### a.   *The Treatment's Plot Is Derived from the Preexisting Works*

As is clear from its face, the Treatment is almost entirely, if not completely, derived from the preexisting *Spider-Man* works.  In fact, the Treatment explicitly admits that its proposed Act One is based entirely on the First *Spider-Man* Film: "Act One covers the origins Peter's spider power (the terrain of the first film): Peter's bullied school days, how he was bitten, his transformation, wrestling scene, love for Mary Jane, loss of Uncle Ben, transformation of Norman Osborne to the Green Goblin, newspaper woes etc." Simmons Decl., Ex. 1, at 1

(emphasis added).  As such, Plaintiffs cannot rely on these elements to support their infringement claim.  *See Canal+*, 773 F. Supp. 2d at 430 (to the extent similarities between plaintiff's film and defendants' musical were derived from preexisting novel, similarities were not protectable).

Similarly, the Treatment states that, "Act One ends with the defeat of Green Goblin.  He will return in Act Two as one of the Sinister Six/ Seven."  *See id.*, Ex. 1 at 1.  Yet again, however, the Green Goblin character is not original to the Treatment, and he is frequently defeated by Spider-Man in the comic books.  *Id.* ¶ 10.  Similarly, the Sinister Six, which has at times been the Sinister Seven, is also not original to the Treatment.  *Id.* ¶ 9.

The next paragraph of the Treatment, which Plaintiffs rely on heavily in Paragraph 80 of the Complaint, states:

> Peter, distrusted and maligned by the press and also unable to find the balance with his human needs and desires (in Act One), finally seems to be able to put those two worlds together in Act Two: After he decides to give up being Spiderman [sic] he is forced by the onslaught of the Sinister Six/Seven attacks to utilize his Spiderman [sic] powers to save his aunt.  Finally, Mary Jane realizes who he is and is ready to accept him as both Spiderman [sic] and Peter, her love.

*Id.*, Ex. 1, at 1.  However, each plot element listed in this paragraph is copied directly from the *Spider-Man* comic books and films.  For example, the statement in the Treatment that Peter is "distrusted and maligned by the press," *see id.*, is an element that has been part of the *Spider-Man* story since *Amazing Spider-Man #1*.  In that issue, J. Jonah Jameson's crusade against Spider-Man begins as he insists on reporting that Spider-Man is a criminal despite all evidence to the contrary.  *Id.* ¶ 8.  The First *Spider-Man* Film also includes the same plot element.  *Id.* ¶¶ 28–29.  As such, Plaintiffs cannot claim copyright protection in this element of the classic *Spider-Man* story.  *See Canal+*, 773 F. Supp. 2d at 431 (basic story from preexisting material not original to plaintiff's work and thus not protectable by plaintiff's copyright).

Next, the Treatment states that Peter is "unable to find the balance with his human needs and desires," Simmons Decl., Ex. 1, at 1, but other than this general, amorphous idea, common to many superheroes—including Superman and his obligations to Lois Lane—the Treatment adds no expressive detail.  Thus, it is an unprotectable idea.  *See Williams*, 84 F.3d at 588 (citing *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930) (similarities described too generally are unprotectable ideas)).  In any case, as described above, Peter's attempt to balance his personal life and his duties as Spider-Man is a classic theme of the *Spider-Man* story.  *See* Simmons Decl. ¶ 15.  In fact, at the climax of the First *Spider-Man* Film, Spider-Man is confronted with an impossible choice between his love for Mary Jane and his duties as Spider-Man, and the film ends with Peter realizing that he cannot balance both parts of his life.  *Id.* ¶ 38.

In the next sentence, the Treatment remarks that Peter "decides to give up being Spiderman [sic]."  *Id.*, Ex. 1, at 1.  The plot element of Peter giving up his role as Spider-Man, however, is not original to Taymor.  Rather, it is a constant theme in the *Spider-Man* story.  *Id.* ¶ 15  In fact, in *Amazing Spider-Man #50*, Peter famously decides to quit being Spider-Man, throwing his costume in the trash, and the costume is delivered to Jameson, who rejoices.  *Id.* The same scene is replicated in the Second *Spider-Man* Film, where Peter quits to pursue his own life and the *Spider-Man* costume is delivered to Jameson.  *Id.*

The Treatment also states that Peter "is forced by the onslaught of the Sinister Six/Seven attacks to utilize his Spiderman [sic] powers to save his aunt."  *See Id.*, Ex. 1, at 1.  This plot element also originates in the preexisting *Spider-Man* works.  For example, after Peter Parker quits being Spider-Man in the comic books, a crime spree forces him to resume the role and reclaim his costume.  *Id.* ¶ 15.  Similarly, in *Spider-Man 2*, Peter quits but realizes that the city needs Spider-Man and that he has to put aside his own personal interests and become Spider-

Man again.  *Id.*  Thus, the idea that Peter needs to resume being Spider-Man due to a crime spree is common.  The Treatment's specific reference to Peter needing to resume being Spider-Man in order to save his aunt, however, is not part of the New Book.

The Treatment goes on to state that, at the end of the proposed Act One, "Mary Jane realizes who he is."  *See Id.*, Ex. 1, at 1.  Once again, this plot element is not original to Taymor, but rather is derived from two scenes from the First *Spider-Man* Film.  In one scene, after Spider-Man rescues Mary Jane from a group of thugs, he flips upside down and she rolls down his mask to kiss him.  *Id.* ¶ 35.  In the other scene, Peter and Mary Jane kiss, and after the kiss Mary Jane figures out that Peter Parker is Spider-Man.  *Id.* ¶ 40.  Thus, everything in Paragraph 80 of the Complaint, on which Plaintiffs heavily rely, originates from the preexisting Spider-Man comic books or is different from the New Book.

The lack of substantial similarity between the Treatment and the New Book is particularly evident from the Treatment's Act Two.  For example, the Treatment states that Spider-Man "defeat[s] the villains of the world with his super spider powers" and "ultimately have a human life, full of love, as well."  *Id.*, Ex. 1, at 1–2.  Those elements, however, are classic features of the *Spider-Man* story to which Plaintiffs cannot lay claim.  *Id.* ¶¶ 9–10, 14–15.

Furthermore, as described above, *supra* at 12, the Treatment is explicit that Arachne is based on Marvel's preexisting spider-women characters, and the plot of the Treatment clearly tracks the Shathra storyline.  The Shathra storyline is told in three comic book issues published in 2002.  In that storyline, Shathra, like Arachne, is a being from the "astral plane," who comes to earth to hunt and to feed on Spider-Man.  *Id.* ¶ 19.  The pair battle throughout the city, but ultimately they have an epic battle in a giant spider web.  *Id.*  Similarly, in the Treatment, Arachne hunts Spider-Man, luring him "into her web to dance a dance of seduction," in which

she intends to "devour" him. *Id.* ¶ 81. Moreover, the Treatment's scene in which Arachne "attacks [Peter] with her hidden spider/wasp stinger," mirrors the scene in *Vampire Tales #3*, described above, where Arachne stabs Morbius with her stringer in a giant web. *Id.* ¶ 18.

In fact, even Plaintiffs' sole allegation of similarity between the text of the Treatment and the text of the New Book is attributable to both works being derived from the preexisting *Spider-Man* works. The Treatment begins with a description of an unidentified person's dream about an unnamed city that has been devastated and that a "huge battle" is raging, during which Spider-Man "flies"[5] "from one burning skyscraper to another." *Id.* ¶ 72. Then the Treatment states that Mary Jane is "pushed" from "a giant bridge," but it does not identify who pushes her. *Id.* The Treatment then states that, "Spiderman [sic] tries to unleash his web shooter – it fails as he leaps after MJ – but he has lost his powers and begins to fall." *Id.*

This scene, however, is clearly a reference to the *Spider-Man* story told in *Amazing Spider-Man #121* from 1973 where Green Goblin learns that Peter Parker is Spider-Man, and in an effort to punish him, kidnaps his long-time girlfriend, Gwen Stacy. *Id.* ¶ 12. Green Goblin carries Gwen to the Brooklyn Bridge, where he and Spider-Man engage in an aerial battle. *Id.* Just as Spider-Man is about to save Gwen, however, Green Goblin knocks her off the bridge, and although Spider-Man tries to save her with his web-shooters, they fail and Gwen dies. *Id.* The traumatic scene has been re-told with slight variations many times. For example, in one issue, just as Spider-Man is about to unleash his web-shooters, he changes his mind and leaps after Gwen, saving her life. *Id.* ¶ 13. In another retelling, it is Mary Jane, not Gwen, that Green Goblin kidnaps and throws off the bridge, and again, Spider-Man leaps after her saving her life. *Id.* In fact, the First *Spider-Man* Film also contains a scene where Mary Jane is thrown off a

---

[5]    Note: Spider-Man does not fly, he swings. *Id.* ¶ 7.

bridge and Spider-Man must leap off the bridge to save her.  *Id.* ¶ 38.  Even the fact that the

scene in the Treatment is a dream comes from the preexisting works' depiction of Peter Parker's

recurring nightmares about the incident.  *See id.* ¶ 12.

Moreover, the expression of this plot idea in the New Book is not substantially similar to

its expression in the Treatment.  For example, in the New Book, Mary Jane "is dangling from the

Brooklyn Bridge" in New York City; the Treatment does not say where Mary Jane is other than

being on a bridge.  *Compare id.* ¶ 64 *with id.* ¶ 72.  Then, in the New Book, Spider-Man appears

on the bridge and runs toward her; the Treatment does not describe Spider-Man's arrival.

*Compare id.* ¶ 64 *with id.* ¶ 72.  While in the New Book Green Goblin then "slices through the

cable Mary Jane is tethered to," and she screams as she disappears into the abyss, by contrast, in

the Treatment Mary Jane is <u>pushed</u> off the bridge by an unidentified person and she does not

scream.  *Compare id.* ¶ 64 *with id.* ¶ 72.  Then, in the New Book Peter's web-shooter fails him as

he screams, "MARY JANE!!"  *Id.*  But there is no dialogue at all in the Treatment.  *Id.* ¶ 64.

Then, in the New Book, Peter "impulsively leaps" after Mary Jane, only to tumble over and over

in slow-motion.  *Id.*  At that time, Green Goblin says in a voice over, "You vanquish my family,

I'll vanquish yours…"  *Id.*  It is then that Peter wakes up and the reader learns that he was

dreaming.  *Id.*  In the Treatment, however, all Peter does is leap after Mary Jane and fall: there is

no slow-motion tumbling, no Green Goblin, no dialogue, and no awakening from the dream.  *Id.*

¶ 72.  Thus, once the pre-existing material is extracted, the many differences between the two

scenes prevent a finding of substantial similarity.  *See Alexander*, 2011 WL 2802899, at *5 (no

substantial similarity between children's birthday parties due to differences in expression).

Moreover, Plaintiffs do not own the idea of a super hero battling in New York near a bridge.  *Cf.*

*Muller v. Twentieth Century Fox Film Corp.*, 794 F.Supp. 2d 429, 445 (S.D.N.Y. 2011)

("expedition team that travels to Antarctica where they discover an underground ancient pyramid or city, and subsequently encounter hostile forces" not protectable).

          **b.**     *The Remaining Plot Elements In the Works Are Different*

Thus, when you extract all of the preexisting material that the Treatment is admittedly based on—i.e., Spider-Man developing powers, the wrestling scene, the loss of Uncle Ben, his love for Mary Jane, his interactions with Jameson, his attempt to balance the responsibilities of being a superhero with having a personal life, battles with the Green Goblin, and a battle with "Arachne" that ends in a giant spider-web—it is clear that everything referenced in the Treatment was derived from the preexisting works. Even the most detailed portion of the Treatment—Arachne's hunt for Spider-Man leading to the final scene in the spider-web—is not original to Taymor, nor is it something that takes place in the New Book.

For example, in Act Two, the Treatment begins by describing that Arachne "hovers in the shadows [sic] the ultimate darkness that is a terror invading the minds of the populace . . . . the weaver of the World's Wide Web," whose "ultimate goal is to come out from the shadows to shine once more." *Id.* ¶ 75. The focus of the New Book's second act, by contrast, is Spider-Man, not Arachne. Moreover, as described above, *supra* at 13, the Treatment and the New Book's portrayal of the Arachne character is very different.

The Treatment then states that Arachne, frustrated by Spider-Man's success, draws him into the astral plane "in his sleeping time, to the dark shadows of the mysterious 'A'. The 'FIRST'. 'The DIVINE'." *Id.* ¶ 78. The Treatment goes on to state that Peter has a dream where Mary Jane disappears and is either saved or caught by Arachne, who reveals that she has been the one responsible for unleashing havoc on the world. *Id.* ¶¶ 78–79. Arachne then reveals that she created super villains from her imagination, and she is "even responsible for helping to spin the myth of Spiderman [sic] himself." *Id.* ¶ 79. Such a scene, however, does not appear in

the New Book.  In the New Book, neither Spider-Man nor Mary Jane is saved or caught by

Arachne; Arachne does not unleash havoc on the world; she does not create super villains, let

alone from her imagination; and she is not "responsible for helping to spin the myth of

Spiderman."  All Arachne does in the New Book is tell Peter is that it is his destiny to be Spider-

Man.  *Id.* ¶ 64.

The Treatment then backtracks and states that, "Peter had defeated [the super villains]

individually (beginning of Act Two) she had brought them together as the SINISTER

SIX/SEVEN for a final assault of terror" to test Spider-Man's invincibility.  *Id.* ¶ 80.  Because of

his "human lexicon of morality," Spider-Man never killed them, however, instead "each villain

either died or disappeared into the shadows of their own mistakes and failures."  *Id.*  Peter's

avoidance of "vanity, greed and hubris . . . impressed and provoked" Arachne, but she continues

to search for his "Achilles heel."  *Id.*  None of this takes place in the New Book.  Arachne does

not bring together the Sinister Six to assault Spider-Man; she does not resurrect them after

Spider-Man defeats them individually to fight him again; she is neither "impressed" nor

"provoked" by Peter's avoidance of "vanity, greed and hubris;" and she does not search for his

"Achilles heel."  Rather, Green Goblin creates the Sinister Six in Act Two by mutating his

disloyal employees, and Arachne is nothing but supportive of Spider-Man.  *Id.* ¶ 56.

The Treatment goes on to state that Arachne is in "love with Spiderman" and has "lured"

him "into her web to dance a dance of seduction," intending to "mate with Peter and then . . .

devour him" to release her from the "darkness."  *Id.* ¶ 81.  It goes on to state that "[t]heir children

will rule the universe in all its places of existence."  *Id.*  No similar scene appears in the New

Book as Arachne is not obsessed with Peter; she does not lure him anywhere; and she does

intend to devour him or have their children rule the universe.

At the end of the Treatment, "Arachne wants deeply to have human humors coursing through her veins once more" and she "will even risk or welcome destruction in her final showdown/union with Spiderman." *Id.* ¶ 82.  In the final scene, Peter is about to embrace Arachne, when he turns and kisses Mary Jane. *Id.* ¶ 82.  Arachne then attacks him with her "spider/wasp stinger," and Spider-Man "bites [Mary Jane] on the neck," like a vampire, giving her "spider powers," and she attacks Arachne. *Id.*  This scene does not appear in the New Book either.  Arachne is not trying to regain her humanity; she does not fight with Spider-Man at any time, let alone with her "spider/wasp stringer"; Spider-Man does not bite Mary Jane on the neck, giving her super powers; and Mary Jane and Arachne do not battle.

In sum, all of the plot elements of the Treatment are either not at all similar to the plot elements of the New Book or they are not original to the Treatment, or both.  Courts have held that works with far more similar plots were not substantially similar. *See Canal+*, 773 F. Supp. 2d at 431 (S.D.N.Y. 2011) (no substantial similarity despite "present[ing] the same basic story" where "protagonist learns of his disinheritance and, spurred in part by rejection…conceives and carries out a plan to murder the eight heirs between him and the noble title"); *DiTocco*, 2011 WL 4373943, at *12 (no substantial similarity where books "both tell the story of modern-day young heroes who must prevent destruction of the world by forces from Greek mythology" and "share some plot elements and scenes"); *Sheldon Abend Revocable Trust v. Spielberg*, 748 F. Supp. 2d 200, 208 (S.D.N.Y. 2010) (no substantial similarity where "both works tell the story of a male protagonist, confined to his home, who spies on neighbors to stave off boredom and, in so doing, discovers that one of his neighbors is a murderer").

### 3.   The Settings Of The Works Are Not Substantially Similar

Just as in the *Spider-Man* comic books and the *Spider-Man* films, the New Book is set in New York City. *See* Simmons Decl. ¶ 64.  Thus, the New York City setting is a preexisting

element to which Taymor cannot claim copyright protection.  Moreover, unlike the New Book, the Treatment does not even specify the city in which it takes place.  Finally, no one can monopolize setting a story about comic book characters in a city.  *Cf. Little v. Twentieth Century Fox Film Corp.*, No. 89 Civ. 8526, 1995 WL 404939, at *14 (S.D.N.Y. July 7, 1995) (New York setting for police story not protectable); *Bevan v. Columbia Broad. Sys., Inc.*, 329 F.Supp. 601, 606–7 (S.D.N.Y. 1971) ("What resemblance remains between the two works arises from the nature of subject matter, a POW camp within Hitler's Germany. . . . Similarity of this kind fails to meet the appropriate legal tests either of substantiality or wrongful appropriation.").

    4.    <u>The Themes Of The Works Are Not Similar</u>

When evaluating themes, courts determine each work's theme and then compare them, keeping in mind that only the expression is protectable, not the general theme itself.  *See Williams*, 84 F.3d at 589 ("dinosaur zoo" theme not protectable); *Muller*, 794 F. Supp. 2d at 445 ("[T]hematic similarities are incidental to the idea of an expedition to a dangerous and remote location, or the stock theme of action-adventure meets science-fiction," and are unprotected).

Here, the works' themes are strikingly different.  The New Book, like the classic *Spider-Man* story, is the story of how a teenager accepts the responsibilities of being a super hero in the fight between good and evil.  It follows the classic hero's journey from ostracized nerd to respected hero, while addressing complex themes such as coming of age, the journey from childhood to adulthood, love, and the struggle between good and evil.  In so doing, the New Book demonstrates the powerful message that with great power, comes great responsibility.

By contrast, the Treatment's theme, while partially about Spider-Man, focuses on the story of a woman whose hubris doomed her "to the shadows in eternity to weave webs that no one would see," and her bitter quest "to be released from the darkness."  Simmons Decl., Ex. 1,

- 23 -

at 1–2.  It is also about her obsession with Peter and her desire to "mate with Peter and then . . .

devour him" so that "[t]heir children will rule the universe in all its planes of existence."  *Id.* at 2.

     To the extent both works share the overall theme of good versus evil, that theme is not

protectable.  *See Castorina*, 784 F. Supp. 2d at 113 (no substantial similarity based on "the

'Good and Evil' dynamic between the co-hosts").  Moreover, as this Court recently held: "Young

male heroes who must cope with missing parents and display their strength in battles with

otherworldly forces are commonplace.  Harry Potter and *Spiderman*, for example, both fit this

mold."  *DiTocco*, 2011 WL 4373943, at *11 (emphasis added).

     5.   <u>Total Concept and Feel Of The Works Differ</u>

     A literary work's total concept and feel consists of the author's selection, coordination

and arrangement of the work's elements, taking into consideration similarities in "mood, details

or characterization."  *Reyher*, 533 F.2d at 91–92.  In comparing the total concept and feel of the

works, courts look at the works as a whole.  *See Jones v. CBS, Inc.*, 748 F. Supp. 748, 754

(S.D.N.Y. 1990).  A plaintiff cannot simply rely on a cherry-picked list of similarities, and a

"scattershot" of "generalized similarities in characterization . . . visual elements and plot points"

cannot support a finding of substantial similarity.  *Mallery v. NBC Universal, Inc.*, No. 07 Civ.

2250, 2007 WL 4258196, at *8 (S.D.N.Y. Dec. 3, 2007).  Here, the works' total concept and feel

is completely different, except for the preexisting *Spider-Man* story.  As demonstrated above, the

works are not substantially similar in characters, plot, settings or theme.  Even their length—one

a two-and-a-half page dialogue-free Treatment and the other a detailed over 130 page book for a

musical—is inconsistent with Plaintiffs' claim.  *See Allen*, 739 F. Supp. 2d at 657 ("[T]he

dramatic difference in length between [the two works] . . . immediately undermines [the

plaintiff's] suggestion that the authors similarly 'selected, coordinated and arranged the

elements' of their work.").  The differences between them are even more extensive, however.

- 24 -

The New Book is a light-hearted and ultimately feel good story where good fights evil and prevails. *See generally* Simmons Decl., Ex. 2. It follows the *Spider-Man* origin linearly from beginning to end, telling the story of a teenager who becomes a super hero, but struggles to maintain his personal life, and the tension it causes. *Id.* The New Book also focuses on Peter Parker's relationships with the other characters, such as Mary Jane, Aunt May and Uncle Ben. *Id.* Moreover, the New Book is about one main hero, Spider-Man, and one main villain, Green Goblin, and is appropriate for adults and children of all ages, as evidenced by its feel good ending. *Id.*; *Canal+*, 773 F. Supp. 2d at 438 (works' different endings reflected different tone).

The Treatment, by contrast, is a dark, depressing and confusingly disjointed story. *See generally* Simmons Decl., Ex. 1.  In the span of two-and-a-half pages, the Treatment moves from the well-known *Spider-Man* story to a story where Arachne seeks to attack, mate with and consume Spider-Man.  *Id.*  Each time Arachne appears in the Treatment, the story becomes more confusing.  *Id.*  For example, the Treatment repeats multiple times that Arachne has lost her humanity in her transformation to a spider, but she also displays various distinctly human emotions, such as frustration, jealousy, and loneliness.  *Id.*  Moreover, unlike the New Book, the Treatment's focus is on Arachne, who is the central villain of Act Two.  Further, the story in the Treatment is decidedly adult in nature.  *Id.*  As such, the total concept and feel of the works is different.  *See Canal+*, 773 F. Supp. 2d at 438 (no substantial similarity where film was "a subtle, dark Wildean comedy, with some truly sinister scenes" and musical was "a far lighter, broad comedy, filled with several bawdy scenes and riotous musical numbers").

## CONCLUSION

With no substantial similarity between the works, which Plaintiffs' cannot change even if permitted to replead, the Complaint's Second Claim should be dismissed with prejudice.

Dated:  New York, New York
        March 21, 2012

                                        /s/ Dale Cendali
                                        _____
                                        Dale Cendali
                                        Claudia Ray
                                        Courtney L. Farkas
                                        Joshua L. Simmons
                                        KIRKLAND & ELLIS LLP
                                        601 Lexington Avenue
                                        New York, New York 10022
                                        Telephone: (212) 446-4800
                                        dale.cendali@kirkland.com
                                        claudia.ray@kirkland.com
                                        courtney.farkas@kirkland.com
                                        joshua.simmons@kirkland.com

                                        Attorneys for Defendants
                                        8 Legged Productions, LLC; Goodbye
                                        Entertainment, LLC; Savior Productions,
                                        LLC; Michael Cohl and Jeremiah Harris