UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**REDACTED**

---

JULIE TAYMOR and LOH, INC.,

    Plaintiffs and Counterclaim-Defendants,

    - against -

8 LEGGED PRODUCTIONS, LLC,
GOODBYE ENTERTAINMENT, LLC,
SAVIOR PRODUCTIONS, LLC, MICHAEL
COHL, JEREMIAH HARRIS, and GLEN
BERGER,

    Defendants and Counterclaim-Plaintiffs,

    - and -

HELLO ENTERTAINMENT, LLC,

    Defendant.

11 Civ. 8002 (KBF)

ECF CASE

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION TO DISMISS AMENDED COUNTERCLAIMS OF DEFENDANTS
8 LEGGED PRODUCTIONS, LLC (FIRST AND SECOND COUNTERCLAIMS) AND
GOODBYE ENTERTAINMENT, LLC (THIRD COUNTERCLAIM)**

LANKLER SIFFERT & WOHL LLP
Charles T. Spada (cspada@lswlaw.com)
Matthew G. Coogan (mcoogan@lswlaw.com)
Patrick C. Toomey (ptoomey@lswlaw.com)
Edward B. Diskant (ediskant@lswlaw.com)

500 Fifth Avenue
New York, NY 10110
(212) 921-8399

*Attorneys for Plaintiffs Julie Taymor
and LOH, Inc.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS PLEADED IN COUNTERCLAIMS ................................... 2

ARGUMENT  ............................................................................................................. 8

    POINT I  ...................................................................................................... 9

        DEFENDANT 8 LEGGED HAS NOT ALLEGED FACTS SUFFICIENT TO
        STATE A COUNTERCLAIM FOR BREACH OF CONTRACT (FIRST
        COUNTERCLAIM) ........................................................................................ 9

        A.    The Contract Did Not Require That Taymor Personally Write Text for the
            Book.......................................................................................................... 10

        B.    The Contract Did Not Require That Taymor Make Changes to the Book of the
            Musical .................................................................................................... 11

        C.    Plaintiffs Did Not Fail to Produce a Finished Book Under the Contract............. 12

        D.    Plaintiffs Did Not Breach the Contract By Developing "Arachne" as a Character
            in the Book............................................................................................... 14

    POINT II  ..................................................................................................... 15

        8 LEGGED AND GOODBYE HAVE NOT ALLEGED FACTS SUFFICIENT TO
        STATE COUNTERCLAIMS AGAINST TAYMOR FOR BREACH OF FIDUCIARY
        DUTY (SECOND AND THIRD COUNTERCLAIMS)............................................ 15

        A.    8 Legged Fails to Allege Facts Plausibly Supporting the Existence of a
            Fiduciary Relationship (Second Counterclaim) .................................................. 15

        B.    Goodbye Fails to Allege Facts Plausibly Supporting the Claim that Taymor
            Owed Any Fiduciary Duty, or Breached any Duty of Loyalty, as a Board
            Member (Third Counterclaim) ......................................................................... 17

            1. Taymor Did Not Owe Goodbye a Fiduciary Duty......................................... 17

            2. Taymor Did Not Breach Any Fiduciary Duty to Goodbye............................. 19

i

POINT III  .................................................................................................................... 22

    PORTIONS OF THE FIRST COUNTERCLAIM, AND THE ENTIRETY
    OF THE SECOND AND THIRD COUNTERCLAIMS, ARE BARRED
    BY 8 LEGGED'S SETTLEMENT AGREEMENT WITH THE STAGE DIRECTORS
    AND CHOREOGRAPHERS SOCIETY .................................................................... 22

CONCLUSION .......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Archie Comic Publ'ns, Inc. v. DeCarlo*,
  141 F. Supp. 2d 428 (S.D.N.Y. 2001)........................................................................16

*Ashcroft v. Iqbal*,
  556 U.S. 662, 129 S. Ct. 1937 (2009)....................................................................9, 19

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...........................................................................................9, 19, 21

*Boley v. Pineloch Associates, Inc.*,
  700 F. Supp. 673 (S.D.N.Y. 1988) ...........................................................................19

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002)........................................................................14, 22, 23

*Chodos v. W. Publ'g Co.*,
  292 F.3d 992, 998-99 (9th Cir. 2002) .......................................................................12

*Christ v. Lake Erie Distribs., Inc.*,
  273 N.Y.S.2d 878 (N.Y. Sup. Ct. 1966) ...................................................................18

*DiFolco v. MSNBC Cable L.L.C.*,
  622 F.3d 104 (2d Cir. 2010)....................................................................................17

*Doubleday & Co. v. Curtis*,
  763 F.2d 495 (2d Cir. 1985)....................................................................................12

*EBC I, Inc. v. Goldman, Sachs & Co.*,
  832 N.E. 2d 26 (N.Y. 2005)...............................................................................15, 20

*EBC I, Inc. v. Goldman Sachs & Co.*,
  936 N.Y.S.2d 92 (N.Y. App. Div. 2011) .................................................................18

*eBusinessware, Inc. v. Tech. Servs. Group Wealth Mgmt. Solutions, LLC*,
  No. 08 Civ. 09101 (PKC), 2009 WL 5179535 (S.D.N.Y. Dec. 29, 2009) ..............18

*Faulkner v. Arista Records LLC*,
  602 F. Supp. 2d 470 (S.D.N.Y. 2009).......................................................................16

*Fursmidt v. Hotel Abbey Holding Corp.*,
  200 N.Y.S.2d 256 (N.Y. App. Div. 1960) ................................................................12

iii

*Higgins v. New York Stock Exch., Inc.*,
    806 N.Y.S.2d 339 (N.Y. Sup. Ct. 2005) ....................................................................21

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    No. 05-MD-1720 (JG), 2008 WL 115104 (E.D.N.Y. Jan. 8, 2008) .........................23

*In re Roxy Roller Rink Joint Venture*,
    67 B.R. 474 (Bankr. S.D.N.Y. 1985) .......................................................................19

*ITEL Containers Int'l Corp. v. Atlanttrafik Express Serv., Ltd.*,
    909 F.2d 698 (2d Cir. 1990)......................................................................................19

*Katz v. Feinberg*,
    167 F. Supp. 2d 556 (S.D.N.Y. 2001) *aff'd,* 290 F.3d 95 (2d Cir. 2002) ...............13

*Kidz Cloz, Inc. v. Officially for Kids, Inc.*,
    No. 00 Civ. 6270 (DC), 2002 WL 392291 (S.D.N.Y. Mar. 13, 2002) ....................15

*Liebowitz v. Elsevier Sci. Ltd.*,
    927 F. Supp. 688 (S.D.N.Y. 1996) ...........................................................................16

*Marmelstein v Kehillat New Hempstead*,
    841 N.Y.S.2d 493 (N.Y. App. Div. 2007) ...............................................................18

*Marx v. Akers*,
    666 N.E.2d 1032 (N.Y. 1996)...................................................................................21

*Meisel v. Grunberg*,
    651 F. Supp. 2d 98 (S.D.N.Y. 2009).........................................................................21

*Mellencamp v. Riva Music, Ltd.*,
    698 F. Supp. 1154 (S.D.N.Y. 1988)..........................................................................16

*Mendez v. Bank of Am. Home Loans Servicing, LP*,
    No. 11-cv-1516 (ADS)(GRB), 2012 WL 112506 (E.D.N.Y. Jan. 14, 2012) ..........11

*Metz v. U.S. Life Ins. Co.*,
    662 F.3d 600 (2d Cir. 2011).......................................................................................9

*Nat'l Football League Properties, Inc. v. Dallas Cowboys Football Club, Ltd.*,
    922 F. Supp. 849 (S.D.N.Y. 1996) ...........................................................................11

*Ne. Gen. Corp. v. Wellington Adver., Inc.*,
    624 N.E.2d 129 (N.Y. 1993)................................................................................15, 19

*Oursler v. Women's Interart Ctr., Inc.*,
    566 N.Y.S.2d 295 (N.Y. App. Div. 1991) ...............................................................15

iv

*Pemberton v. Windsor Leasing Co.*,
    58 N.Y.S.2d 292 (N.Y. Sup. Ct. 1945) ...................................................................16

*Poon v. Roomorama, LLC*,
    No. 09 Civ. 3224 (RMB), 2009 WL 3762115 (S.D.N.Y. Nov. 10, 2009)..............................15

*Press v. Chem. Inv. Servs. Corp.*,
    166 F.3d 529 (2d Cir. 1999)...................................................................20

*Reiss v. Fin. Performance Corp.*,
    97 N.Y.2d 195 (2001) ...................................................................11

*Ross v. FSG PrivatAir, Inc.*,
    No. 03 Civ. 7292 (NRB), 2004 WL 1837366 (S.D.N.Y. Aug. 17, 2004) ..............................19

*Rowe v. Great Atl. & Pac. Tea Co.*,
    46 N.Y.2d 62 (1978) ...................................................................11

*Salichs v. Tortorelli*,
    No. 01 Civ. 7288 (DAB), 2004 WL 602784 (S.D.N.Y. Mar. 29, 2004) ..............................22

*Schneider v. Wien & Malkin LLP*,
    798 N.Y.S.2d 713 (N.Y. Sup. Ct. 2004) ...................................................................21

*Silvester v. Time Warner, Inc.*,
    763 N.Y.S.2d 912 (N.Y. Sup. Ct. 2003), *aff'd sub nom. Silvester v. Time-Warner,*
    *Inc.*, 787 N.Y.S.2d 870 (N.Y. App. Div. 2005) ...................................................................16

*Smith McDonnell Stone & Co. v. Delicato Vineyards*,
    No. 94 Civ. 6474 (JFK), 1995 WL 375918 (S.D.N.Y. June 22, 1995) ..............................9

*Sobol v. E.P. Dutton, Inc.*,
    112 F.R.D. 99 (S.D.N.Y. 1986) ...................................................................16

*United States v Chestman*,
    947 F.2d 551 (2d Cir. 1991)...................................................................18

*Wells Fargo Bank Nw., N.A. v. Sundowner Alexandria, LLC*,
    No. 09 Civ. 7313 (BSJ), 2010 WL 3238948 (S.D.N.Y. Aug. 16, 2010) ..............................9, 11

*William P. Pahl Equip. Corp. v. Kassis*,
    588 N.Y.S.2d 8 (N.Y. App. Div. 1992) ...................................................................13

*World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*,
    530 F. Supp. 2d 486 (S.D.N.Y. 2007)...................................................................15, 19

**STATUTES**

Copyright Act, 17 U.S.C. § 101 ..................................................................................................10

N.Y. Bus. Corp. L. § 717(a) ......................................................................................................19

**OTHER AUTHORITIES**

16 New York Jurisprudence 2d, Business Relationships, § 1580 at 256.......................................19

Rule 12(b)(6) .............................................................................................................................23

Rule 56 ......................................................................................................................................23

Plaintiffs Julie Taymor and LOH, Inc. ("LOH") respectfully submit this memorandum of law in support of their motion to dismiss the amended counterclaims of defendants 8 Legged Productions, LLC (First and Second Counterclaims) and Goodbye Entertainment, LLC (Third Counterclaim), as set forth in the Amended Answer and Counterclaims, dated February 16, 2012, of defendants 8 Legged Productions, LLC ("8 Legged"), Goodbye Entertainment, LLC ("Goodbye"), Savior Productions, LLC, Michael Cohl, and Jeremiah Harris.

## PRELIMINARY STATEMENT

Julie Taymor—the director, collaborator, mask designer, and co-author of the hit Broadway musical *Spider-Man: Turn Off the Dark* ("*Spider-Man*" or the "Musical")—and her company LOH, Inc. filed this action to remedy willful copyright infringement and breaches of contract arising from the Musical's producers' unauthorized and unlawful use of Taymor's copyrighted written works.  In response, the producers launched a full-scale attack on Taymor aimed at assassinating her character and seeking to hold her singly responsible—financially and reputationally—for past problems with the Musical.  First, defendants filed an antitrust complaint with this Court accusing Taymor of illegal, anti-competitive behavior and seeking treble damages.  Second, the very same day, defendants asserted counterclaims here for alleged breaches of contract and fiduciary duties premised on over thirty pages of highly-sensationalistic allegations that ranged from belittling Taymor's previous experience and successes unrelated to the Musical to disparaging Taymor's years of work on the Musical and her creative decisions in trying to make the Musical a success.

Not surprisingly, less than a month later, the producers voluntarily dismissed their frivolous antitrust lawsuit against Taymor with prejudice before she even answered the allegations.  Taymor and her company now seek dismissal of the producers' remaining attempt

to needlessly besmirch Taymor's reputation while holding the threat of financial damages over her head—the facially implausible counterclaims raised in this lawsuit alleging breaches of contract and fiduciary duties against Taymor and her company.

The producers' counterclaims for breaches of contract and fiduciary duties must be dismissed as they suffer from obvious and fundamental defects and therefore fail to state any cognizable cause of action.  8 Legged's breach of contract counterclaim fails on its face, as Taymor's author contract does not contain a single one of the conditions or obligations that the producers now allege Taymor breached in co-authoring the book.  Moreover, as neither 8 Legged nor Goodbye plausibly alleges the existence of a fiduciary relationship between the parties—an unremarkable result given the contractual and creative nature of their relationship—or any conduct by Taymor that could even arguably breach any corresponding duty owed, their counterclaims for breaches of fiduciary duties also are fatally flawed.  Finally, the counterclaims for breaches of fiduciary duties and most of the breach of contract counterclaim must be dismissed as released and barred under the terms of 8 Legged's settlement agreement with the Stage Directors and Choreographers Society, which was entered last month.

## STATEMENT OF FACTS PLEADED IN COUNTERCLAIMS

Marvel owns intellectual property rights in the Spider-Man character.  (Am. Countercls. ¶ 25.)  In 2003, Marvel approached producers Tony Adams and David Garfinkle of defendant Hello Entertainment, LLC ("Hello") about producing a musical based on Spider-Man.  (*Id.* ¶ 26.)  Hello negotiated a rights agreement with Marvel to produce the Musical.  (*Id.* ¶ 25.)  Hello then approached Paul David Hewson (professionally known as "Bono") and David Howell Evans (professionally known as "Edge" or "The Edge") of the rock band U2 to compose music for the production.  (*Id.* ¶ 27.)  Bono and Edge suggested that Hello engage Taymor to serve as the Musical's director.  (*Id.* ¶ 28.)

2

In or around 2004, Taymor agreed to join the Musical's production team and thereafter wrote a three-page treatment for the Musical (the "Treatment"). (*Id.* ¶ 30.) Taymor registered the Treatment with the United States Copyright Office in 2005. (*Id.* ¶ 34.)

On August 4, 2005, Hello entered into a deal memorandum with plaintiffs relating to Taymor's status as co-bookwriter for the Musical (the "Author Deal Memo"). (*Id.* ¶ 37.) The Author Deal Memo is attached as Exhibit 1 to the Amended Counterclaims. It states:

Spider-Man Musical

Acknowledgement Between LOH, Inc. ("Lender") f/s/o Julie Taymor ("Taymor")<br>and Hello Entertainment, LLC ("Hello" or "Producer")

<u>Hello acknowledges and agrees that in Lender's position as co-owner of the book of the musical currently entitled Spider-Man: A Musical Web (the "Musical"), Lender shall have approval (to be shared with the composer and lyricist, and, if such parties and Lender agree, with the bookwriter) over dispositions of rights to the Musical, and all other decisions customarily reserved to the authors of a Musical</u>, and the foregoing, and the first sentence of Paragraph 5 and the provisions of Paragraph 6 in Lender's directing terms with Hello dated July 12, 2005 will be agreed in a writing or writings signed by Lender and all authors prior to performances of the Musical. Lender will use all good faith efforts to secure such an agreement between Lender and all authors as soon as possible. In addition, <u>Hello and Lender acknowledge and agree that in Lender's position as a co-owner/co-writer of the book of the Musical, Lender will receive, in addition to the director and collaborator royalties set forth in Lender's directing agreement, one-half of the aggregate remaining shares of the bookwriter royalty and subsidiary rights participation (after accounting for the participation of Neil Jordan)</u>. Specifically, subject to Marvel's approval of Lender as a co-book writer, she and her co-writer will each receive (1) 37.5% of the bookwriter's share of weekly operating profit, which amount is equal to 1.945% of weekly operating profit pre-recoupment increasing to 2.2225% post recoupment; (2) 37.5% of the bookwriter royalty for all productions of the Musical that Hello produces, co-produces, presents or licenses outside of Broadway; and (3) 50% of the bookwriters 1/3 portion of authors' net share of subsidiary rights proceeds (i.e. net of customary agency commissions and all third party participations agreed to by Lender; third party participations currently agreed to are Marvel as set forth in Marvel's March 25, 2004 agreement with Hello and Lender's 1/7[th] share of authors participation as set forth in Lender's director agreement). <u>In addition, Taymor and her co-writer will each receive equal credit as a co-bookwriter of the Musical.</u> (Am. Countercls., Ex. 1 (emphasis added).)

3

On September 27, 2005, Adams and Garfinkle executed a separate deal memorandum with Taymor's co-bookwriter, defendant Glen Berger (the "Berger Deal Memo").  (*Id.* ¶ 39; Ex. 2.)  The Berger Deal Memo is attached as Exhibit 2 to the Amended Counterclaims.  Among other things, it states:

> <u>Consultation on Bookwriter/Creative Decisions</u>:  Berger shall collaborate with Julie Taymor on bookwriter related and other creative decisions for the Musical; provided, however, <u>Julie Taymor, in her sole and absolute discretion, shall have final approval on all such decisions</u>, including her directing of any film adaptation of the Musical.  (Am. Countercls., Ex. 2 ¶ 11 (emphasis added).)

As defendants acknowledge, Taymor and Berger worked together on an "Expanded Treatment" for the Musical.  (*Id.* ¶¶ 41-42.)  Taymor conveyed "high level ideas" to Berger, and Berger "expressed those ideas in writing."  (*Id.* ¶ 42.)

In June 2005, the "Expanded Treatment" was submitted to Marvel for approval.  (*Id.* ¶ 42.)  According to defendants, Marvel expressed disapproval of the "Expanded Treatment" (*id.* ¶¶ 43-46), but Taymor "assured both Marvel and the producers, Garfinkle and Adams, that such concerns would be addressed" in her and Berger's full-length book of the Musical (*id.* ¶ 47).

Taymor and Berger then worked together on the full-length book.  (*Id.* ¶ 48.)  Defendants allege that Taymor "would tell Berger the general ideas that she wanted incorporated into the story for the show or make comments on Berger's work," but that "Taymor herself did not write any scenes or contribute any lines of dialogue."  (*Id.*)  Rather, defendants allege "Berger was the one who put pen to paper—or fingers to a keyboard as the case may be."  (*Id.*)

Defendants allege that in August 2007, Marvel expressed concern with the book.  (*Id.* ¶ 50.)  In response, Hello wrote to Marvel "requesting that Marvel reserve judgment until it could see the Musical performed in rehearsals and previews."  (*Id.* ¶ 51.)  Marvel agreed.  (*Id.* ¶ 52.)

In the summer of 2009, defendants Michael Cohl and Jeremiah Harris took over as lead producers of the Musical.  (*Id.* ¶¶ 54-56.)  They raised "tens of millions of dollars to keep the

show going," with Cohl and Harris themselves contributing over $20 million dollars.  (*Id.* ¶ 57.)  As a result, Hello assigned certain rights and liabilities—including the Author Deal Memo—to Cohl and Harris's production company, defendant 8 Legged.  (*Id.* ¶ 132.)  At the same time, 8 Legged took over lead production of the Musical from Hello.  (*Id.* ¶ 56.)

On November 28, "201[0]," the Musical played its first public preview performance.  (*Id.* ¶ 58.)  Significantly, defendants do not allege that they had not read or had access to the book of the Musical co-authored by Taymor, or even allege that they were unfamiliar with the book of the Musical, before public performances began.  Similarly, defendants do not allege that they expressed any concern or complaint to plaintiffs about the book of the Musical or Taymor's performance as a co-bookwriter under the Author Deal Memo *before* the Musical began public performances.[1]

Defendants now allege, however, that the first public performance "was a disaster" and that it then "became apparent" that the book Taymor and Berger had co-written "did not work."  (*Id.* ¶ 58.)  Defendant producers allege, however, that they "continued to support the Musical and waited to see the Musical in its completed form, after the changes that Taymor had promised to make," because they believed Taymor would "make the necessary changes" and would "cooperate with the other members of the production."  (*Id.* ¶ 63.)  Without specifying which changes Taymor "promised to make," defendants allege that "[b]y December 201[0] . . . , it became apparent to the Producers that the changes that Taymor had promised had not been made and that Taymor had no intention of making any significant alterations" to the book of the Musical.  (*Id.* ¶ 64.)

---

[1]  The Amended Counterclaims fail to include any facts whatsoever concerning 8 Legged's, Cohl's, and Harris's activities and involvement in the development of the Musical between 2009, when they took over as lead producers, and November 28, 2010, when public preview performances began.

Defendants allege that Taymor's co-bookwriter, Berger, meanwhile, was "[d]etermined to find a way to fix the show" and "conceived of several plans" to do so, two of which he called "Plan A" and "Plan C." (*Id.* ¶¶ 66-67.)  According to the defendants, Taymor refused to consider Berger's ideas and "told Berger that if he continued to push for changes, she could no longer work with him." (*Id.*)  As a result, Berger secretly developed a plan called "Plan X" without Taymor's knowledge. (*Id.* ¶ 73.)  Defendants allege that Plan X was a "radical jump" from Berger's and Taymor's original book, in which "Spider-Man would finally take his rightful place as the central focus of the show, with Arachne receding into the backdrop as a guardian angel-like figure, and . . . the show would culminate in a battle between Spider-Man and the Green Goblin." (*Id.* ¶¶ 73-74.)  According to defendants, Berger "tried to discuss Plan X with Taymor," but Taymor "refused to talk to him and again threatened that if he pushed to change the show, he would be terminated." (*Id.* ¶ 75.)

Defendants allege that "poor focus group results" and "bad reviews" prompted Cohl to meet with Taymor and place a telephone call to Taymor on February 16 and February 20, 2011, respectively. (*Id.* ¶¶ 78, 83, 92-94.)  According to defendants, Cohl "reiterated [to Taymor] that the story of the Musical did not work and that the show needed to be fixed or else it would close." (*Id.* ¶¶ 93-94.)  Defendants allege in conclusory form that Taymor "continued to resist any significant changes to the Musical." (*Id.*)  Defendants, however, do not allege that they instructed Taymor to make any specific changes to the book. (*Id.*)  Nor do they specifically allege the "significant changes" Taymor "continued to resist," nor that the producers communicated to Taymor that they would be willing to suspend public performances of the show to allow Taymor to make such "significant changes." (*Id.*)

On February 26, 2011, Cohl and Harris met with Taymor, Bono, and Edge to "consider the Musical's options." (*Id.* ¶ 95.) At that meeting, Cohl and Harris allegedly "made it clear that if the show were to continue in its current state, the production would run out of money within a month and it would close." (*Id.*) Defendants allege they "pleaded with Taymor, begging her to support Plan X," but Taymor "argued that Plan X would not work," "assured the Producers . . . that she was making significant changes to the show," and "convinced them to continue to withhold their judgment until they could see the show again." (*Id.* ¶ 96-97.) Shortly after the meeting, defendants allege that they "found out that no significant changes were planned and that Taymor had misled them to believe that anything more than *de minimus* changes were being made." (*Id.* ¶ 97.)

Cohl and Harris state that on March 4, 2011, they met with Taymor. (*Id.* ¶ 98.) At that meeting, defendants allege, Taymor "stated that she would not be a part of Plan X." (*Id.*) Cohl and Harris "had no choice but to terminate Taymor as a co-bookwriter," director, and collaborator because "Taymor would not cooperate with the other members of the production or agree to co-write the new version of the Musical." (*Id.* ¶ 99.)

Defendants allege they then hired a new co-bookwriter and "creative consultant" to make changes to the Musical (*id.* ¶¶ 100, 105), temporarily canceled performances so changes could be implemented, (*id.* ¶ 103), and, three-and-a-half weeks later, resumed public performances of a "new show," (*id.* ¶¶ 106, 112.) As a result of the changes made to the production, defendants allege, the Musical "is now a hit." (*Id.* ¶ 120.)

In response to plaintiffs' lawsuit to remedy defendants' willful copyright infringement and breaches of contract arising from their unauthorized and unlawful use of Taymor's copyrighted written works, defendants assert counterclaims against plaintiffs. Defendant 8

Legged claims that Taymor and LOH breached their contract—the Author Deal Memo—and that Taymor breached "fiduciary duties of good faith and loyalty" that Taymor allegedly owed as the Musical's co-bookwriter.  (Am. Countercls. ¶¶ 130-41.)  Defendant Goodbye alleges that Taymor breached a "fiduciary duty of loyalty" owed as a result of her alleged membership on a "board" pursuant to a 2009 bilateral joint venture agreement between defendants Hello and Goodbye.  (*Id.* ¶¶ 142-51.)

## <u>ARGUMENT</u>

The First, Second, and Third Amended Counterclaims should be dismissed for three reasons.  *First*, 8 Legged's claim that LOH and Taymor breached the Author Deal Memo (First Counterclaim) fails to allege facts sufficient to plausibly state a claim that any term of the Author Deal Memo was breached.  *Second*, 8 Legged's and Goodbye's breach-of-fiduciary-duty claims against Taymor (Second and Third Counterclaims, respectively) do not plausibly allege either the existence of a fiduciary relationship or any conduct by Taymor that would constitute a breach of any fiduciary duty.  *Third*, most of 8 Legged's breach-of-contract claim (First Counterclaim), as well as the entirety of 8 Legged's and Goodbye's breach-of-fiduciary-duty claims (Second and Third Counterclaims) are barred by 8 Legged's release in its Settlement Agreement with the Stage Directors and Choreographers Society, dated February 14, 2012.[2]

To survive a motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  For a claim to be plausible, the claimant's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Id.* at 555; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct.

---

[2]  The present motion does not seek dismissal of defendants' Fourth and Fifth Counterclaims, which request a declaratory judgment concerning Taymor's authorship rights and future productions in non-Broadway venues.  (Am. Countercls. ¶¶ 152-65.)

1937, 1949 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").  While the court must assume the truth of all pleaded facts, *see Metz v. U.S. Life Ins. Co.*, 662 F.3d 600, 602 (2d Cir. 2011), it need not accept "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *Iqbal*, 129 S. Ct. at 1949.

## POINT I

## DEFENDANT 8 LEGGED HAS NOT ALLEGED FACTS SUFFICIENT TO STATE A COUNTERCLAIM FOR BREACH OF CONTRACT (FIRST COUNTERCLAIM)

8 Legged's claim that plaintiffs LOH and Taymor breached the Author Deal Memo cannot survive because 8 Legged's factual allegations, even if true, do not establish a breach of any term of the contract.  *See Wells Fargo Bank Nw., N.A. v. Sundowner Alexandria*, LLC, No. 09 Civ. 7313 (BSJ), 2010 WL 3238948 (S.D.N.Y. Aug. 16, 2010) (dismissing breach-of-contract counterclaim where defendant failed to plead conduct that violated a term of the contract at issue); *Smith McDonnell Stone & Co. v. Delicato Vineyards*, No. 94 Civ. 6474 (JFK), 1995 WL 375918 (S.D.N.Y. June 22, 1995) (same).

8 Legged alleges that Taymor breached the Author Deal Memo by:  (i) "failing to actually write any text for the Book"; (ii) "failing to make changes to the Book requested by the Producers"; (iii) "failing to produce a finished book prior to the first public performance of *Spider-Man* or any time thereafter"; (iv) "insisting—despite the protestations of [the producers]—that the *Spider-Man* Musical focus on the character of Arachne and relegating the *Spider-Man* character to a minor role"; and (v) "preventing her co-bookwriter, Berger, from making the changes to the Book requested by the Producers."  (Am. Countercls. ¶ 133.)  These allegations, however, do not state a claim for breach when measured against the terms of the parties' contract.

9

The plain language of the Author Deal Memo merely conferred on Hello—and, later, 8 Legged—a limited right to use the book created by Taymor and her "co-owner/co-writer" in exchange for royalty payments, while preserving Taymor's rights to control the content and uses of her work as an author.  If the producers did not agree with Taymor's creative development of the book, they of course were not required to use Taymor's work and could hire another bookwriter to write a new book.  The producers, however, were not granted any right under the Author Deal Memo to dictate changes to Taymor or, in the event of a creative disagreement, to simply continue to use and change Taymor's work without paying the royalties provided for in the agreement.  Defendants make no allegation that they contracted with Taymor to create a "work for hire" under the Copyright Act, 17 U.S.C. § 101, and they appear to concede this point.

## A.   The Contract Did Not Require That Taymor Personally Write Text for the Book

8 Legged's first theory of breach—that Taymor "fail[ed] to actually write any text for the Book" —is utterly unsupported by the language of the Author Deal Memo.  No provision in that agreement requires, as 8 Legged alleges, that Taymor "put pen to paper—or fingers to a keyboard as the case may be" (Am. Countercls. ¶ 48) or draft any amount of text.  To the contrary, the agreement's reference to Taymor's status as a "co-owner/co-writer" plainly contemplates that there would be another "co-owner/co-writer," and the agreement makes no provision for the division of responsibilities between the joint authors or how Taymor's and Berger's ideas would be committed to paper.  As such, 8 Legged's claim that Taymor literally was required to "put pen to paper" is specious and finds no support in the actual contract between the parties.  *See Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 199 (2001) ("[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing."); *Rowe v. Great*

*Atl. & Pac. Tea Co.,* 46 N.Y.2d 62, 72 (1978) ("[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include.") (citations and internal quotations omitted); *see also Wells Fargo*, 2010 WL 3238948, at *3 (holding that "when 'the content of the contracts conflicts with allegations about those contracts made in the Complaint, the actual language of the contracts must control'") (quoting *Nat'l Football League Props., Inc. v. Dallas Cowboys Football Club, Ltd.*, 922 F. Supp. 849, 852-53 (S.D.N.Y. 1996)); *Mendez v. Bank of Am. Home Loans Servicing, LP*, No. 11-cv-1516 (ADS)(GRB), 2012 WL 112506, at *15 (E.D.N.Y. Jan. 14, 2012) (dismissing breach of contract claim where contract at issue "d[id] not contain language" articulating the contractual term that plaintiff alleged was breached).

Although the evidence at trial will show that Taymor greatly contributed to the co-writing of the book, for purposes of this motion, 8 Legged's own allegations plainly negate any plausible claim of breach.  8 Legged concedes that Taymor made actual contributions to the book, alleging that she communicated "general ideas that she wanted incorporated into the story" to Berger and "ma[d]e comments on Berger's work."  (Am. Countercls. ¶¶ 42, 48.)  8 Legged further concedes that Taymor wrote a treatment that included plot lines, themes, characters, narrative arc, and other dramatic elements that thereafter served as the basis for her and Berger's work on the full-length book of the Musical.  (*Id.* at ¶¶ 30, 33, 36, 61.)  There is no basis in the contract to support the claim that these substantial contributions were insufficient to satisfy any contractual obligation.

**B.    The Contract Did Not Require That Taymor Make Changes to the Book of the Musical**

8 Legged's contentions that Taymor breached the Author Deal Memo by "failing to make changes to the Book requested by the Producers" and "preventing her co-bookwriter, Berger,

11

from making the changes to the Book requested by the producers" likewise find no support in the language of the contract.  (Am. Countercls. ¶ 133.)  The contract grants no creative control over the content of Taymor's work to the Musical's producers and confirms that Taymor is a "<u>co-owner</u> of the book of the musical" and has "<u>approval</u> . . . over dispositions of rights to the Musical, and all other decisions customarily reserved to the authors of a Musical."  (Am. Countercls. Ex. 1 (emphasis added).)[3]  The Berger Deal Memo, moreover, re-affirms that Taymor retained "<u>sole and absolute discretion</u>" to exercise "<u>final approval</u>" over "<u>all</u>" "bookwriter related and other creative decisions for the Musical."  (Am. Countercls. Ex. 2 ¶ 11 (emphasis added).)  It is simply not plausible, as 8 Legged suggests, to read the Author Deal Memo as implying an obligation by Taymor and LOH to "make changes to the Book requested by the Producers."

### C.    Plaintiffs Did Not Fail to Produce a Finished Book Under the Contract

8 Legged's claim that plaintiffs breached by "failing to produce a finished book prior to the first public performance of *Spider-Man* or any time thereafter" is wholly conclusory and unsupported by the contract.  There is no mention of any "finished book" standard or similar requirement in the contract.  Nor does the contract provide any definition of a "finished book" or provide a timeline for its delivery.  And plaintiffs' contract certainly contains no guarantee of a blockbuster Broadway hit, which appears to be the true import of defendants' allegations.

---

[3]  The Author Deal Memo contains nothing resembling a "satisfaction" clause—a common contractual provision requiring a bookwriter to produce a book that its counterparty deems satisfactory.  *See, e.g.*, *Doubleday & Co. v. Curtis*, 763 F.2d 495, 500 (2d Cir. 1985); *Chodos v. W. Publ'g Co.*, 292 F.3d 992, 998-99 (9th Cir. 2002) (publisher not entitled to reject book under acceptance clause as "unacceptable" based solely on its opinion about book's likely commercial success).  *See generally Fursmidt v. Hotel Abbey Holding Corp.,* 200 N.Y.S.2d 256, 259 (N.Y. App. Div. 1960) (discussing the interpretation of "satisfaction" clauses under New York law).  In essence, 8 Legged now seeks to write such a provision into the contract retroactively.

In contrast to plaintiffs' contract, the Berger Deal Memo, which was drafted contemporaneously, sets forth a detailed provision titled "Delivery and Vesting Schedule," which, among other things, required Berger, upon written request of the producers, to deliver 80 pages of text within 90 days. (Am. Countercls., Ex. 2 ¶ 6.) The absence of such a requirement in Taymor's contract demonstrates that none was intended. *Katz v. Feinberg*, 167 F. Supp. 2d 556, 566-67 (S.D.N.Y. 2001) *aff'd*, 290 F.3d 95 (2d Cir. 2002) (observing that the contract "contain[ed] no qualification or proviso, an absence that is revealing because the parties clearly knew how to include limitations on or exceptions to the final and binding nature of a decision when they intended to," as shown by their other agreements); *William P. Pahl Equip. Corp. v. Kassis*, 588 N.Y.S.2d 8, 13 (N.Y. App. Div. 1992) (finding that where memorandum of agreement contained a cross-default provision but contract of sale did not, "[t]hat the contract of sale did not contain a similar provision seems to us persuasive that the parties, sophisticated businessmen represented by counsel throughout the negotiation, drafting and execution of the agreements, never intended that one be included").

Even if 8 Legged's wholly conclusory allegation of a "finished book" standard was supported by plaintiffs' contract, there is no plausible basis to conclude that the book co-written by Taymor and Berger did not meet that standard. Even a cursory review of the original book evidences a full-length work. (Spada Aff., Ex. D (Mar. 4, 2011 book).)[4] Indeed, the producers concede that they began public preview performances using the book on November 28, 2010. (Am. Countercls. ¶¶ 58-61.) While they now contend that they had "grave concerns" about elements of the story (*id.* ¶ 61), it is simply not plausible to conclude that the book co-written by

---

[4]  The book that was co-written by Taymor and Berger is properly before the Court on this motion to dismiss, as it is referenced and relied upon in the Amended Counterclaims. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

Taymor and Berger was not "finished" for purposes of any contractual standard as the Musical began public performances. This is particularly true in light of 8 Legged's allegations that its principals, Cohl and Harris, "continued to support" Taymor's and others' work on changes to the book after preview performances began (Am. Countercls. ¶ 63) and the lack of any allegation that Taymor was notified of any alleged "breach" at the time.

### D.   Plaintiffs Did Not Breach the Contract By Developing "Arachne" as a Character in the Book

8 Legged's final theory of breach—that Taymor "insist[ed] . . . that the *Spider-Man* Musical focus on the character of Arachne and relegate[ed] the *Spider-Man* character to a minor role"—likewise fails to state a cognizable claim. The Author Deal Memo does not contain any term dictating, or even relating to, the content of the book. No term in the agreement requires any particular treatment of the Spider-Man character or otherwise specifies the plot, characters, or focus of the book Taymor and her co-writer would write.

Moreover, 8 Legged's own allegations confirm that Spider-Man (and his alter ego Peter Parker) remained at all times a central and focal character of the book. (Am. Countercls. ¶¶ 59, 61.) A full reading of Taymor and Berger's book further demonstrates its enduring focus on Spider-Man. (Spada Aff., Ex. D.) The fact that the Musical's producers had seen and approved Taymor's 2004 Treatment for the book of the Musical—which the producers now allege contained many of the later book's offending elements relating to Arachne (Am. Countercls. ¶ 33)—years before the Musical opened in previews, yet did not object to the Treatment's "focus," confirms that 8 Legged's current theory is simply an after-the-fact, and implausible, effort to avoid its obligations under the contract.

14

## POINT II

### 8 LEGGED AND GOODBYE HAVE NOT ALLEGED FACTS SUFFICIENT TO STATE COUNTERCLAIMS AGAINST TAYMOR FOR BREACH OF FIDUCIARY DUTY (SECOND AND THIRD COUNTERCLAIMS)

#### A.    8 Legged Fails to Allege Facts Plausibly Supporting the Existence of a Fiduciary Relationship (Second Counterclaim)

8 Legged's claim that Taymor owed "fiduciary duties of good faith and loyalty" as a result of her status as co-bookwriter for the Musical (Am. Countercls. ¶¶ 136-41) is not cognizable under New York law.

A fiduciary relationship can be inferred only where there is some basis to ground the relationship "in a higher level of trust than normally present in the marketplace between those involved in arms' length business transactions." *EBC I, Inc. v. Goldman, Sachs & Co.*, 832 N.E. 2d 26, 31 (N.Y. 2005).  A "conventional business relationship, without more," does not create fiduciary duties.  *Kidz Cloz, Inc. v. Officially for Kids, Inc.*, No. 00 Civ. 6270 (DC), 2002 WL 392291, at *4 (S.D.N.Y. Mar. 13, 2002) (quoting *Oursler v. Women's Interart Ctr., Inc.*, 566 N.Y.S.2d 295, 297 (N.Y. App. Div. 1991)); *see also Ne. Gen. Corp. v. Wellington Adver., Inc.*, 624 N.E.2d 129, 131 (N.Y. 1993).  "[W]here a contract governs the relationship between two commercial parties, the assumption is that there is no fiduciary relationship unless the contract provides otherwise."  *World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 503-04 (S.D.N.Y. 2007); *see also Poon v. Roomorama, LLC*, No. 09 Civ. 3224 (RMB), 2009 WL 3762115, at *3 (S.D.N.Y. Nov. 10, 2009) ("[B]eing a party to a contract does not itself impose a fiduciary duty.") (citations omitted).

Not surprisingly, New York courts have been particularly reluctant to recognize fiduciary duties arising from contractual relationships between creative artists and their various counterparties—e.g., publishers, producers, and record companies.  *See, e.g., Faulkner v. Arista*

15

*Records LLC*, 602 F. Supp. 2d 470, 482 (S.D.N.Y. 2009) ("Courts in this District have repeatedly rejected the existence of a fiduciary relationship between recording artists and their record label.") (internal quotation marks and citation omitted); *Archie Comic Publ'ns, Inc. v. DeCarlo*, 141 F. Supp. 2d 428, 432-33 (S.D.N.Y. 2001) ("The express and implied obligations assumed by a publisher in an exclusive licensing contract are not, as a matter of law, fiduciary duties.") (internal quotations and citations omitted); *Liebowitz v. Elsevier Sci. Ltd.*, 927 F. Supp. 688, 711 (S.D.N.Y. 1996) ("New York law . . . does not regard the relationship between a publisher and author, or between a licensor receiving royalty payments from a licensee, as establishing a fiduciary duty.") (citing *Sobol v. E.P. Dutton, Inc.*, 112 F.R.D. 99, 104 (S.D.N.Y. 1986)); *Mellencamp v. Riva Music, Ltd.*, 698 F. Supp. 1154, 1157 (S.D.N.Y. 1988) ("[T]he conventional publisher-author arrangement is not a per se fiduciary relationship."); *Silvester v. Time Warner, Inc.*, 763 N.Y.S.2d 912, 918 (N.Y. Sup. Ct. 2003) ("[A]n artist's assignment of rights to a record company in exchange for royalties is contractual and does not create a fiduciary relationship or duty.") (collecting authorities), *aff'd sub nom. Silvester v. Time-Warner, Inc.*, 787 N.Y.S.2d 870 (N.Y. App. Div. 2005); *Pemberton v. Windsor Leasing Co.*, 58 N.Y.S.2d 292, 294 (N.Y. Sup. Ct. 1945) (holding that, in suit between theater owner/producer and playwright, parties' "agreement clearly indicates that the parties thereto were neither partners nor joint venturers, and that no fiduciary relationship between the parties was created").

Here, 8 Legged alleges no more than that Taymor entered into and provided services under a contract—the Author Deal Memo. That agreement contains no indicia to impose fiduciary duties on plaintiffs. Under the contract, the producers left themselves with significant leverage in that they were not obligated to use any book co-authored by Taymor and had no duty to pay her if they did not use her work. 8 Legged does not even allege that it reposed any special

trust or confidence in Taymor.  Thus, there is no plausible basis in 8 Legged's factual allegations to support that Taymor owed a fiduciary duty.

> **B.    Goodbye Fails to Allege Facts Plausibly Supporting the Claim that Taymor Owed Any Fiduciary Duty, or Breached any Duty of Loyalty, as a Board Member (Third Counterclaim)**

Goodbye's claim that Taymor owed a fiduciary duty of loyalty as a "board" member under a joint venture agreement, and that Taymor breached that duty by not making changes to the book of the Musical (Am. Countercls. ¶¶ 142-51), is not supported by the facts pleaded.

> ### 1.    *Taymor Did Not Owe Goodbye a Fiduciary Duty*

The facts alleged do not plausibly support a fiduciary relationship between Goodbye and Taymor.  The October 2009 joint venture agreement between defendants Hello and Goodbye (the "Joint Venture Agreement")—which Goodbye alleges to be the source of Taymor's fiduciary duty because the agreement "designated" Taymor a member of a "board"—is a bilateral contract between two third-parties.  (Spada Aff., Exs. E (Oct. 2009 Joint Venture Agreement), F (Aug. 2010 Amended Joint Venture Agreement).)[5]  Taymor never signed the Joint Venture Agreement and there is no allegation that she signed it.  Taymor is not alleged to have agreed to serve as a member of any "board" or otherwise to take on any fiduciary responsibility vis-à-vis Goodbye, nor is she alleged to have received any consideration or payment for her alleged "board" service.  Finally, she is not alleged to have generally attended meetings of the "board" or engaged in other "board" activities.  Under New York law, a fiduciary duty "cannot be imposed unilaterally" on Taymor.  *See Marmelstein v Kehillat New Hempstead*, 841 N.Y.S.2d 493, 497 (N.Y. App. Div.

---

[5]  The Joint Venture Agreements are properly before the Court on this motion to dismiss because they are "incorporated by reference" by the counterclaims.  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *see* Am. Countercls. ¶¶ 143-45.  Moreover, because the counterclaims "rel[y] heavily upon its terms and effect," the Joint Venture Agreement may be deemed "integral" to the counter-claims and thus properly before the Court at this time. *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (internal quotations omitted).

2007) (quoting *United States v. Chestman*, 947 F.2d 551, 567 (2d Cir. 1991)); *EBC I, Inc. v. Goldman Sachs & Co.*, 936 N.Y.S.2d 92, 96 (N.Y. App. Div. 2011) (same); *Christ v. Lake Erie Distribs., Inc.*, 273 N.Y.S.2d 878, 883 (N.Y. Sup. Ct. 1966) ("Election alone does not make the person elected a director; there must also be an acceptance, either express or implied.").

Goodbye's sole factual allegation relating to Taymor's alleged exercise of "board" powers is its contention in paragraph 147 that Taymor once cast a telephonic "vote" related to the Musical's financing in December 2010.  Such a meager allegation does not plausibly support the existence of a fiduciary relationship.  *Cf. eBusinessware, Inc. v. Tech. Servs. Group Wealth Mgmt. Solutions, LLC*, No. 08 Civ. 09101 (PKC), 2009 WL 5179535, at *7 (S.D.N.Y. Dec. 29, 2009) (holding that use of term "fiduciary" in a single e-mail was insufficient to create corresponding duties because "[a] layperson's acceptance of the legal label 'fiduciary,' standing alone, is insufficient to convert a non-fiduciary relationship into a fiduciary relationship.").[6]

Even if Taymor could plausibly be alleged to be a member of a "board" created by the Joint Venture Agreement, Goodbye still makes no allegation that such membership gave rise to a fiduciary relationship.  Merely invoking the word "board" alone is insufficient to impose substantive fiduciary duties on another.  *Cf. Ne. Gen. Corp.*, 82 N.Y.2d at 163 ("Ultimately, the dispositive issue of fiduciary-like duty or no such duty is determined not by the nomenclature 'finder' or 'broker' or even 'agent,' but instead by the services agreed to under the contract

---

[6]  Paragraph 148 of the Counterclaims alleges that, in June 2011, Taymor's attorney, Seth Gelblum, "communicated to Counterclaim Plaintiffs' counsel that Taymor was resigning from the board."  That allegation wholly mischaracterizes a June 17, 2011 letter from Gelblum, which is attached as Exhibit G to the Spada Affirmation.  As is clear from the letter, Gelblum did not communicate that "Taymor was resigning from the board" as Goodbye alleges; rather, he stated that "Ms. Taymor is not now, and has never been, a member of any board."  Defendant's additional allegation that "Gelblum also attended a board meeting on Taymor's behalf" (Am. Countercls. ¶ 146) is belied by the Joint Venture Agreement, which expressly provides that "no Board member may appear and participate [in board meetings] by proxy," including through "attorneys."  (Spada Aff., Ex. F ¶ 5(E) at 8.)

between the parties.").[7]   Rather, "plaintiffs must allege at least some factors from which a court could conclude that such a relationship has been established."  *Ross v. FSG PrivatAir, Inc.*, No. 03 Civ. 7292 (NRB), 2004 WL 1837366, at *6 (S.D.N.Y. Aug. 17, 2004) (quoting *Boley v. Pineloch Assocs., Inc.*, 700 F. Supp. 673, 681 (S.D.N.Y. 1988)); *see also World Wrestling Entm't, Inc.*, 530 F. Supp. 2d at 504 ("[T]he Court is not required to credit mere legal conclusions that are dressed up as factual allegations that a defendant was in a fiduciary relationship with a plaintiff.").

Goodbye alleges no such facts.  It offers nothing more than conclusory assertions that "[a]s a member of the Joint Venture Agreement board, Hello and Goodbye placed trust and confidence in Taymor" and "[a]s such, Taymor owed a fiduciary duty of loyalty."  (Am. Countercls. ¶ 149.)  Such allegations are patently insufficient under *Twombly* and *Iqbal*.

### 2.   *Taymor Did Not Breach Any Fiduciary Duty to Goodbye*

Goodbye's claim also fails because it does not allege conduct by Taymor that would have breached a fiduciary duty of loyalty.

*First*, the alleged conduct—Taymor's "refus[al] to cooperate with members of the production or support changes to the show" (Am. Countercls. ¶ 150)—has nothing to do with Taymor's alleged role as a "board" member under the Joint Venture Agreement, but rather only arguably with her role as co-bookwriter under the Author Deal Memo.  The Joint Venture

---

[7]  Unlike situations involving formal corporate board membership, there is no statutory basis to impute fiduciary duties to an individual who is loosely designated a member of a group labeled a "board" by a bilateral joint venture contract between two third-parties.  *Cf.* N.Y. Bus. Corp. L. § 717(a); *ITEL Containers Int'l Corp. v. Atlanttrafik Express Serv., Ltd.*, 909 F.2d 698, 702 (2d Cir. 1990) ("A joint venture and a corporation are mutually exclusive ways of doing business."); *In re Roxy Roller Rink Joint Venture*, 67 B.R. 474, 477 (Bankr. S.D.N.Y. 1985) ("A joint venture and corporate form of business are mutually exclusive, each being governed by a separate body of law.") (quoting 16 *New York Jurisprudence 2d, Business Relationships* § 1580).

Agreement did not delegate basic creative decisions about the Musical to "board" members.  It delegated "Major Decisions" to "a majority vote of the six-person board, consisting of Bono, the Edge, Julie Taymor, Cohl, Harris, and Hello," with Cohl and Harris each getting a "second vote" in the event of a tie.  (Spada Aff., Ex. D ¶ 5(A).)  The Agreement defines "Major Decisions" to include an enumerated list of eight items.  None has anything to do with resolving creative differences about the story told by the Musical.  (*Id.* ¶ 5(A)(i)-(viii).)

Under New York law, where a party has both a fiduciary and contractual relationship with another party, the scope of the fiduciary duty is limited to actions taken in the fiduciary role.  Actions taken under the contract are not subject to fiduciary scrutiny.  *Cf. EBC I, Inc. v. Goldman, Sachs & Co.*, 832 N.E.2d 26, 32 (N.Y. 2005); *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999).  Because the alleged actions Goodbye complains of relate to Taymor's role as co-bookwriter, not as a "board" member, Goodbye's claim is unsupportable under New York law.

*Second*, Goodbye does not allege any act by Taymor resembling the kind of self-dealing that would give rise to a violation of the fiduciary duty of loyalty under New York law.  In order to establish a breach of the fiduciary duty of loyalty, Goodbye must allege facts supporting the conclusion that Taymor somehow benefited personally from her alleged "refus[al] to cooperate with members of the production or support changes to the show."  (Am. Countercls. ¶ 150.)  *Cf. Marx v. Akers*, 666 N.E.2d 1032, 1042 (N.Y. 1996) (where director is alleged to have acted in self-interest, plaintiff must show that "directors . . . receive[d] a direct financial benefit from the transaction which is different from the benefit to shareholders generally"); *Higgins v. New York Stock Exch., Inc.*, 806 N.Y.S.2d 339, 357 (N.Y. Sup. Ct. 2005) ("[C]onflicts of interest are

typically found where . . . a director stands to receive a personal benefit from the transaction at issue that is different from that received by all shareholders . . . .").

Goodbye does not allege such facts.  Its sole allegation relating to personal benefit states simply that "Taymor put her own personal interests ahead of those of the show."  (Am. Countercls. ¶ 150.)  Such a conclusory assertion is insufficient under *Twombly* and makes no sense as a practical matter.  Under the Author Deal Memo, Taymor was to be paid for her services as co-bookwriter by percentages of weekly operating profits after the Musical began public performances.  Taymor's interests were thus fully aligned with the financial success of the Musical and the interests of Goodbye and the other producers.

To the extent Goodbye is suggesting that Taymor's exercise of artistic discretion as a co-bookwriter breached a duty of loyalty Taymor owed as a member of the joint venture "board," the potential for conflicting responsibility was apparent to and authorized by Goodbye, and Goodbye thus cannot now claim breach.  *See, e.g.*, *Schneider v. Wien & Malkin LLP*, 798 N.Y.S.2d 713, at *14 (N.Y. Sup. Ct. 2004) ("[A] breach of fiduciary duty claim may not be based on a conflict of interest or even self-dealing where the conflict was specifically disclosed in the partnership agreement or prospectus.").[8]

---

[8]  Goodbye's fiduciary duty claim should also be dismissed because Goodbye has not alleged facts suggesting that it was harmed by Taymor's conduct.  *See Meisel v. Grunberg*, 651 F. Supp. 2d 98, 114 (S.D.N.Y. 2009) (elements of breach of fiduciary duty claim include "damages as a result of the breach") (collecting authorities).

### POINT III

**PORTIONS OF THE FIRST COUNTERCLAIM, AND THE ENTIRETY OF THE SECOND AND THIRD COUNTERCLAIMS, ARE BARRED BY 8 LEGGED'S SETTLEMENT AGREEMENT WITH THE STAGE DIRECTORS AND CHOREOGRAPHERS SOCIETY**

As referenced by 8 Legged's counsel during this Court's February 17, 2012 conference, this litigation was preceded by a separate arbitration filed by the Stage Directors and Choreographers Society ("SDC") on Taymor's behalf against the Musical's producers for failure to pay royalties to Taymor for her work as director and collaborator on the Musical.  (Spada Aff., Ex. I (2/17/12 Tr.) at 5.)  On February 14, 2012, 8 Legged and the SDC entered into a written settlement agreement (the "SDC Settlement Agreement").

As 8 Legged's counsel represented to the Court, defendants' Amended Answer and Counterclaims were filed "[p]ursuant to that settlement."  (Spada Aff., Ex. H (2/17/12 Tr.) at 5.)

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████   ████████████████████████████████████

---

[9]  The SDC Settlement Agreement is properly before the Court on this motion to dismiss.  *First*, defendants admit they filed the Amended Answer and Counterclaims "[p]ursuant to" the SDC Settlement Agreement (Spada Aff., Ex. H (2/17/12 Tr.) at 5) and thus relied on the "terms and effect" of the settlement.  *Cf. Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.") (internal quotation marks and citation omitted); *Salichs v. Tortorelli*, No. 01 Civ. 7288 (DAB), 2004 WL 602784, at *3 (S.D.N.Y. Mar. 29, 2004) ("Plaintiff's allegations rely on the 'terms and effects' of the Settlement Agreement in framing the Complaint . . . .  Accordingly, this Court finds the Settlement Agreement may be examined and utilized in deciding a motion to dismiss under Rule 12(b)(6).").  *Second*, the SDC Settlement Agreement is a legal document of which judicial notice may properly be taken, particularly given



The Amended Counterclaims, however, do not, as the SDC Settlement Agreement required, "██████████████████████████████" to its previous claim that Taymor breached the Director/Collaborator Deal Memo by allegedly refusing to make changes to the Musical. Instead, they merely excise six paragraphs at the end of the original Counterclaims purporting to

that defendants are well aware of the existence and substance of the agreement. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (JG), 2008 WL 115104, at *8 (E.D.N.Y. Jan. 8, 2008) ("[T]he court may, without converting a dismissal motion into a motion for summary judgment, consider materials of which judicial notice may be taken, such as a settlement agreement."); *cf. Chambers*, 282 F.3d at 153 ("[W]here plaintiff has actual notice of all the information in the movant's [extrinsic] papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.").

[10] ████████████████████████████████████████████████
████████████████████████████████████████████
████████████ (Spada Aff., Ex. I at 4.)  The First Counterclaim in defendants' original Answer and Counterclaims incorporated all factual allegations in paragraphs 1 through 131 of that pleading. (Spada Aff., Ex. B ¶ 132.)  Based on those allegations, 8 Legged claimed that Taymor's conduct in "refusing to collaborate with other members of the production, among other things," breached the Director/Collaborator Deal Memo. (Spada Aff., Ex. B ¶ 135.)  In paragraph 152 of the original Answer and Counterclaims, Goodbye claimed that "Taymor put her own personal interests ahead of those of the show and refused to collaborate with members of the production or support changes to the show . . ., all in breach of her duty of loyalty."

recite the legal elements of that claim.  (Spada Aff., Ex. B ¶¶ 132-37.)[11]  The factual allegations in the Amended Counterclaims are virtually identical to those in the original Counterclaims.  (*Id.* ¶¶ 1-131.)  Defendants also inserted a new counterclaim for breach of fiduciary duty based on the same conduct as previously alleged.  (*Id.* ¶¶ 136-41.)

To the extent the Amended Counterclaims are not dismissed on the grounds discussed in Points I and II above, significant portions of 8 Legged's breach-of-contract counterclaim (the First Counterclaim), as well as the entirety of 8 Legged's and Goodbye's breach-of-fiduciary counterclaims (the Second and Third Counterclaims), should be dismissed as barred by the release in the SDC Settlement Agreement.

The majority of 8 Legged's First Counterclaim is barred by 8 Legged's release under the SDC Settlement Agreement because the claim relies heavily on many factual allegations that had been pleaded in support of 8 Legged's "Collaborator Counterclaim" in the original Answer and Counterclaims.  It also relies on facts alleged by 8 Legged as a defense to the SDC arbitration. (Spada Aff., Ex. G.)[12]  Those allegations include that Taymor: "fail[ed] to make the changes to the Book requested by the Producers"; "insist[ed]—despite the protestations of Answering Defendants, the other members of the Musical's creative team and Marvel—that the *Spider-Man* Musical focus on the character of Arachne and relegat[ed] the *Spider-Man* character to a minor role"; and "prevent[ed] her co-bookwriter, Berger, from making the changes to the Book

---

[11]  The Amended Counterclaims also replaced the word "collaborate" and "collaborators" in the original Counterclaims with various thinly-veiled synonyms (such as "cooperate" and "creative team").  (*E.g.*, Spada Aff., Ex. A ¶¶ 7-8, 63, 99, 133, 150.)

[12]  8 Legged's September 27, 2011 letter, which was submitted to the arbitrator setting forth 8 Legged's defense in the SDC arbitration, is properly before the Court on this motion to dismiss for the same reasons that the Court may consider the SDC Settlement Agreement.  Because 8 Legged has relied on the "terms and effect" of the SDC Settlement Agreement in this litigation—including its provisions relating to the amendment of its counterclaims—it is proper for the Court to determine the scope of the release contained in that agreement.

requested by the Producers."  (Am. Countercls. ¶ 133.)  To the extent 8 Legged's breach-of-

contract counterclaim relies on these allegations, it must be dismissed with prejudice because it

has been released under the SDC Settlement Agreement.

8 Legged's Second Counterclaim and Goodbye's Third Counterclaim rely *exclusively* on

facts previously alleged in support of either 8 Legged's "Collaborator Counterclaim" in the

original Answer and Counterclaims or its defenses in the SDC arbitration.  (*Compare* Spada Aff.,

Ex. A ¶¶ 137-40, 149-50 *with id.*, Ex. G.)  Therefore, the Second and Third Counterclaims are

entirely barred by the SDC Settlement Agreement and must be dismissed with prejudice.

## <u>CONCLUSION</u>

For the reasons set forth herein, the defendants' First, Second, and Third Counterclaims

should be dismissed with prejudice.

Dated:  New York, New York
       March 21, 2012

LANKLER SIFFERT & WOHL LLP

By:    <u>*/s/ Charles T. Spada*</u>
      Charles T. Spada (cspada@lswlaw.com)
      Matthew G. Coogan (mcoogan@lswlaw.com)
      Patrick C. Toomey (ptoomey@lswlaw.com)
      Edward B. Diskant (ediskant@lswlaw.com)

      500 Fifth Avenue
      New York, NY 10110
      (212) 921-8399

      *Attorneys for Plaintiffs Julie Taymor and LOH, Inc.*