LANKLER SIFFERT & WOHL LLP
Charles T. Spada (cspada@lswlaw.com)
Matthew G. Coogan (mcoogan@lswlaw.com)
Lauren C. Freundlich (lfreundlich@lswlaw.com)
Andrew S. Lee (alee@lswlaw.com)
Patrick C. Toomey (ptoomey@lswlaw.com)
500 Fifth Avenue
New York, NY 10110
(212) 921-8399

*Attorneys for Plaintiffs*

RECEIVED 2012 JUL -9 P 10: 27 U S DISTRICT COURT SDNY

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JULIE TAYMOR and LOH, INC., <br><br> Plaintiffs, <br><br> - against - <br><br> 8 LEGGED PRODUCTIONS, LLC, HELLO ENTERTAINMENT, LLC, GOODBYE ENTERTAINMENT, LLC, SAVIOR PRODUCTIONS, LLC, MICHAEL COHL, JEREMIAH HARRIS, and GLEN BERGER, <br><br> Defendants. | 11 Civ. 8002 (KBF) <br><br> __AMENDED COMPLAINT__ <br><br> **Jury Trial Demanded** |

Plaintiffs Julie Taymor and LOH, Inc., by and through their attorneys Lankler Siffert &

Wohl LLP, as and for their Amended Complaint against Defendants 8 Legged Productions, LLC,

Hello Entertainment, LLC, Goodbye Entertainment, LLC, Savior Productions, LLC, Michael

Cohl, Jeremiah Harris, and Glen Berger, allege as follows:

## NATURE OF THE ACTION

1.     Julie Taymor and her wholly-owned company, LOH, Inc. ("LOH"), bring this

action to remedy Defendants' willful copyright infringement and breaches of contract arising

from their unauthorized and unlawful use of Taymor's copyrighted written works in the current

hit Broadway musical *Spider-Man: Turn Off the Dark* (the "Musical" or "*Spider-Man*").

2.      Taymor, a world-famous director, writer, collaborator, and costume designer,

worked on *Spider-Man*—including co-writing its book (also called a "libretto" or "script")—for

over seven years.  In early 2011, the Musical's producers removed Taymor from the production.

Since then, they have continued to promote, use, change, and revise Taymor's work, including

her book of the Musical.  They have done so without her approval or authorization and in

violation of their agreements with Taymor and Taymor's intellectual property rights, including

her right to approve changes to her book of the Musical.  They have refused to pay Taymor her

contractually guaranteed authorship royalties.

3.      By their actions, Defendants have: (a) violated Taymor's rights under the

Copyright Act; (b) breached their agreements with Taymor and LOH; and (c) threatened to

violate Taymor's right of privacy under Sections 50 and 51 of the New York Civil Rights Law.

Taymor and LOH seek compensatory and statutory damages, a declaratory judgment, and

injunctive relief.

## **PARTIES**

4.      Plaintiff Julie Taymor is domiciled in this District.  Taymor served as director,

collaborator, co-bookwriter, and mask designer for *Spider-Man*.

5.      Plaintiff LOH, Inc., is a domestic business corporation organized and existing

under the laws of the State of New York and having its principal place of business in this

District.  LOH is wholly owned by Taymor, who serves as President of the company.

6.      Defendant 8 Legged Productions, LLC ("8 Legged") is a domestic limited

liability company organized and existing under the laws of the State of New York and having its

principal place of business in this District.  8 Legged is the current lead production company for *Spider-Man*.  8 Legged was formed by Defendants Hello Entertainment, LLC ("Hello") and Goodbye Entertainment, LLC ("Goodbye") in or around August 2010.  In August 2010, by written agreement between Hello and Goodbye and its operating agreement, 8 Legged assumed rights and obligations relating to *Spider-Man*.

7.    Defendant Hello Entertainment, LLC, is a limited liability company organized and existing under the laws of the State of Delaware.  Hello was *Spider-Man*'s original lead production company before 8 Legged took over that role.  Hello was formed by David Garfinkle and the late Tony Adams in July 2003.  Hello is a Manager of 8 Legged and remains a producer of *Spider-Man* today.  Upon information and belief, Hello has participated and continues to participate in decisions related to the production of the Musical, including the producers' decisions to engage in the conduct that is the basis of this lawsuit.

8.    Defendant Goodbye Entertainment, LLC, is a limited liability company organized and existing under the laws of the State of Delaware.  Goodbye was formed by Defendants Michael Cohl and Jeremiah Harris in November 2009 to facilitate the carrying out of Cohl's and Harris's new responsibilities as lead producers of *Spider-Man*.  Goodbye is a Manager of and responsible for the day-to-day operations of 8 Legged.  Goodbye is a producer of *Spider-Man*.

9.    Defendant Savior Productions, LLC ("Savior") is a domestic limited liability company organized and existing under the laws of the State of New York and having its principal place of business in this District.  Savior was formed by Cohl and Harris for the purpose of financing the completion of *Spider-Man* after they assumed certain lead production responsibilities in 2009.  Savior is a Member of 8 Legged and a producer of *Spider-Man*.

10.     Defendants Michael Cohl and Jeremiah Harris are the current lead producers of *Spider-Man*.  They have acted as lead producers since 2009, when the Musical's original producers encountered financing difficulties and ceded certain lead production responsibilities for the Musical to Cohl and Harris.  Upon information and belief, Cohl and Harris are Lead Managers and Board members of, and have authority to conduct the day-to-day management of, Goodbye and Savior.

11.     Defendant Glen Berger is a co-bookwriter of *Spider-Man*.

## JURISDICTION & VENUE

12.     This Complaint arises under the federal Copyright Act, 17 U.S.C. § 101 *et seq*., the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and New York state law.  All of the claims in this action form part of the same case or controversy.  This Court has jurisdiction under 28 U.S.C. §§ 1331, 1338, and 1367.

13.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1400(a).

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

**Julie Taymor**

14.     Taymor is an accomplished and critically acclaimed director, writer, collaborator, and costume designer.  She is widely known for her work on the Broadway musical *The Lion King*, which is the highest-grossing Broadway musical of all time and among the longest running, and which has also been successful in other venues worldwide.  Taymor directed *The Lion King* and designed the show's signature costumes, masks, and puppets.  In 1998, Taymor won two Tony Awards for her work on *The Lion King*, becoming the first woman ever to win a Tony Award for Best Direction of a Musical.  Taymor and *The Lion King* also won numerous other awards for Taymor's direction and her original costume, mask, and puppet designs.

15.     In addition to *The Lion King*, Taymor has directed and written numerous Broadway productions, motion pictures, and operas.  She has won myriad awards for her work, including three Drama Desk Awards, an Emmy Award, and a MacArthur "Genius" Fellowship. The motion picture *Frida* (2002), which Taymor directed, was nominated for six Academy Awards and won two.

**Beginnings of *Spider-Man: Turn Off the Dark***

16.     Spider-Man is a fictional superhero created in the 1960s by Stan Lee and Steve Ditko.  Over the years, Spider-Man has appeared in more than one thousand Marvel Comics publications.  Spider-Man also has been the subject of works in other media, such as television, video games, and four major motion pictures: *Spider-Man* (2002), *Spider-Man 2* (2004), *Spider-Man 3* (2007), and *The Amazing Spider-Man* (2012).  Certain intellectual property rights related to the Spider-Man character and comic books are owned by Marvel Entertainment, LLC, or Marvel Entertainment, Inc. (together, "Marvel").

17.     In or around 2003, producers David Garfinkle and Tony Adams began negotiating with Marvel for the right to produce a musical stage play based on the Spider-Man character. Garfinkle and Adams approached famed musicians Paul David Hewson (professionally known and referenced herein as "Bono") and David Howell Evans (professionally known and referenced herein as "The Edge" or "Edge") of the multiple Grammy Award winning rock band U2 to compose music and lyrics for the Musical.  Bono and Edge agreed to work on the project.

18.     In or around 2004, Marvel licensed the right to produce the Musical to Garfinkle and Adams through their production company Hello Entertainment.

19.     Garfinkle and Adams initially engaged Neil Jordan to author the "book" of the Musical.  A "book" of a musical (also called a "libretto" or "script") is a written work that sets

5

forth all aspects of a musical stage play, including the spoken dialogue and storyline, as well as descriptions of sets, costumes, characters, and actions that are to occur on stage.

20.    In or around 2004, Bono, Edge, Jordan, and the producers asked Taymor to direct and collaborate on the Musical.  Taymor agreed.

**Taymor's Treatment for the Musical**

21.    In 2004, Taymor authored a three-page original treatment for the Musical (the "Treatment").  A treatment is a work of prose that sets out the basic storyline, characters, and narrative arc of a longer work.  It conveys the essential themes and structure of the work and may be as short as a few pages or much longer.  A treatment for a musical stage play is typically used both as a tool to obtain approval of the musical's concept from interested parties and, later, as a basis for drafting the book of the musical.

22.    Drawing on her years of experience in theater—including her direction of the Broadway musical *The Lion King* (which has become the highest-grossing musical in Broadway history)—Taymor endeavored to create an original dramatic work about Spider-Man that was engaging, coherent, and well-suited for live performances before diverse Broadway audiences.

23.    Taymor's intent in creating the Treatment (and later in co-writing the book of the Musical) was to distill the wide-ranging themes presented in the pre-existing Spider-Man works into a unified story that would encompass the entire contemporary myth of Spider-Man in a two-and-a-half hour drama.  Taymor envisioned the Musical not to be an "episode" in the tradition of the comic books, but a self-contained story that would capture the essence and meaning of the overall ethos of Spider-Man.  Taymor also created the story so as to showcase the music and thrilling visual and technical aspects, such as elaborate costumes and ground-breaking flying sequences, that Taymor envisioned for the Musical.

24.     In the Treatment, Taymor set forth the structure of the Musical as a two-act play in which Act One would explain how Spider-Man gained his powers and introduce various characters and conflicts that would be further explored and resolved in Act Two.  Taymor envisioned the story of the Musical not as dealing with just one villain, as was done in many of the pre-existing individual comic books and the movie, but as exploring Spider-Man's crime fighting as a whole, with multiple villains drawn from numerous different comic books.  This concept was original and was not suggested by the pre-existing Spider-Man works, which consisted of a serial, episodic unfolding of varying and intertwining plotlines and characters over 40-plus years.

25.     By 2004, when Taymor authored the Treatment, the universe of pre-existing Spider-Man works included more than one thousand comic books and one movie, *Spider-Man* (2002).  Hundreds of different characters and storylines had been portrayed in the pre-existing works.

26.     Taymor's creative process in preparing the Treatment included, among other things, reviewing many different comic books and works of mythology and viewing the movie *Spider-Man*.  She selected, adapted, combined, and arranged certain elements from these works that she believed could be sung in a Musical, could be presented in a visually spectacular way, and would support and complement the unique narrative structure that Taymor had chosen for the Musical.  Such elements included the villains Green Goblin and the Sinister Six (or Seven), which were selected from over one hundred different villains that had been portrayed in the pre-existing works, as well as discrete portions of certain storylines relating to the origins of Spider-Man's powers and his relationships with other characters.

27.     Taymor's selection and arrangement of these and other pre-existing elements was a substantial creative task given the breadth and variation of themes, plotlines, characters, and other elements within the pre-existing works.

28.     Taymor also deliberately chose *not* to use certain prominent elements from the pre-existing works that she believed would not serve (or could actively impede) her artistic goals.

29.     For example, Taymor chose not to include the character Gwen Stacy in the Treatment, who was portrayed in the Spider-Man comic books as Peter Parker's original love interest, opting instead to focus on Parker's relationship with Mary Jane Watson.

30.     As another example, Taymor chose not to include the character Harry Osborn or any storylines related to him in the Treatment.  Harry Osborn had been portrayed as a central character in the pre-existing Spider-Man works, particularly the first Spider-Man movie.  Harry Osborn had a complicated relationship with Peter Parker, playing a pivotal and evolving role as Parker's close friend, his rival for Mary Jane Watson's affection, son of Green Goblin, and ultimately a formidable villain in his own right.  None of the many scenes or events essential to the Harry Osborn narrative that are portrayed in the pre-existing works appear anywhere in the Treatment.  Taymor deliberately excluded such elements for various creative reasons, including her desire that the Musical not get bogged down in a complicated narrative that risked confusing the audience and detracting from the production's music, visual components, and other thrilling technical aspects.

31.     In addition to her original selection and arrangement of pre-existing elements from the Spider-Man comic books and movie, Taymor also contributed new, independently conceived elements in authoring the Treatment.

32.     One of the most important new elements that Taymor created in the Treatment story is the character Arachne.  Taymor conceived and developed Arachne and her relationship with Peter Parker as, among other things, a device to frame and enhance the audience's understanding of Parker's transformation into Spider-Man and to serve as an illustration of the risks of arrogance and hubris faced by Parker as he attempts to balance his new powers and responsibilities as Spider-Man with his personal life and relationships.  Taymor also developed Arachne in order to provide the female vocal color she believed essential to any musical.  Mary Jane alone could not deliver this necessary musical element.  But Arachne, a mezzo-soprano with an edge, would provide contrast to Mary Jane's sweet voice.

33.     The ancient Greek myth of Arachne had been referenced in certain previously published Spider-Man works.  The Spider-Man works, however, had not previously portrayed Arachne as depicted in the Treatment or any of the settings, themes, plots, and narrative arcs related to Arachne that Taymor expressed in the Treatment.

34.     Taymor combined her original, independently conceived elements with the ones she had selected, arranged, and adapted from the pre-existing Spider-Man works and presented them in the Treatment as the basis for the Musical.

35.     The Treatment combines forms of originality commonly found in both derivative works and compilations under the Copyright Act.

36.     In 2004, Taymor's Treatment was approved by Bono, Edge, Garfinkle, and Adams as the basis for the Musical.  As recounted in a December 2010 Chicago Magazine article profiling Garfinkle and the Musical:

> Taymor immersed herself in the world of Spider-Man.  She watched the movies, read the comic books, and even delved into other superhero influences, such as ancient mythology.  During one sleepless 48-hour creative binge, she wrote a three-page

treatment, which she presented to the group.  "This is the way we bring it to the stage," she proclaimed.  Her approach had all of the conventional "Wham!" "Pow!" and "Zap!" of the comic books but also offered a deeper character study of the angst-ridden teenage superhero who must rise above his self-doubt to save the world from bad guys, including a new villain of Taymor's creation: Arachne, a powerful spider-woman derived from Greek mythology.  "We were all, like, floored," recalls Garfinkle.  Over the next few days, Bono and the Edge used Taymor's framework to sketch out some of the show's musical themes.  "You could already see the synergy there," says Garfinkle.

37.    In or around 2004, Neil Jordan ceased working as bookwriter on the Musical.  With Jordan's departure, Taymor, in addition to directing and collaborating, agreed to author the book of the Musical.

38.    In 2005, to accommodate her additional responsibilities on the Musical, Taymor chose Glen Berger as her co-bookwriter.  The producers and Marvel approved of Berger as co-bookwriter.

39.    On March 17, 2005, Taymor registered her Treatment with the United States Copyright Office.  The copyright registration certificate, attached hereto as Exhibit A, identifies the Treatment as both a compilation and derivative work under the Copyright Act.

**Deal Memoranda With the Producers**

40.    From the beginning of her involvement with the Musical, Taymor insisted that she have creative control over her contributions to the Musical, including the book of the Musical, and that she have approval over subsequent productions of the Musical beyond Broadway.  On March 28, 2005, Taymor's lawyer, Seth Gelblum, Esq., of the firm Loeb & Loeb LLP, confirmed by e-mail to Garfinkle and Adams that Taymor would serve as the Musical's co-bookwriter going forward with the understanding that Taymor had "full customary author approvals over creative and business issues."

41.     Taymor's insistence on creative control over her contributions to the Musical, as well as Garfinkle's and Adams's agreement to such control, was not unusual in light of Taymor's sought-after stature, skill, experience, and proven success.

42.     Glen Berger entered into a deal memorandum (the "Berger Deal Memo," attached hereto as Exhibit B), dated June 22, 2005, with Hello Entertainment (Garfinkle's and Adams's production company).  The Berger Deal Memo reflected the material terms of Berger's and Hello's agreement on issues related to Berger's services as co-bookwriter of the Musical.  Among other things, Berger and Hello expressly agreed that Taymor had the sole right to authorize any changes to the book of the Musical.  Paragraph 11 of the agreement states:

> Consultation on Bookwriter/Creative Decisions: Berger shall collaborate with Julie Taymor on bookwriter related and other creative decisions for the Musical; provided, however, Julie Taymor, in her sole and absolute discretion, shall have final approval on all such decisions, including her directing of any film adaptation of the Musical.  [Emphasis added.]

43.     Taymor was an intended third-party beneficiary of Paragraph 11 of the Berger Deal Memo.  Indeed, on June 28, 2005, Garfinkle sent an unsigned copy of the Berger Deal Memo to Taymor's lawyer (Gelblum) for review.  In an e-mail the same day, Gelblum told Garfinkle that Berger "ha[d] to agree that Julie . . . has approval over authorial decisions."  Garfinkle confirmed that Paragraph 11 of the Berger Deal Memo reflected such an agreement.

44.     On or about June 28, 2005, Garfinkle assured Gelblum during a telephone conversation that Bono's and Edge's agreement with Hello contained a similar provision affirming Taymor's approval rights over authorial decisions for the Musical.  Upon information and belief, Bono and Edge executed an agreement with Hello containing such a provision.

45.     On August 4, 2005, Taymor, LOH, and Hello signed a deal memorandum reflecting the material terms of their agreement on issues related to Taymor's services as co-

bookwriter of the Musical (the "Author Deal Memo," attached hereto as Exhibit C).  In entering into that agreement, Taymor knew and relied on the fact that the producers had agreed with other members of the creative team, including Berger, that Taymor had approval rights over changes to the book of the Musical.

46.    The Author Deal Memo with Taymor provides that Taymor and LOH, "as a co-owner of the book of the musical . . . <u>shall have approval (to be shared with the composer and lyricist [Bono and Edge], and if such parties and [Taymor and LOH] agree, with the bookwriter) over dispositions of rights to the Musical, and all other decisions customarily reserved to the authors of a Musical.</u>"  (Emphasis added.)  The parties' contemporaneous e-mails and conversations confirm that this was intended to mean, among other things, that Taymor had approval rights over changes to the book of the Musical.

47.    Pursuant to the Author Deal Memo, the producers also agreed to pay Taymor a co-bookwriter royalty based on a figure of 1.945% of weekly operating profits from public performances (with that percentage increasing as the Musical's investors recouped their investments).

48.    Taymor, LOH, and Hello also signed a deal memorandum, dated July 12, 2005, reflecting the material terms of their agreement on issues related to Taymor's services as director and collaborator on the Musical (Exhibit D).  The July 12, 2005 deal memorandum, an amendment thereto, and a subsequent long-form agreement entered into by the parties were the subject of an arbitration brought by the Stage Directors and Choreographers Society on Taymor's behalf against 8 Legged for, among other things, payment of director and collaborator royalties owed to Taymor (the "SDC Arbitration").  As explained below, the SDC Arbitration has since settled.

49.     On October 22, 2005, producer Tony Adams died unexpectedly.  Garfinkle took over as sole lead producer of the Musical.

**Subsequent Negotiations and Creation of the Book of the Musical**

50.     In or around 2005, Taymor and Berger began to author the book of the Musical based on Taymor's Treatment.  They worked on the book over approximately the next six years.  Consistent with their agreements regarding Taymor's creative approval rights, Taymor was responsible for or approved all authorial decisions regarding the drafting of the book.

51.     Taymor and Berger created the book of the Musical based on Taymor's Treatment.  The book theatricalizes in novel ways the familiar story of Peter Parker and his love interest Mary Jane Watson, creates new themes and characters, expands on pre-existing characters from Marvel's Spider-Man comic books, develops new plotlines and specific dialogue, and contains detailed, original descriptions of stage activity used to bring the story of Spider-Man to life on stage.

52.     For example, the book continues to highlight and develop the new character of Arachne that Taymor created in the Treatment, her contrast to and relationship with Peter Parker, and her personification of themes critical to the Musical's story.  Arachne also serves to introduce other unique plot elements into the story, including those which spring from her relationship with Peter Parker.

53.     The development of Arachne, her relationship to Peter Parker, and her personification of themes critical to the Musical's story are original, protectable expression owned by Taymor.  By written amendment of the original 2004 license agreement between Marvel and Hello, Taymor, Marvel, and the Musical's producers agreed that only the "appearance and/or attributes" of Arachne as portrayed in the Musical would be deemed works

13

made for hire for Marvel under the Copyright Act.  Marvel and the producers further agreed with Taymor that their "right to exploit [Arachne] is frozen and will not be exploited without the Creators' permission."

54.     In addition to introducing new elements that had not been portrayed in pre-existing Spider-Man works, the book that Taymor and Berger co-authored expresses an original selection and arrangement of elements drawn from the vast universe of pre-existing Spider-Man material.  The book preserves much of the original selection and arrangement that Taymor first introduced in her Treatment.  At the same time, however, Taymor and Berger also expanded upon the Treatment by selecting and arranging additional characters and plot elements from the pre-existing Spider-Man works.

55.     The book co-authored by Taymor and Berger combines the properties of both a derivative work and a compilation under the Copyright Act.   This synthesis of pre-existing elements and new elements extends beyond those found in Taymor's 2004 Treatment.

56.     Throughout the time period in which Taymor and Berger worked on the book, Bono, Edge, and the Musical's producers enthusiastically supported Taymor's vision for the Musical and her authorial decisions with respect to the book, including her choice to portray Arachne as a central character.  Transcripts from multi-day work sessions demonstrate the depth of this support, particularly from Bono and Edge, for Taymor and her work.  For example:

- During one work session in August 2006, Bono stated: "The tragedy of Arachne is [the] joy of Spider-Man – the tragedy morphs to joy.  Somehow her theme, all she went through, finding some kind of transformation into his – the power of him flying."

- Later in the same session, Bono added: "Yeah.  See, if you go to Arachne, you can use Arachne's theme.  And Arachne's theme is a big emotional theme.  So – and you want – you're gonna want to bang that theme a lot, whenever you can."

- At another work session in October 2006, Edge commented: "I think that the questions to ask about the character of Arachne is – it's very hard to pin down in

my head.  Because she's not kind of a bad person.  You know.  She's pretty misguided, or whatever.  But she's – if Mary Jane is the heroine, as it were, the positive female character, then Arachne's the flip side of Mary Jane.  But Mary Jane has to win.  So, there's – so, what is it?  It's almost like, it all hinges on the reason why they like Peter.  And the difference between the reasons they love Peter Parker.  Is, I think, Mary Jane loves Peter Parker for who he actually is.  It is Arachne who loves Peter Parker for who she thinks he can become."

- As the October 2006 session ended, Bono stated: "There's a great line in the Scriptures, it's 'Know the truth, and the truth shall set you free.'  That's the kind of line that sums up Arachne.  Because she's all about weaving this web of fantasy, and illusion."

57.     Marvel and the producers of the Musical also approved drafts of the book at each stage of the writing process.  During the writing process, Marvel and the producers viewed workshops and staged readings of the Musical.

58.     While working on the book of the Musical, Taymor and Berger, through their representatives, engaged in negotiations with the producers on a long-form author agreement.  A final long-form author agreement was not executed, however, because Bono and Edge did not respond to requests for comments.  Nevertheless, the negotiations among Taymor, Berger, and the producers toward a long-form author agreement reflected agreement on a number of material terms.  For instance, they confirmed Taymor's creative approval rights over authorial decisions and changes to the book of the Musical.  Thus, paragraphs 15.1 and 15.5 of the most recent draft of the long-form author agreement provide that:

> No changes in the book, music or lyrics of the Musical will be made without the approval of the Author and Producer . . . .

> Approval rights belonging solely to the Co-Bookwriters will be made and communicated by Taymor (after consultation with Berger) and Producer will have the right to rely thereupon.

59.     In good-faith reliance on these negotiations and the agreement among the parties, Taymor continued to work on the book of the Musical, making numerous, independently copyrightable contributions to the book.

**Cohl and Harris Become Lead Producers**

60.     In or around 2009, Garfinkle and Hello faced financing difficulties that threatened the Musical's survival.

61.     Thereafter, Cohl and Harris took over certain lead production responsibilities, with the approval of Bono, Edge, and Taymor.  Cohl and Harris formed 8 Legged, Goodbye, and Savior to continue the production and financing of the Musical.

62.     At the time Cohl and Harris became lead producers in 2009, the book of the Musical already had been approved in its then-current form.  Upon information and belief, Cohl and Harris were familiar with the book of the Musical when they took over as lead producers.

63.     On November 6, 2009, in connection with the announcement that Cohl and Harris would assume new roles as producers of the Musical, Cohl, Harris, Hello, and the Musical's other producers issued a press release acknowledging that the producers were familiar with "the details and intricacies of this wildly ambitious project."  The press release also characterized the story told in the Musical, stating, among other things:  "Drawing from over 40 years of Marvel comic books for inspiration, ***SPIDER-MAN*** spins a new take on the mythic tale . . . .  Spider-Man's battles will hurtle the audience through an origin story both recognizable and unexpected yielding new characters as well as familiar faces until a final surprising confrontation casts a startling new light on this hero's journey."

64.     On or about August 24, 2010, to induce additional investors to finance the Musical, Taymor, LOH, Berger, Bono, Edge, 8 Legged, and others entered into written agreements to reduce their royalty percentages under the 2005 deal memoranda by half for a limited time in exchange for the producers' agreement to double the guaranteed minimum weekly royalties (the "2010 Amendment," attached hereto as Exhibit E).  Before the restructuring, Taymor and the producers had agreed to a guaranteed minimum weekly royalty

16

amounting to $750 per percentage point of weekly operating profits for each eight-performance week of the Musical, beginning with the first public preview performance.  Thus, Taymor was to receive a guaranteed minimum weekly royalty of $1,458.75 per eight-performance week in her role as co-bookwriter.  (Exhibit F.)  Under the 2010 Amendment, Taymor's guaranteed minimum weekly royalty as co-bookwriter was doubled to $2,917.50 per eight-performance week.  (Exhibit E.)

65.     The 2010 Amendment was not intended to—and did not—release Hello from its obligations under the 2005 Author Deal Memo or the Berger Deal Memo.  Taymor has never agreed to release Hello from its contractual obligations to her.

66.     Hello remained involved as a producer of the Musical in the time after Cohl and Harris assumed their new responsibilities in 2009.  Among other things, Hello signed various agreements as a producer related to the financing, casting, and production of the Musical.

### *Spider-Man* Begins Rehearsals and Opens in Previews on Broadway

67.     In or around mid-August 2010, the Musical began rehearsals.  During the rehearsal period, Taymor and Berger continued work on the book of the Musical.

68.     In late 2010, Marvel and the producers approved the book of the Musical as it existed at that time.

69.     On November 28, 2010, *Spider-Man* played its first public preview performance on Broadway.

70.     Throughout the preview period until her removal from the production, Taymor continued to work on changes to the Musical, including working with Berger on further changing and refining the book of the Musical within the confines of the preview performance schedule.  After public performances had started, the producers never conveyed to Taymor that they would

be agreeable to suspending public performances for a period of time if major changes to the Musical were desirable.

71.     Upon information and belief, beginning in or around December 2010, Berger, Cohl, Harris, and others discussed and worked on certain other revisions to the book of the Musical without Taymor's knowledge or consent.  Upon information and belief, Berger, Cohl, and Harris intentionally concealed from Taymor their communications among each other and with Bono, Edge, and others as they prepared to make their own changes to the book of the Musical without Taymor's knowledge or consent.

72.     As of February 20, 2011, although Taymor was due royalties as co-bookwriter, director, and collaborator for each public performance from the time the Musical began previews on November 28, 2010, the producers had not paid Taymor the royalties due.  On February 20, 2011, Gelblum sent Cohl and Harris an e-mail requesting that they pay Taymor the royalties due.

73.     On February 26, 2011, Taymor met with Cohl, Berger, and Edge at Gelblum's office, with Bono and Harris participating by conference call.  Taymor was told at that meeting about certain proposed changes to the book of the Musical on which Berger, Cohl, and Harris had been working without Taymor's knowledge or approval.

74.     On March 1, 2011, Gelblum notified Cohl and Harris by telephone and e-mail that Taymor was not waiving her approval rights over changes to the book of the Musical.

75.     The last version of the original book of the Musical co-written by Taymor before she was removed from the production in March 2011 is entitled "Spider-Man: Turn Off the Dark" (the "Original Book").  Taymor registered the Original Book with the United States Copyright Office effective October 11, 2011.  The copyright registration certificate for the Original Book is attached hereto as Exhibit G.

**Defendants Remove Taymor From the Production and Change the Book of the Musical Without Taymor's Approval**

76.     On March 4, 2011, Taymor and Gelblum were summoned to a meeting with Cohl, Harris, Bono, and Edge in Manhattan.  At that meeting, Taymor was told that she was being removed from the production and that a new "creative consultant" and a bookwriter were being hired to make changes to Taymor's work, including to the Original Book.  Taymor did not give her permission or consent to the hiring of the creative consultant or bookwriter or to the proposed changes to her Original Book.

77.     On March 9, 2011, the producers publicly announced that Philip William McKinley and Roberto Aguirre-Sacasa were joining the Musical's creative team "to help implement new staging and book rewrites, respectively."  The producers then began to implement the changes to the Original Book that they and Berger secretly had been planning for months.  No one sought or obtained Taymor's consent to make these changes.

78.     On March 29, 2011, Taymor's counsel again notified the producers' counsel in writing that Taymor retained creative rights over her work, including her right to approve any changes made to the Original Book.

79.     Following its April 17, 2011 preview performance, *Spider-Man* shut down for approximately three weeks in order to facilitate the book rewrites and restaging that Defendants had been planning without Taymor's approval.  During the shut-down period, Berger and Aguirre-Sacasa continued to make changes to the Original Book at the urging and direction of Cohl and Harris, who, upon information and belief, had consulted with and obtained approval of the Musical's other producers, including Hello.  These changes included reducing or eliminating the role of certain characters and revising certain plotlines.  The changes were made without

Taymor's approval or consultation.  The changes resulted in a revised book (the "Infringing Book"), which was adapted and derived from Taymor's Original Book.

80.     On May 12, 2011, *Spider-Man* re-opened in previews using the Infringing Book.

81.     The Infringing Book, which has been used in the Musical since it re-opened on May 12, 2011, is copied and derived from Taymor's copyrighted 2004 Treatment and her Original Book.  As detailed in the examples below, the Infringing Book is substantially similar to both works.  In addition, the producers have copied portions of Taymor's Original Book without authorization in, among other things, merchandise sold in connection with the Musical since the May 12, 2011 re-opening.

82.     Taymor has been billed as co-bookwriter of the Musical since the Musical opened in previews in November 2010.  Even after the producers removed Taymor in March 2011 as the director, they have continued to acknowledge that Taymor is a co-bookwriter of the Musical and have publicized that fact to capitalize on Taymor's name and reputation, while refusing to compensate Taymor as she is entitled.

83.     As of the date of this Amended Complaint, for example, the Musical's website and other advertising and press materials continue to bill Taymor as a co-bookwriter, among other things.  A copy of Taymor's biography as it appeared on the Musical's website until recently is attached hereto as Exhibit H.  In addition, until recently, a building-size billboard hanging from the Foxwoods Theater, where *Spider-Man* is playing, advertised Taymor as co-bookwriter and director of the Musical.  A photograph of that billboard as it was displayed is attached hereto as Exhibit I.  Furthermore, on the Musical's website, the producers touted a recent review stating:

> It [the Musical] was one of the most dazzling theatrical
> experiences we have ever seen!  And, most of that, we think, can

> be attributed to the bold and inspired work of Julie Taymor, who
> also helmed Disney's groundbreaking Lion King stage Musical.
> EVERYTHING about Spider-Man worked!

The review has been removed from the Musical's website since this lawsuit was originally filed.

84.     On June 14, 2011, *Spider-Man* officially opened on Broadway using the Infringing Book.

85.     In the opening night credits for the Musical, the producers continued to list Taymor as co-bookwriter of the Musical.  As a consequence, Taymor was eligible to be nominated for a 2012 Tony Award as co-writer of the book of the Musical.

86.     On November 3, 2011, further acknowledging Taymor's work on the Musical, the Tony Awards Administration Committee ruled that Taymor also would be eligible to be nominated for a 2012 Tony Award in the category of Best Direction of a Musical.  In so ruling, the Tony Awards Administration Committee rejected the producers' contention that Philip William McKinley had transformed the Musical into a "new" production and therefore should be eligible for the Best Direction award along with, or instead of, Ms. Taymor.

87.     *Spider-Man* continues to play in the Foxwoods Theater, Broadway's largest house, and regularly grosses in excess (sometimes far in excess) of $1.4 million per week.  The Foxwoods Theater seats 1,930 people.  Current ticket prices average over $100 per seat, and capacity regularly averages over 90% for each of the Musical's eight performances every week.

88.     Upon information and belief, Cohl, Harris, Berger, 8 Legged, Hello, Goodbye, and Savior have derived and continue to derive substantial revenues, profits, fees, and other benefits and advantages from the Musical and from the use therein of Taymor's copyrighted works.  To date, the producers have derived over $100 million in revenues from public performances of the Musical, including preview performances.

89.     Upon information and belief, Hello and its representatives participated in meetings, major decisions, and other activities related to the Musical and Defendants' infringement from March 2011 to the present.  These activities include board meetings for the Hello-Goodbye Joint Venture during the crucial period after Taymor's dismissal, convened on, among other dates, April 8, 2011, May 1, 2011, and June 10, 2011.  In addition, agents and employees of Hello continue to be involved in the day-to-day operations of the Musical.  For example, Anne Tanaka, an employee or agent of Hello, remains actively involved with the day-to-day operations of the Musical as an Associate Producer.  Likewise, David Garfinkle and Adam Silberman—both employees or agents of Hello—continue to be involved with the Musical and held out as a Producer and Executive Producer of the Musical, respectively.  Garfinkle is Hello's founder and CEO.

90.     Upon information and belief, during the period before and after Taymor was dismissed from the Musical, Hello was consulted about, participated in, and actively supported numerous decisions that caused and contributed to the ongoing infringement of Plaintiffs' rights, including, but not limited to, the decisions to: (i) dismiss Taymor as co-bookwriter after public performances had already begun; (ii) temporarily shut down public performances of the Musical; (iii) hire a new co-bookwriter; (iv) create an unauthorized derivative work from the book co-written by Plaintiffs, in derogation of the sole approval rights Hello had granted to Plaintiffs; (v) raise millions of additional dollars to finance the temporary shutdown and changes to the Musical; and (vi) resume and continue performances using the Infringing Book.

91.     As a producer of the Musical, a Manager of 8 Legged, and a voting board member of the Hello-Goodbye Joint Venture, Hello also has the right and ability to supervise Defendants' infringing activities.  Upon information and belief, in June 2011, Bono and Edge resigned their

positions on the board of the Hello-Goodbye Joint Venture, thereby increasing Hello's voting power and its ability to influence and control major decisions related to the Musical, including those decisions causing or contributing to the ongoing infringement.

92.     On November 4, 2011, the producers' counsel belatedly sent Taymor a check for $52,880, purporting to represent payment of her co-bookwriter royalties for performances of the Musical through April 17, 2011, when the Musical had its last public performance before Cohl, Harris, Berger, and Aguirre-Sacasa implemented their revisions to the Original Book.  The producers, however, continue to refuse to pay Taymor any royalties for performances after April 17, 2011.

93.     On November 8, 2011, Plaintiffs filed their original Complaint in this action.

94.     On January 17, 2012, Defendants Cohl, Harris, 8 Legged, Goodbye, and Savior filed an Answer and Counterclaims asserting that Plaintiffs had breached their contractual and fiduciary obligations based on certain conduct by Taymor, the majority of which 8 Legged had alleged in written submissions as the basis of its defense in the SDC Arbitration.

95.     Also on January 17, 2012, Defendant Berger filed an Answer and Counterclaim.

96.     On February 14, 2012, the Stage Directors and Choreographers Society and 8 Legged settled the SDC Arbitration by way of a confidential settlement agreement requiring 8 Legged to pay to Taymor, among other amounts, the full royalties owed her for the New York production of the Musical in her role as director.

97.     On February 16, 2012, purportedly pursuant to the releases in the February 14, 2012 settlement agreement between the Stage Directors and Choreographers Society and 8 Legged, Defendants Cohl, Harris, 8 Legged, Goodbye, and Savior filed an Amended Answer and Counterclaims.  The Amended Counterclaims assert factual allegations nearly identical to those

that had been asserted in the original Counterclaims, which had also been alleged by 8 Legged in defense of the SDC Arbitration.

98.     Despite repeated requests, and despite the fact that they have filed with the New York State Department of Law financial statements indicating that author royalties have been paid, Cohl, Harris, and 8 Legged have refused to pay Taymor and LOH the royalties they are due, including royalties for public performances of the Musical after April 17, 2011.  A total of over $175,000 in co-bookwriter royalties is due to date, in addition to the $52,880 that was belatedly paid on November 4, 2011, for pre-April 17, 2011 performances.  Continuing royalties of at least $2,917.50 per week (a minimum based on each eight-performance week) are owed from April 17, 2011, to the present, as the Musical continues public performances.

99.     Upon information and belief, the Musical's producers are planning to mount additional productions of the Musical using the Infringing Book outside New York.

100.     As a board member of the Hello-Goodbye Joint Venture, Hello has explicit power to vote on decisions related to non-Broadway productions of the Musical.  Upon information and belief, Hello has actively supported and continues actively to support the producers' plans to mount infringing productions of the Musical outside New York.

**Substantial Similarity Between the Infringing Book and Taymor's Treatment**

101.     The Infringing Book copies, is derived from, and is substantially similar to, Taymor's copyrighted Treatment for the book of the Musical.  The Infringing Book copies Taymor's original, copyrighted contributions to the Treatment, including both her original selection, adaptation, and arrangement of pre-existing elements from previously published Spider-Man works and elements that Taymor herself independently created for the Treatment.

102.    Among the original elements copied from the Treatment in the Infringing Book
are the Treatment's portrayal of the Arachne myth and the development of Arachne as a
character in relation to Peter Parker and Spider-Man.  For example, the opening paragraphs of
the Treatment describe "[t]he myth of Arachne in the beginning – how she was transformed into
spider and doomed to the shadows in eternity to weave webs that no one would see. . . .  She
seems like a sad, almost benevolent and tragic figure of delicate beauty . . . ."  The Treatment
goes on to present Arachne as a cautionary tale about the risks of "vanity, greed and hubris"
causing one to squander power and the potential to live a "human life, full of love."  The
Treatment contrasts Arachne with Peter Parker, who is portrayed as "an exceptionally average
human, full of self-doubt, normal fears and vulnerabilities."  The Infringing Book copies this
original portrayal of Arachne and the use of her to illustrate the challenges Peter Parker faces as
he comes to terms with his role and powers as Spider-Man.

103.    The Infringing Book copies a primary aspect of the relationship between Peter
Parker and Arachne, as Taymor presented it in the Treatment: Arachne's seductive influence
over Parker and the sensual nature of the relationship.  In the Treatment, Arachne entrances
Parker with a "dance of seduction" and is "in love with Spiderman," and Parker is "drawn to the
astral plane in his sleeping time, to the dark shadows of the mysterious 'A[rachne].'"  The
Infringing Book, in an "intense, hypnotic" scene involving the Musical's title song, "Turn Off
the Dark," depicts Arachne descending over Parker sleeping in his bed, after which Parker
"rise[s] from his bed" and joins Arachne in a "charged, mysterious aerial pas de deux."

104.    The importance of Arachne in the Infringing Book and current performances of
the Musical is evident from the fact that Arachne is integral to the two most important songs
performed in the Musical: "Rise Above" (performed in Act One, Scene 13: The Astral

Plane/Peter's Bedroom) and "Turn Off the Dark" (the Musical's theme song, performed in Act

Two, Scene 8: Peter's Dream – Turn Off the Dark).

105.   Various original elements related to Arachne in the Treatment are also copied by

the Infringing Book, having simply been transferred to Green Goblin for expedience in the

producers' haste to revise the Musical in the weeks after Taymor was dismissed.  For example:

- In the Treatment, Arachne "created" the characters comprising the Sinister Six/Seven and "brought them together . . . for a final assault of terror."  In the Infringing Book, Green Goblin creates the Sinister Six/Seven and unleashes them on the city.  No pre-existing work portrays the Sinister Six/Seven as sharing such common lineage or purpose.

- In the Treatment, Arachne uses her "World's Wide Web" to terrorize humans with images of monsters she has created.  The Infringing Book copies this expression by portraying the Sinister Six/Seven on television screens, and having Green Goblin take control of video monitors.

- In the Treatment, Arachne has lost her "humanity."  In the Infringing Book, the same has happened to Green Goblin, to whom Parker states: "I can help you—Together, we can find a cure—restore your humanity."

- In the Treatment, Arachne wants to have "children [who] will rule the universe in all its planes of existence."  In the Infringing Book, after creating the Sinister Six in Act Two, Scene 1, Green Goblin addresses the villains, stating:  "All right my children-I love ya but I can't keep you cooped up in here any longer.  Go out and show the world there's a NEW dominant race in town!  Show *Spider-Man*-how to mix it up, *Osborn* style!"  Later in the Infringing Book, Green Goblin declares that his goal is "[t]o repopulate the planet with a super-race of Osborn Mutant Children!"

- The Treatment's climactic fight scene poses existential questions about Peter Parker, Spider-Man, and their relationship to each other, including: "Is Peter more spider than human? Will he let his rage and desire for vengeance over power him?  Will he destroy Arachne; kill her?  Does he have to in order to save MJ?"  The climactic fight scene in the Infringing Book addresses these same questions:  Green Goblin provokes Parker by threatening Aunt May and Mary Jane, Parker responds by swearing that he will kill Green Goblin, and Green Goblin delights in Parker's anger, which draws upon a "spider . . . hunter" who "kills without mercy."

106.    The Infringing Book also copies the Treatment's original opening scene, in which

Mary Jane Watson falls from a bridge and Spider-Man is unable to save her.  The Treatment

describes the scene as follows:

> The Dream: a city devasted [sic], a huge battle is
> raging – we see glimpses of Spiderman flying from
> one burning sky scraper to another – we see Mary
> Jane pushed from the heights of a giant bridge –
> Spiderman tries to unleash his web shooter – it fails
> as he leaps after MJ – but he has lost his powers and
> begins to fall.

The Infringing Book contains the same scene, depicted as follows:

> SCENE 7: BROOKLYN BRIDGE NIGHTMARE
>
> MJ is dangling from the Brooklyn Bridge.
>
> SPIDER-MAN appears Upstage on the
> bridge and runs toward MJ.
>
> The large Goblin cut-out "slices" through
> the cable MJ is tethered to.  SHE SCREAMS as she
> disappears into the abyss.
>
> Peter's web-shooter fails him.
>
> PETER:  MARY JANE!!
>
> He impulsively leaps after MJ.
>
> A stunt double tumbles over and over in
> slow-motion.
>
> [ . . .]
>
> PETER is tossing and turning in his bed UC.
> It was a nightmare.

107.    The Infringing Book copies the Treatment's depiction of Spider-Man's fame in

Act Two.  The Treatment states that, in Act Two, Spider-Man "has achieved tremendous fame,

the people finally love him, he is the ultimate super hero, his name is everywhere, every

television, billboard, newspaper—all the media acclaim him: films, comic books, songs, streets, cities are named for him."  The Infringing Book's fifth scene of Act Two—in which Spider-Man is portrayed as being hailed and admired by the public as the Sinister Six are vanquished—copies this element of the Treatment.

108.    The Infringing Book also copies the Treatment's original selection and arrangement of certain pieces of previously published storylines regarding the origin of Peter Parker's spider powers.  For example, the Treatment states:

> Act One covers the origins of Peter's spider power (the terrain of the first film): Peter's bullied school days, how he was bitten, his transformation, wrestling scene, love for Mary Jane, loss of uncle Ben, transformation of Norman Osborne [sic] to the Green Goblin, newspaper woes etc.  In this version, though, Peter Parker seems to have been selected to be bitten by the spider because he is an exceptionally average human, full of self-doubt, normal fears and vulnerabilities.  In his battle with evil he will be able to maintain that balance of humility that Arachne lacked in her challenge with the Gods.

While Act One of the Treatment references the "first film," it is clear that Taymor selectively chose particular elements rather than merely retelling the story from the first Spider-Man film. The Infringing Book copies each element of this original selection and arrangement, in the same order as presented in the Treatment.

109.    The Infringing Book copies the Treatment's original selection and portrayal of Norman Osborn and Green Goblin, as well as Taymor's choice *not* to include in the Treatment certain elements from pre-existing works, such as the Harry Osborn and Gwen Stacy characters and storylines, among others.

110.    The Infringing Book copies the Treatment's selection and portrayal of the Sinister Six and their "final assault of terror" and "ultimate massive attack at the near end of Act Two," as described in the Treatment.

111.    The Infringing Book copies the Treatment's original depiction of villains being vanquished as a result of "their own mistakes and failures" rather than being intentionally killed by Spider-Man.  In the Infringing Book, for example, Green Goblin unwittingly kills himself by pushing a piano off of the Chrysler Building to smash humans below, not realizing that Spider-Man had "webbed [Green Goblin] to the piano so [he] wouldn't push it off."  The Treatment explains that Taymor's choice not to have Spider-Man kill the villains himself was intended to demonstrate "part of [Spider-Man's] human strength within the human lexicon of morality," in contrast with Arachne's failings in succumbing to "vanity, greed and hubris."  The Infringing Book copies this original expression.

112.    The Infringing Book also copies from broader narrative arcs introduced in the Treatment, which include both independently conceived elements and the selection and arrangement of pre-existing elements.  For example, the Treatment states:

> Peter, distrusted and maligned by the press and also unable to find the balance with his human needs and desires (in Act One), finally seems to be able to put those two worlds together in Act Two: After he decides to give up being Spiderman he is forced by the onslaught of the Sinister Six/Seven attacks to utilize his Spiderman powers to save his aunt. Finally, Mary Jane realizes who he is and is ready to accept him as both Spiderman and Peter, her love.

113.    The Infringing Book copies virtually every detail of that narrative arc.  For example, in the Infringing Book:

- The press (in particular, JJ Jameson and his Daily Bugle) reports that Spider-Man is a villain, not a hero, harshly criticizing him much to Peter Parker's dismay.

- Peter finds himself "unable to find the balance" between his "human needs and desires"—specifically, his need to care for his aunt and his desire to spend time with MJ—on the one hand, and his need to be Spider-Man on the other.  For example: (a) Peter is unable to spend time with his aunt because he is off fighting crime; (b) Peter misses his girlfriend's play because he is caught up in a Spider-Man dream sequence with the character Arachne; and (c) Peter and Mary Jane fight frequently about Peter's inability to be present for her as a boyfriend when she needs him.

- Peter decides to give up being Spider-Man and turns his costume over to JJ Jameson in an effort to save his family and Mary Jane from harm and to spend more time with them.

- Peter is then forced back into the Spider-Man role due to mayhem caused by the Sinister Six and the responsibility he feels to save the city.

- Peter is ultimately able to "reconcile" his two worlds by learning to live with both and by disclosing his true identity to Mary Jane.

- At the book's dramatic height at the end of Act Two, Mary Jane realizes that Spider-Man, who has just rescued her from Green Goblin, is in fact Peter Parker.  She accepts him in both roles as the two kiss and agree to go forward as boyfriend and girlfriend.

114.    The Infringing Book also copies other original, copyrighted elements and selection and arrangement from the Treatment in addition to the examples listed above.

**Substantial Similarity Between the Infringing Book and the Original Book**

115.    The Infringing Book also copies, is derived from, and is substantially similar to many novel and unique elements of the Original Book co-authored and approved by Taymor.

116.    As in the Treatment, the story told in the Original Book combines characters, themes, and plot elements from across the broad universe of pre-existing Spider-Man works.  In doing so, it presents an overarching, self-contained narrative that seeks to capture the essence of the Spider-Man myth.  Taymor and Berger created the Original Book based on the Treatment,

and many of the characters, themes, and plot elements presented in the Treatment were carried forward and expanded in the Original Book.  As a result, the examples of substantial similarity outlined above with respect to the Treatment also apply to the Original Book.  At the same time, the Infringing Book also copies additional original elements first introduced by Taymor and Berger in the Original Book.

117.    The Infringing Book copies the Original Book's novel portrayal and development of the Arachne character and her role and relationship with Peter Parker.  Arachne contributes to the Musical's plot, watching over Peter as he struggles with his new-found powers, and to the Musical's overall themes, as she personifies and illustrates the dangers of arrogance and hubris.  Unlike any previous Spider-Man story, Arachne is presented as a central force in Peter's personal struggles and transformation into Spider-Man, with her story framing the themes and emotions that Taymor wanted the audience to experience while watching the Musical.  The Infringing Book copies this pivotal contribution from the Original Book, using Arachne to highlight the risks that Peter Parker faces as he attempts to come to terms with his new spider powers.

118.    The Infringing Book also copies entire scenes, dialogue blocks, themes, plotlines, narrative arcs, characters, and descriptions of stage activity from the Original Book, as well as much of the original selection and arrangement of pre-existing elements from previously published Spider-Man comic books and movies that was embodied in the Original Book.  In total, over 350 lines of dialogue and descriptions of stage activity—nearly one quarter of the Infringing Book—are copied verbatim from Taymor's Original Book.  Hundreds of additional lines and descriptions of stage activity are copied in sum and substance from the Original Book.  Indeed, upon the Musical's official opening with the Infringing Book in June 2011, Aguirre-

Sacasa told the theater publication "Playbill" that his new role as "co-bookwriter" on the Musical had been to "help[] the rest of the team bring forward what was already there, in the DNA of the show."

### Descriptions of Stage Activity

119.    Not surprisingly given that the goal in deriving the Infringing Book was to "bring forward what was already there," the Infringing Book repeatedly copies wholesale, among other things, Taymor's descriptions of stage activity—which are new and unique contributions in the Original Book that are subject to copyright protection.  For example, the initial entrance of Arachne is copied in the Infringing Book as shown by the following comparison:

| Original Book | Infringing Book (verbatim copying highlighted) |
|---|---|
| A Time before Time.  A Giant "Loom" is revealed--Seven actors swing on vertical silks to form a "tapestry."  Meanwhile, Arachne floats down "on" a "Greek altar-like" Loom Platform . . . . Front projection on the tapestry depict white threads of light, forming an image [of the "moon."]  As Arachne continues to "work at her loom," MISS ARROW speak/sing-- . . .  A projection of "Athena's Shadow" quickly grows larger and larger upon the tapestry, until CRAAAACK! -- a "lightning bolt" projection and the tapestry is "torn to shreds," leaving two or three remnants of saffron silk dangling. | A Time before Time.  A giant "Loom" is revealed: Seven actors swing on vertical silks to form a "tapestry."  Meanwhile, ARACHNE floats down "on" a "Greek altar-like" loom platform . . . . Front projection on the tapestry depict white threads of light, forming an image [of the "sun"]  As ARACHNE continues to "work at her loom," PETER speak/sing-- . . .  A projection of "Athena's Shadow" quickly grows larger and larger upon the tapestry, then CRAAAACK!. -- a "lightning bolt" projection and the tapestry  is "torn to shreds," leaving two or three remnants of saffron silk dangling. |

120.    The Original Book brings Spider-Man to life on stage through a newly created scene entitled "Spider-Man's New York Debut," in which the Musical's famous high-flying acrobatics first appear and several new characters, including gangsters, a mugger, an old lady, and a chorus of mothers, are introduced.  The scene is copied in the Infringing Book as shown by the following comparison:

32

| Original Book | Infringing Book (verbatim copying highlighted) |
|---|---|
| STIRRING MUSIC.  The forced-perspective Cityscape is now in daylight. | STIRRING MUSIC.  The forced-perspective Cityscape is now in daylight. |
| Spider-Man (#1) suddenly appears upstage, flips (in a gainer), and lands all the way downstage. | SPIDER-MAN #1 (BRANDON) suddenly appears upstage, flips (in a gainer), and lands all the way downstage. |
| He then backflips and flies off SR [stage right]. | HE back flips, as, from offstage, we hear the OFF-STAGE SOUND OF A SIREN -- SPIDER-MAN flies off SR [stage right] -- |
| Spider-Man (#2) makes a swing across from SR to SL [stage left]. | SPIDER-MAN #2 (MARCUS) makes a swing across from SR to SL [stage left] |
| In an explosive jump, Spider-Man (#3) leaps from the floor, lands, jumps onto the SL proscenium, crawls up the wall, then swings hand from hand, exiting SR. | SPIDER-MAN #3 (GERALD) makes a swing across from SL to SR |
| Spider-Man (#4) is an acrobat who utilizes a tumble-track to tumble and jump. | From SR, SPIDER-MAN #4 (CRAIG) enters. HE is an acrobat who utilizes a tumble-track to tumble and jump. |
| Spider-Man (#5) is another tumbling acrobat. | SPIDER-MAN 5# (DOLLAR) is another tumbling acrobat, going SL to SR. |
| Spider-Man (#6) is another tumbling acrobat. | SPIDER-MAN #6 (MANNY) is another tumbling acrobat, going SR to SL. |
| The music transmutes into rousing SPIDER-MAN CRIME-FIGHTING MUSIC. | The music transmutes into rousing SPIDER-MAN CRIME-FIGHTING MUSIC. |
| Three gangsters with sacks of money on their backs and holding Tommy guns run down the ramp.  From above, Spider-Man (#1) makes a double swing, drops a web-net over them.  The gangsters roll down into the trap. | Three gangsters with sacks of money on their backs and holding Tommy guns run down the ramp.  From above, SPIDER-MAN (#1) makes a double swing, drops a web-net over them. The GANGSTERS roll down into the trap.

SPIDER-MAN (V.O) (as he swings): Special today! Free webbing! |
| Another Spider-Man (#7) SR, swings over the audience, lands onto the balcony HL [house | Another SPIDER-MAN (#7) SR, swings over the audience, lands onto the balcony HL [house |

| | |
|---|---|
| left]. | left]. |
| | MJ, entering SR, walking with her nose in a script, crosses the stage, stops, looks up, and sees . . . SPIDER-MAN, swinging around. |
| | SPIDER-MAN (V.O): Hi . . . just passing through! |
| | SHE is transfixed.  Love at first sight . . . SHE exits SL. |
| A mugger snatches a purse from an old lady.  Spider-Man (#7) swings back to the stage, lands in front of the purse-snatcher.  Spidey gives the purse back to the lady, the mugger runs away, Spider-Man shoots a web and tosses the mugger offstage (SR).  Spider-Man then exits SL. | A MUGGER snatches a purse from an OLD LADY.  SPIDER-MAN (#7) swings back to the stage, lands in front of the PURSE-SNATCHER.  SPIDEY gives the purse back to the LADY, the MUGGER runs away, SPIDER-MAN shoots a web and tosses the MUGGER offstage (SR).  SPIDER-MAN then exits SL. |
| | SPIDER-MAN (V.O): Spider Airlines – the safest way to fly! |
| A Burning Building.  A Chorus of Mothers appear and an off-stage voice screams "My Baby!" | A Burning Building.  A Chorus of Mothers appear and an off-stage voice screams "My Baby!" |
| Two Pop-Ups depict a baby falling into Spidey's arms. | Two Pop-Ups depict a baby falling into Spidey's arms. |

121.    The Infringing Book also copies inventive staging techniques critical to the

Original Book.  For example, a key confrontation between Peter Parker and bullies in his high

school is copied in the Infringing Book as shown by the following comparison:

| Original Book | Infringing Book (verbatim copying highlighted) |
|---|---|
| Utilizing "black theater" puppet techniques, a Comic fight between Peter and the Bullies ensues, with Peter delivering effortless punches into the Bullies which send them flying high in the air and bouncing off the walls. | Utilizing "black theater" puppet techniques, a Comic fight between PETER and the BULLIES ensues, with PETER delivering effortless punches into the BULLIES which send them flying high in the air and bouncing off the walls. |

**Dialogue**

122.    The Infringing Book also copies extensive dialogue from the Original Book, in some cases copying entire scenes almost verbatim.  For example, both books feature an early scene introducing Peter Parker and his classmates.  In both books, Peter asks a question, prompting the teacher to assign work to the class and incurring the wrath of Peter's classmates. The Infringing Book copies from the Original Book as shown by the following comparison:

| Original Book | Infringing Book (verbatim copying highlighted) |
|---|---|
| TEACHER:  Well! I guess I'll be letting you out for lunch early today. | TEACHER:  Why don't we wrap up a bit early-- |
| CHEERS from class. | CHEERS from class. |
| TEACHER (CONT'D) (adding--): That is, unless anyone has something to add? | |
| Pause. | |
| Then Peter Parker raises his hand.  A GROAN from the students.  Flash leans toward Peter with menace- | PETER (raising hand):  Uhm, Mrs. Gribrock? |
| FLASH:  You are so gonna to [sic] get it, Parker. | FLASH (sotto to PETER; anger, disbelief): Oh, you are *such* dead meat, Parker! |
| | TEACHER: Yes, Peter? |
| PETER (eagerly):  Well I found this really interesting footnote in Bullfinch's Mythology. | PETER (eagerly):  I found this interesting footnote.  Apparently, Athena used aconite to |

| | |
|---|---|
| Apparently, Athena used aconite to turn Arachne into a spider, and I was just wondering if that was referring to the compound made from the roots of wolfsbane, containing the alkaloid pseudaconitine? | turn Arachne into the spider, and I was curious if that's the same compound as the alkaloid pseudaconitine? |
| TEACHER:  Peter, I teach Classics, not Chemistry. | TEACHER:  Peter, I teach Classics, not Chemistry. |
| PETER:  Well I was just wondering, because— | PETER:  Well I was just wondering, because -- |
| FLASH:  --because you're a dork. | FLASH:  --because you're a dork. |
| General laughter from class.  Peter soldiers on— | TEACHER: Class, class -- |
| PETER:  Well it's just that the possibility of metamorphosis- | PETER:  I was wondering because . . . (back to TEACHER) . . . I don't know if you're familiar with the work of Norman Osborn.  A lot of his projects -- About evolution, genetic splicing, metamorphoses-- |
| TEACHER (gasps):  Metamorphosis-I almost forgot!  (announcing sternly) Ovid's Metamorphoses!  It's ancient, it's full of myths, and I want a ten-page paper on it by Monday!  Thanks for reminding me Peter—(chuckling)--you kids almost got off scot-free this weekend! | TEACHER (cutting him off):  Metamorphoses-I almost forgot!  Ovid's Metamorphoses!  It's ancient, it's long, it's dense and I want a ten-page paper on it by Monday!  Thanks for reminding me Peter -- you kids almost got off scott-free this weekend!  Have a nice lunch. |
| The BELL RINGS. | SCHOOL BELL RINGS |

123.    Likewise in both books, Peter Parker and his classmates visit Oscorp Labs, whereupon the character Dr. Osborn—soon to become Green Goblin—is introduced.  The Infringing Book copies from the Original Book as shown by the following comparison:

| **Original Book** | **Infringing Book**<br>**(verbatim copying highlighted)** |
|---|---|
| NORMAN (calling out to assistants): Newts!  Where are those newts!? | NORMAN (calling out to ASSISTANTS): Newts!  It came to me in the night-newts! |
| EMILY: Norman, can you just stand still | EMILY: Norman, can you just stand still |

| | |
|---|---|
| for a moment -- | for a minute -- |
| NORMAN (rushing off to another station): I'm sure I *can* stand still, honey, I just don't see the point. | NORMAN: I'm sure I *can* stand still, I just don't see the point. |
| EMILY: We need to talk about our funding problem— | EMILY: We need to talk about our *EXTREME* funding problem— |
| NORMAN (now engrossed in newspaper, on high horse): See! Now Emily, here's what I'm talking about.  Climate change in North America -- it's gonna make the cloud-cover so thick we'll need bigger eyes just to compensate.  Or no no no -- (snaps fingers)—Infra-red!  Honey, what are those— | NORMAN (now engrossed in newspaper, on high horse): See! Now Emily, here's what I'm talking about.  Climate change in North America -- it's gonna make the cloud-cover so thick we'll need bigger eyes just to compensate.  Or no no no -- (snaps fingers)—Infra-red!  What species has infra-red? (to EMILY)  Oh, come on Honey, what -- |
| EMILY (knowing what he's going to ask): Pit Vipers. | EMILY: Rattlesnakes. |
| NORMAN: Bingo! (yelling to lab-coat-clad assistant) Danny!, that genome sequence we isolated on that rattlesnake?, get me the printout!, human beings are gonna see in the dark!, oh and hey -- splice in a little luciferin from the glowworm and…geez louise, I'm gonna be Norman Osborn who turned night into day!  Let there be Light I say! Or no no no, wait, somebody else said that. | NORMAN: Bingo! (yelling to lab-coat-clad assistant) Danny!, that genome sequence we isolated on that rattlesnake?, get me the printout!, human beings are gonna see in the dark!, oh and hey -- splice in a little luciferin from the glowworm and…I swear Emily, I'm gonna be Norman Osborn who turned night into day!  Let there be Light I say!  Or no no no, wait, somebody else said that. |
| EMILY: God? | EMILY: God? |
| NORMAN:  Who? No no, Edison. | NORMAN:  Who? No no, Edison. |

124.    In both books, newspaper publisher "JJ" Jameson is introduced in his newsroom, where he is discussing news coverage of Spider-Man.  The Infringing Book copies the original scene as shown by the following comparison:

| Original Book | Infringing Book (verbatim copying highlighted) |
|---|---|
| JAMESON:  "Masked Man Foils Robbery"?!  Well that's a typo!  Masked men don't foil robberies, they commit robberies! | JAMESON:  "Masked Man Foils Robbery"?!  Well that's a typo!  Masked men don't foil robberies, they commit robberies! |
| | ALL SECRETARIES:  That's right, JJ. |
| (to Buttons):  Buttons, did you edit this?  You're fired! | JAMESON (to Buttons):  Buttons -- |
| | BUTTONS:  Yeah JJ? |
| | JAMESON: Did you edit this? |
| | BUTTONS:  You bet. |
| | JAMESON: You're fired! |
| (to Bud):  You -- whatcha got? | (to Bud):  You, Bud -- whatcha got? |
| BUD (reading report):  "Man in Tights saves Child"! | BUD (reading report):  "Man in Tights saves Child"! |
| JAMESON:  That's the plot to the Nutcracker!—Get me news! | JAMESON:  That's the plot to the Nutcracker!—Get me news! |
| STOKES (reading headline of his report):  "Stick-up Man gets Mysteriously Stuck." | STOKES (reading headline of his report):  "Stick-up Man gets Mysteriously Stuck." |
| JAMESON:  What do you mean.  Stuck in what? | JAMESON:  What do you mean?  Stuck in what? |
| MAXIE (referring to her notes):  "Goo." | MAXIE (referring to her notes):  "Goo." |
| JAMESON: "Goo"?  What kind of goo?! | JAMESON: "Goo"?  What kind of goo?! |
| STOKES (struggling):  A sort of web-like… | STOKES (struggling):  A sort of web-like goo… |
| MAXIE (helpfully clarifying):  *Goo* goo- | MAXIE (helpfully clarifying):  Goo goo. |
| TRAVIS (helpfully adding--):  Webby goo goo! | TRAVIS (helpfully adding--):  Webby goo goo! |
| | STOKES/MAXIE/TRAVIS:  Yeah, goo |

| | |
|---|---|
| | goo! |
| JAMESON:  Have you all turned into infants?!! What's wrong with you people!? This is the Daily Bugle!  I ask for answers and what do I get?! | JAMESON:  Have you all turned into infants?? What's wrong with you people?! This is the Daily Bugle!  Not the Herald! Not the Times! And God knows it's not the Post! |
| | ROBERTSON:  Hey, JJ, take a look at this. |
| | Hands him the paper. |
| (reading a headline on his desk--):  "Heister gets Hoisted by Whosits."  Once and for all, Who's Whosits!?  I want a name, I want a motive, I want a glossy eight by ten! | JAMESON:  "Heister gets Hoisted by Whosits!"  You call that a headline, Robertson?!  For the millionth time, who's Whosits?!  And where are all the photographs!?  You! Where! |

**Plot Developments and Narrative Arcs**

125.    The Infringing Book also copies specific plot developments and narrative arcs

from the Original Book.

126.    At the outset of both the Original Book and the Infringing Book, the myth of

Arachne introduces Arachne as a character borne of "arrogance" and a "cautionary tale" about

using talent and power responsibly.  As the story develops, Arachne's arrogance contrasts with

the humility and self-doubt central to Peter Parker's character.  In both books, Arachne is

portrayed as having a seductive/sensual influence over Parker, and Arachne is integral to the two

most important songs performed in the Musical—"Rise Above" (Original Book, Act One, Scene

13; Infringing Book, Act One, Scene 13) and "Turn Off the Dark" (Original Book, Act Two,

Scene 2; Infringing Book, Act Two, Scene 8).  The "Turn Off the Dark" scene in both books

describes an identical "intense, hypnotic" scene in which Arachne descends over Parker sleeping

in his bed, after which Parker "rise[s] from his bed" and joins Arachne in a "charged, mysterious

aerial pas de deux."

127.    Other plot developments and narrative arcs copied from the Original Book

include:

- Parker is harassed by his classmates who are upset about the nearly-avoided homework assignment and who play a "game" with him called "bullying by numbers"; Parker and Mary Jane then walk home from school together and she consoles him; Parker is then consoled by his Aunt May and Uncle Ben who encourage him to "Rise Above" his petty classmates and their bullying.

- Peter awakens after having been bitten by a spider to discover he is "bouncing off the walls," which is depicted through substantially similar descriptions of stage activity.

- Dr. Osborn is portrayed as a moral, well-intentioned doctor who is attempting to help people.  He is approached by an evil force seeking to buy his science for nefarious purposes; Dr. Osborn rejects their advances and instead plans to use his science on himself; Dr. Osborn then transforms himself into Green Goblin, not by accident, but instead through a dangerous procedure which results in the death of his wife, Emily.  This portrayal of Dr. Osborn and his wife Emily is original to the Musical and not in the pre-existing works.

- Mary Jane, an actress, invites Peter to the opening of her new, off-Broadway play, "The Fly," which Peter misses because he falls asleep and dreams of Arachne; Peter, disgusted at himself for letting Mary Jane down, decides to give up being Spider-Man and gets rid of his Spider-Man costume; Peter and Mary Jane end up in a dance club where Peter, yelling over a U2 song blaring in the background, confesses his love for Mary Jane and then kisses her, "causing" a city-wide blackout; Peter ultimately decides he has to return to being Spider-Man, even if it keeps him away from those he loves.

- The Sinister Six wreak havoc on New York City and are broadcast on LED screens doing so.

- Green Goblin appears at a grand piano atop the Chrysler building where he plots to take over New York; Spider-Man confronts Green Goblin atop the Chrysler building, leading to their dramatic battle; Spider-Man defeats Green Goblin, sending him and the grand piano tumbling to the sidewalk.

128.    These represent just a few examples of the many new, copyrighted elements in the

Original Book—including some of the book's most critical moments—that are entirely or

substantially copied by the Infringing Book.

**Selection and Arrangement of Pre-Existing Elements**

129.    The Infringing Book also copies from the Original Book Taymor's original

selection, adaptation, and arrangement of certain pre-existing elements from previously

published Spider-Man comic books and movies and other materials.  These adapted elements

include, but are not limited to, the Original Book's portrayal of: (i) the myth of Arachne; (ii)

Peter Parker's background and acquisition of his spider powers; (iii) Parker's relationship with

Mary Jane Watson; (iv) the death of Uncle Ben; (v) Norman Osborn / Green Goblin and the

Sinister Six (including Taymor's selection of particular villains to include in the group) as

antagonists; (vi) Parker's attempt to balance his personal life with his new role as Spider-Man,

including his choice to give up being Spider-Man; (vii) Parker's and Spider-Man's relationships

with J. Jonah Jameson and the Daily Bugle; and (viii) the Original Book's use and depiction of

the Astral Plane, including Parker's communication with Arachne during his dreams in the Astral

Plane.

**Defendants' Public Performances of the Musical Infringe Both the Treatment and the
Original Book**

130.    Defendants' public performances of the Musical copy dramatic elements of the

Treatment and the Original Book beyond those reflected in the text of the Infringing Book.  The

Treatment and the Original Book each contain a number of dramatic elements that are copied in

the Musical as it is performed on stage, to a degree not fully apparent from the text of the

Infringing Book.

131.    For example, the visual presentation of Arachne when she is introduced during

Act One, Scene 3 of the infringing performances—in one of the Musical's most visually striking

moments—mimics the Treatment's introduction of Arachne as "a sad, almost benevolent and

tragic figure of delicate beauty" whose experience frames the audience's view of Peter Parker's

subsequent transformation.  Similarly, the movement and relationship of Peter Parker and Arachne as they dance and tumble together through the air during Act One, Scene 13 of the infringing performances are a clear expression of the Treatment's original choice to present Parker and Arachne in a "full, sexual human embrace" and a "dance of seduction."

132.    These original elements and others, which have been carried from the Treatment and Original Book to the infringing performances, are a qualitatively distinct form of infringement of Taymor's works, extending beyond the infringement occasioned by the Infringing Book itself.

**Defendants' Merchandise Copies Protected Aspects of Taymor's Original Book**

133.    The producers also have used Taymor's copyrighted works without her permission in connection with the marketing and sale of *Spider-Man* merchandise, including a souvenir program that copies portions of Taymor's copyrighted works.

134.    For example, the souvenir program contains a picture of the classroom scene described above and reproduces the following exchange from the Original Book:

> FLASH:  YOU ARE SO GONNA GET IT, PARKER!
>
> PETER:  WELL, I WAS JUST WONDERING, BECAUSE-
>
> FLASH:  -- BECAUSE YOU'RE A DORK.

135.    The souvenir program contains a picture of the newspaper scene described above and reproduces the following dialogue taken from the Original Book:

> STICK-UP MAN GETS MYSTERIOUSLY STUCK!
>
> WELL THEY ALL SAY HE LOOKS LIKE A SPIDER!
>
> MASKED MAN FOILS ROBBERY?!
>
> MAN IN TIGHTS SAVES CHILD.

136.    Upon information and belief, Defendants have exploited and intend to continue exploiting Taymor's copyrighted works in the creation, marketing, and sale of other merchandise in addition to the souvenir program.

**FIRST CLAIM FOR RELIEF**

**Copyright Infringement, 17 U.S.C. § 501 – Original Book
(Against 8 Legged, Hello, Goodbye, Savior, Cohl, and
Harris)**

137.    Taymor and LOH repeat and reallege the allegations set forth in paragraphs 1 through 136 as if fully set forth herein.

138.    Taymor is the owner of a valid copyright in the Original Book, which includes her original and unique contributions and which constitutes copyrightable subject matter under the laws of the United States.  Under the parties' agreements, all rights to prepare or license derivative works were, and were intended to be, exclusively owned and controlled by Taymor.

139.    Taymor's copyright in the Original Book was registered by the United States Copyright Office effective October 11, 2011, under registration number PAu 3-576-391.

140.    Without authorization, Defendants intentionally and willfully copied unique and original portions of Taymor's Original Book, including by reproducing and publicly performing the work; by using such portions in the preparation of an unauthorized derivative work that is substantially similar to Taymor's Original Book; and by using such portions in advertisements and merchandise in connection with the current Broadway production of *Spider-Man*.

141.    Defendants' alteration of Taymor's work, without her approval or consent, and their failure to pay her the royalties she is due, rescinded any license they had to use her work.

142.    Through their actions, Defendants have directly, contributorily, and vicariously engaged, and threaten further to engage, in willful infringement of Taymor's exclusive rights, among other things, to: (a) reproduce her Original Book under 17 U.S.C. § 106(1); (b) prepare a

derivative work based upon and substantially similar to her Original Book under 17 U.S.C.

§ 106(2); and (c) publicly perform her Original Book under 17 U.S.C. § 106(4).

143.    Cohl and Harris, as lead producers and Managers of Goodbye, are personally

liable for Defendants' infringing activities.  Cohl and Harris, and the entities they manage and

control, were instrumental in the decision to remove Taymor from the production, alter her

copyrighted work without authorization, and publicly perform her work without payment of

royalties.  By removing Taymor and instructing others to make changes to the Original Book

without her consent, Cohl and Harris knew of and caused, induced, and materially contributed to

the infringing activities.  Similarly, Cohl and Harris had the right and ability to control the

infringing conduct, and they received, and continue to receive, a direct financial benefit from the

infringement.

144.    8 Legged, as the production company performing the revised Musical, knew of

and caused, induced, and contributed to the infringing activities.  8 Legged has the ability to

direct and control the infringing activities in its role as the Musical's lead production company.

145.    Savior and Goodbye, through their principals Cohl and Harris, and through their

respective positions as Member and Manager of 8 Legged, knew of and caused, induced, and

contributed to Defendants' infringing activities.  By acting through their principals Cohl and

Harris, Savior and Goodbye have the ability to direct and control the infringing activities.

146.    Hello, as a Manager of 8 Legged and a board member under the Hello-Goodbye

joint venture, knew of and caused, induced, and contributed to Defendants' infringing activities.

As a Manager of 8 Legged and through its rights and powers in the Hello-Goodbye joint venture,

Hello has the ability to direct and control the infringing activities.

147.    Defendants continue to perform the Musical using the Infringing Book eight times per week and intend to do so indefinitely without compensating Taymor for their infringement.

148.    Defendants' continued infringement of Taymor's copyright in the Original Book is causing Taymor irreparable harm for which Taymor has no adequate remedy at law, including but not limited to: (a) harm to Taymor's future business prospects and commercial reputation; (b) loss of control over Taymor's creative work; and (c) prospective harm attributable to continuing performances of the Musical, which cannot readily or precisely be calculated.

149.    With respect to the current Broadway production of the Musical, Taymor is entitled to a permanent injunction barring Defendants from using copyrighted elements of her Original Book without compensating her for such use and honoring their contracts with her, or upon such terms as the Court finds to be just and equitable.

150.    Taymor is entitled to a permanent injunction barring Defendants from any future use of copyrighted elements of her Original Book in any medium whatsoever, including any future production of the Musical in venues other than on Broadway and any "making-of" film or video, without Taymor's written consent.

151.    As a direct and proximate result of Defendants' infringement, Taymor has suffered actual damages in an amount not yet determined or ascertainable but believed to be in excess of $1 million.

152.    Taymor is entitled to disgorgement of Defendants' profits attributable to their unauthorized use of Taymor's copyrighted Original Book.

153.    Taymor is entitled to attorneys' fees, costs, and disbursements under 17 U.S.C. § 505.

## SECOND CLAIM FOR RELIEF

**Copyright Infringement, 17 U.S.C. § 501 – Treatment**
**(Against 8 Legged, Hello, Goodbye, Savior, Cohl,**
**and Harris)**

154.    Taymor and LOH repeat and reallege the allegations set forth in paragraphs 1

through 153 as if fully set forth herein.

155.    Taymor is the owner of a valid copyright in the Treatment, which includes her

original and unique contributions and which constitutes copyrightable subject matter under the

laws of the United States.  Only Taymor has the right to authorize derivative works based on the

Treatment.

156.    Taymor's copyright in the Treatment was registered by the United States

Copyright Office on March 17, 2005, under registration number PAu002942150.

157.    Without authorization, Defendants intentionally and willfully copied unique and

original portions of Taymor's Treatment, including by reproducing and publicly performing the

work and by using such portions in the preparation of an unauthorized derivative work that is

substantially similar to Taymor's Treatment.

158.    Defendants' alteration of Taymor's work, without her approval or consent, and

their failure to pay her the royalties she is due, rescinded any license they had to use her work.

159.    Through their actions, Defendants have directly, contributorily, and vicariously

engaged, and threaten further to engage, in willful infringement of Taymor's exclusive rights,

among other things, to: (a) reproduce the Treatment under 17 U.S.C. § 106(1); (b) prepare a

derivative work based upon and substantially similar to the Treatment under 17 U.S.C. § 106(2);

and (c) publicly perform the Treatment under 17 U.S.C. § 106(4).

160.    Defendants continue to perform the Musical using the Infringing Book eight times

per week and intend to do so indefinitely without compensating Taymor for their infringement.

161.    Defendants' continued infringement of Taymor's copyrighted Treatment is causing Taymor irreparable harm for which Taymor has no adequate remedy at law, including but not limited to: (a) harm to Taymor's future business prospects and commercial reputation; (b) loss of control over Taymor's creative work; and (c) prospective harm attributable to continuing performances of the Musical, which cannot readily or precisely be calculated.

162.    With respect to the current Broadway production of the Musical, Taymor is entitled to a permanent injunction barring Defendants from using copyrighted elements of her Treatment without compensating her for such use and honoring their contracts with her, or upon such terms as the Court finds to be just and equitable.

163.    Taymor is entitled to a permanent injunction barring Defendants from any future use of copyrighted elements of her Treatment in any medium whatsoever, including any future production of the Musical in venues other than on Broadway and any "making-of" film or video, without Taymor's written consent.

164.    As a direct and proximate result of Defendants' infringement, Taymor has suffered actual damages in an amount not yet determined or ascertainable but believed to be in excess of $1 million.

165.    Taymor is entitled to disgorgement of Defendants' profits attributable to their unauthorized use of Taymor's copyrighted Treatment.

166.    Taymor is entitled to attorneys' fees, costs, and disbursements under 17 U.S.C. § 505.

## THIRD CLAIM FOR RELIEF

**Breach of Contract**
**(Against Hello and 8 Legged)**

167.    Taymor and LOH repeat and reallege the allegations set forth in paragraphs 1 through 166 as if fully set forth herein.

168.    The Author Deal Memo and 2010 Amendment are valid and enforceable contracts with Taymor and LOH requiring Hello and 8 Legged, among other things, to: (a) pay weekly royalties to Taymor and LOH; and (b) obtain Taymor's approval prior to making changes to the Original Book.

169.    Taymor and LOH have performed all of their obligations under the Author Deal Memo and the 2010 Amendment.

170.    Hello and 8 Legged have breached their obligations under the Author Deal Memo and 2010 Amendment by, among other things: (a) failing to pay royalties owed to Taymor and LOH, including, at a minimum, Taymor's continuing guaranteed minimum weekly royalty of $2,917.50 per eight-performance week; and (b) failing to obtain Taymor's approval prior to making changes to the Original Book.

171.    The Berger Deal Memo is a valid and enforceable contract for Berger's services as co-author of the Original Book.

172.    Taymor is a third-party beneficiary of the Berger Deal Memo.  Taymor's benefits under the Berger Deal Memo include the requirement that "Berger shall collaborate with Julie Taymor on bookwriter related and other creative decisions for the Musical; provided, however, Julie Taymor, in her sole and absolute discretion, shall have final approval on all such decisions."  (Emphasis added.)  The benefits to Taymor of this provision were substantial and immediate, rather than incidental.

173.     Berger and Hello intended to benefit Taymor under the Berger Deal Memo, and Taymor relied on the Berger Deal Memo to her detriment.

174.     Hello and 8 Legged breached their obligations under the Berger Deal Memo by failing to obtain Taymor's approval of changes made to the Original Book.

175.     As a direct and proximate result of Hello's and 8 Legged's breaches, Taymor and LOH have suffered and will continue to suffer actual damages in an amount not yet determined or ascertainable but believed to be in excess of $1 million.

## FOURTH CLAIM FOR RELIEF

### Declaratory Judgment and Injunction – Non-Broadway Productions
### (Against Hello and 8 Legged)

176.     Taymor and LOH repeat and reallege the allegations set forth in paragraphs 1 through 175 as if fully set forth herein.

177.     The Author Deal Memo requires Hello and 8 Legged to obtain Taymor's and LOH's approval over dispositions of rights to the Musical such as production of the Musical in venues other than on Broadway.

178.     Neither Taymor nor LOH has authorized or approved any disposition of rights to the Musical that would permit a production of the Musical in a venue other than on Broadway.

179.     Upon information and belief, Hello and 8 Legged are preparing to produce or license to be produced, without Taymor's approval, a version of the Musical to be performed in venues other than on Broadway.

180.     An actual, present, and justiciable controversy exists as to whether Hello and 8 Legged have the right to produce or license to be produced a version of the Musical to be performed in a venue other than on Broadway.

181.    The production or licensing of a production of the Musical to be performed in a venue other than on Broadway would cause Taymor and LOH to suffer irreparable harm for which they have no adequate remedy at law, including but not limited to: (a) harm to Taymor's future business prospects and reputation; (b) loss of control over Taymor's creative work; and (c) prospective harm attributable to continuing performances of the Musical, which cannot readily or precisely be calculated.

182.    Taymor and LOH are entitled to a declaratory judgment under 28 U.S.C. § 2201 that the production or licensing of a production of the Musical to be performed in a venue other than on Broadway, without Taymor's written consent, would breach the Author Deal Memo.

183.    Taymor and LOH are entitled to a permanent injunction barring Defendants from producing or licensing a version of the Musical to be performed in a venue other than on Broadway without Taymor's written consent.

## FIFTH CLAIM FOR RELIEF

### Declaratory Judgment and Injunction – NY Civil Rights Law §§ 50 and 51
### (Against 8 Legged, Cohl, and Harris)

184.    Taymor and LOH repeat and reallege the allegations set forth in paragraphs 1 through 183 as if fully set forth herein.

185.    Upon information and belief, 8 Legged, Cohl, Harris, and others are in the process of producing a promotional "making-of" film or video using, among other things, Taymor's name and likeness (the "Promotional Film").  8 Legged, Cohl, and Harris intend to use the Promotional Film as, among other things, an advertising tool for the Musical and for purposes of trade.

186.    Taymor has not granted permission to the producers to use her name and likeness in connection with a Promotional Film.

187.    Taymor's counsel has notified the producers' counsel that Taymor has not waived her approval rights over a Promotional Film.

188.    8 Legged's counsel has notified Taymor's counsel that 8 Legged does not intend to recognize or comply with Taymor's approval rights over a Promotional Film.

189.    An actual, present, and justiciable controversy exists as to whether 8 Legged has the right to produce or market a Promotional Film without Taymor's consent.

190.    The production or marketing of a Promotional Film without Taymor's consent would cause Taymor to suffer irreparable harm for which she has no adequate remedy at law, including but not limited to: (a) harm to Taymor's future business prospects and commercial reputation; (b) harm to Taymor's ability to control the use of her name and likeness; and (c) prospective harm attributable to sales of a Promotional Film, which cannot readily or precisely be calculated.

191.    Taymor is entitled to a declaratory judgment under 28 U.S.C. § 2201 that the use of her name or likeness in connection with a Promotional Film without her written consent would violate her right of privacy under Sections 50 and 51 of the New York Civil Rights Law.

192.    Taymor is entitled to a permanent injunction barring 8 Legged, Cohl, and Harris from using her name or likeness in connection with a Promotional Film without her written consent.

## SIXTH CLAIM FOR RELIEF

### Copyright Accounting
### (Against Berger)

193.    Taymor and LOH repeat and reallege the allegations set forth in paragraphs 1 through 192 as if fully set forth herein.

194.     As set forth in the registration certificate for Taymor's copyright in the Original Book (Exhibit G), Taymor and Berger are joint authors of the Original Book.  Each made independently copyrightable contributions to the work.

195.     Berger, however, did not have the power or authority to license or transfer any right to prepare derivative works based on the Original Book or to make changes to the Original Book.  Under the Author Deal Memo and the Berger Deal Memo, all rights to prepare or license derivative works were, and were intended to be, exclusively owned and controlled by Taymor.

196.     As an alternative to her copyright infringement claim based on infringement of the Original Book, if Berger is held to have validly effected the license or transfer of any rights in the Original Book (including but not limited to any license or transfer to the producers), Taymor, as a joint author, is entitled to an accounting and half of any proceeds obtained by Berger as a result of such license or transfer.

## JURY DEMAND

197.     Taymor and LOH demand a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Taymor and LOH respectfully request judgment against 8 Legged Productions, LLC, Hello Entertainment, LLC, Goodbye Entertainment, LLC, Savior Productions, LLC, Michael Cohl, Jeremiah Harris, and Glen Berger as follows:

1.     On their First and Second Claims for Relief, for copyright infringement:

(a)     a full and complete accounting from Defendants of the profits, gains, and advantages derived from their infringing use of Taymor's copyrighted Original Book and Treatment;

(b)     damages in an amount to be determined at trial but believed to be in excess of $1 million, including Plaintiffs' actual damages and Defendants' profits

pursuant to 17 U.S.C. § 504(b), or, in the alternative, enhanced statutory damages pursuant to 17 U.S.C. § 504(c);

(c)     disgorgement of profits attributable to Defendants' unauthorized use of Taymor's copyrighted Original Book and Treatment;

(d)     with respect to the current Broadway production of the Musical, a permanent injunction barring Defendants from using copyrighted elements of Taymor's Original Book or Treatment without compensating Taymor for such use and honoring their contracts with her, or upon such terms as the Court finds to be just and equitable; and

(e)     a permanent injunction barring Defendants from any future use of copyrighted elements of Taymor's Original Book or Treatment in any medium whatsoever, including any future production of the Musical in venues other than on Broadway and any "making-of" film or video, without Taymor's written consent;

2.     On their Third Claim for Relief, for breach of contract:

(a)     a full and complete accounting from Defendants of the revenues and profits derived from the Musical, as well as the fees, advances, royalties, and other payments owed to Plaintiffs under the parties' contracts; and

(b)     damages in an amount to be determined at trial but believed to be in excess of $1 million;

3.     On their Fourth Claim for Relief, for declaratory judgment:

(a)     a declaration that the production or licensing of a production of the Musical to be performed in a venue other than on Broadway, without Taymor's written consent, would breach the Author Deal Memo; and

(b)      a permanent injunction barring Defendants from producing or licensing a version of the Musical to be performed in a venue other than on Broadway without Taymor's written consent;

4.      On their Fifth Claim for Relief, for declaratory judgment:

(a)      a declaration that the use of Taymor's name or likeness in connection with a "making of" Promotional Film without Taymor's written consent would violate Taymor's right of privacy under Sections 50 and 51 of the New York Civil Rights Law; and

(b)      a permanent injunction barring 8 Legged, Cohl, and Harris from using Taymor's name or likeness in connection with a Promotional Film without Taymor's written consent;

5.      On their Sixth Claim for Relief, in the alternative, for a copyright accounting:

(a)      a full and complete accounting of all profits, gains, and advantages derived by Berger from any license, transfer, sale, or lease of any rights in the Original Book; and

(b)      damages in the amount of half of all profits, gains, and advantages derived by Berger from any license, transfer, sale, or lease of any rights in the Original Book;

6.      Attorneys' fees, costs, and disbursements, including but not limited to fees, costs, and disbursements under 17 U.S.C. § 505;

7.      Pre-judgment and post-judgment interest, to the fullest extent available, on the foregoing; and

8.      Such other and further relief as may be just and proper.

Dated: New York, New York
    July 9, 2012

LANKLER SIFFERT & WOHL LLP

By: _____

Charles T. Spada (cspada@lswlaw.com)
Matthew G. Coogan (mcoogan@lswlaw.com)
Lauren C. Freundlich (lfreundlich@lswlaw.com)
Andrew S. Lee (alee@lswlaw.com)
Patrick C. Toomey (ptoomey@lswlaw.com)

500 Fifth Avenue
New York, NY 10110
(212) 921-8399

*Attorneys for Plaintiffs*

# EXHIBIT A

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Form PA**
For a Work of Performing Arts
UNITED STATES COPYRIGHT OFFICE

REG **PAu2−942−150**

EFFECTIVE DATE OF REGISTRATION
MAR 17 2005
Month    Day    Year

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**1** **TITLE OF THIS WORK ▼**

Spiderman/Caught

**PREVIOUS OR ALTERNATIVE TITLES ▼**

**NATURE OF THIS WORK ▼ See instructions**

Treatment for book for Musical Play

**2 a** **NAME OF AUTHOR ▼**
Julie Taymor

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR Citizen of United States
Domiciled in

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes ☑ No
Pseudonymous?   ☐ Yes ☑ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼
Author of treatment

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**b** **NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR Citizen of
Domiciled in

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes ☐ No
Pseudonymous?   ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

**c** **NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR Citizen of
Domiciled in

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes ☐ No
Pseudonymous?   ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

**3 a** **YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED** This information must be given in all cases.
2004   Year

**b** **DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK** Complete this information ONLY if this work has been published.
Month    Day    Year    Nation

**4** **COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼
Julie Taymor
874 Broadway, Apt. 1001
New York, NY 10003

APPLICATION RECEIVED
MAR 17 2005
ONE DEPOSIT RECEIVED
MAR 17 2005
TWO DEPOSITS RECEIVED
FUNDS RECEIVED

**TRANSFER** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

**See instructions before completing this space.**

DO NOT WRITE HERE

---

**MORE ON BACK ▶** • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.    • Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of 2 pages

| EXAMINED BY | | FORM PA |
|---|---|---|
| CHECKED BY | | |
| ☐ CORRESPONDENCE<br>☐ Yes | | FOR<br>COPYRIGHT<br>OFFICE<br>USE<br>ONLY |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes ☒ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼ If your answer is No, do not check box A, B, or C.

a. ☐ This is the first published edition of a work previously registered in unpublished form.

b. ☐ This is the first application submitted by this author as copyright claimant.

c. ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: **Previous Registration Number** ▼          **Year of Registration** ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation.
Preexisting Material  Identify any preexisting work or works that this work is based on or incorporates. ▼

Characters and setting from "Spiderman" comic books

**a**

**6**

See instructions
before completing
this space.

Material Added to This Work  Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

Original story, using Greek myth and new material

**b**

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
Name ▼                                                            Account Number ▼

**a**

**7**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/ZIP ▼

Seth Gelblum, Esq.
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154-0037

**b**

Area code and daytime telephone number

Email sgelblum@loeb.com Tel: 212.407.4931          Fax number ( )  Fax: 212.407.4990

**CERTIFICATION\*** I, the undersigned, hereby certify that I am the

Check only one ▶
☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☒ authorized agent of Julie Taymor

Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

**8**

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

Seth Gelblum                                                  Date  03.07.05

Handwritten signature (X) ▼

x _Seth Gelblum_

| Certificate<br>will be<br>mailed in<br>window<br>envelope<br>to this<br>address: | Name ▼<br>Seth Gelblum, Esq.<br>Loeb & Loeb LLP<br>Number/Street/Apt ▼<br>345 Park Avenue<br>City/State/ZIP ▼<br>New York, NY 10154-0037 | • Complete all necessary spaces<br>• Sign your application in space 8 |
|---|---|---|

**9**

*17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Rev: June 2002—20,000   Web Rev: June 2002   ⊛ Printed on recycled paper                                                  U.S. Government Printing Office: 2000-461-113/20,021

# **EXHIBIT B**

## Seth Gelblum

| | |
|---|---|
| **From:** | David Garfinkle [dgarfinkle@eipgrouplaw.com] |
| **Sent:** | Tuesday, June 28, 2005 1:50 PM |
| **To:** | Seth Gelblum |
| **Cc:** | TAHello@aol.com; 'rfeiner'; 'Adam Silberman' |
| **Subject:** | Berger Deal Memo |

Dear Seth:

Per our conversation, attached is a copy of the deal memo for Glen that has been sent to Joyce Ketay.  As I indicated, material business points have been agreed, although we are awaiting a response to the specific language.

Best regards,

David

David Garfinkle
**HELLO ENTERTAINMENT**
630 Ninth Avenue, Suite 610
New York, NY 10036
phone: (212) 589 5446
fax:    (212) 589-5425
cell:   (312) 391 2547

---

Unless otherwise indicated or obvious from the nature of the following communication, the information contained herein may be attorney-client privileged and may constitute confidential information/work product. The communication is intended for the use of the individual(s) or entity(ies) named above. If the reader of this transmission is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by return e-mail and destroy any copies, electronic, paper or otherwise, which you may have of this communication.

6/28/2005

June 22, 2005

Spider-Man Musical

Summary of Material Terms between Glen Berger ("Berger" or "Bookwriter") and Hello
Entertainment, LLC ("Hello" or "Producer")

The summary of material terms set forth below, when countersigned by Berger and Hello, outlines
material terms upon which the parties have agreed Berger will co-write the treatment and/or book for a
dramatico-musical work for the legitimate stage presently entitled "Spider-Man: A Musical Web" (the
"Musical") and grant Hello the right to produce and present the Musical.

The parties acknowledge that Hello entered into an agreement with Marvel Enterprises, Inc. dated March
25, 2004 (the "Marvel Agreement") pursuant to which Hello has acquired the right to cause to be created
a stage musical based on certain intellectual property owned by Marvel (including the comic book
character known as Spider-Man), which intellectual property is defined in the Marvel Agreement as the
"Work".  Berger hereby acknowledges and agrees that his position as a co-writer of the treatment and/or
the book of the Musical is subject to the approvals of both Marvel Enterprises, Inc. ("Marvel") and Bono
and the Edge of U2.

   1) Treatment and Bookwriter Payments:  For the initial option to present the first class production of
the Musical on Broadway in New York City or on the West End of London (in either case, the "Initial
First Class Production"), and any developmental or tryout productions prior to the deadlines set forth
in the Marvel Agreement, as such dates may be extended by Marvel, Hello will pay Berger the
following:

     a. Treatment Payment: Ten Thousand Dollars ($10,000) upon delivery of a completed
treatment/step outline (the "Treatment") for which Berger shall serve as co-writer (the "Treatment
Payment").   The Treatment shall include, without limitation, those elements set forth in the
definition of "Basic Treatment" in the Marvel Agreement, which is "the story, basic treatment,
overall concept and music-style contained in the Musical (e.g. rock vs. hip-hop), including but not
limited to the basic storyline, character descriptions, portrayal of the powers, basic personal traits,
physical appearance and the living habitat, environment and setting thereof" and a scene by scene
breakdown.  The Treatment Payment shall be paid to Berger by Producer regardless of whether
Producer elects to utilize Berger's services to make revisions to the Treatment, to write the Book
(or any portion thereof) or in any other manner in connection with the Musical.

     b. Bookwriter Payment:  In the event that Berger co-writes the complete book of the Musical
(the "Book"), Hello shall pay Berger an additional Twenty Thousand Dollars ($20,000) (the
"Bookwriting Payment").  Half of the Bookwriting Payment shall be paid to Berger upon
Producer's acceptance of the Treatment and Producer's request for Berger to commence writing
the first draft of the Book.  The remainder of the Bookwriting Payment shall be paid to Berger
upon delivery of the first draft of the Book to Producer.  To the extent Berger co-writes both the
Treatment and the Book, Fifteen Thousand Dollars ($15,000) of the total payments made by
Producer to Berger hereunder shall be considered a fee and the remaining Fifteen Thousand
Dollars ($15,000) shall be considered an advance against the royalties set forth in Paragraph 3
below.

  2) Buyout Provision:  Berger hereby acknowledges and agrees that any determination of whether to
engage Berger to co-write the Book shall be made by Producer in its sole, unfettered discretion.
In the event that Producer does not elect to retain Berger's services to co-write the Book, Berger

agrees to accept the additional sum of Ten Thousand Dollars ($10,000) (i.e. for a twenty thousand dollars ($20,000) total payment) as full and complete consideration in exchange for Producer's unfettered right in and to the Treatment and to the exploitation thereof in all media now known or hereafter developed in perpetuity without further compensation or obligation to Berger. In such instance, Berger hereby agrees that all results and proceeds of Berger's services hereunder in regard to the Treatment and all other material prepared, submitted, written, discussed or interpolated by Berger and provided to Producer hereunder prior to a decision that Berger will not co-write the Book, shall constitute works made-for-hire and shall on their creation be and remain for all purposes the sole and exclusive property of Producer. In the event said results and proceeds are not considered works made-for-hire, Berger hereby irrevocably assigns all right, title and interest Berger may possess in and to said results and proceeds (including, without limitation, the copyright) to Producer. Berger shall deliver to Producer any documents required by Producer to evidence such assignment.

3) Broadway Royalties:

    a.    Royalty as bookwriter: In the event Berger co-writes the Book which is acceptable to Producer and Marvel in accordance with the Marvel Agreement, he shall receive 37.5% of the bookwriter's share of Weekly Operating Profit, which amount is equal to 1.945% of Weekly Operating Profit pre-recoupment increasing to 2.2225% post recoupment. If Berger, at the request of Bono and Edge, writes lyrics and such lyrics are included in the lyrics of the Musical, the calculation of remuneration, if any, related to such lyrics shall be the responsibility of Bono and Edge and not Producer. It is further understood and agreed that Berger's contributions to the lyrics of the Musical (if any) shall be owned by Bono and Edge for all purposes, and Bono and Edge shall not be responsible for any compensation due and owing to Berger absent their prior written approval and execution of appropriate agreements therefore. Berger shall receive 37.5% of the bookwriter minimum weekly guarantee ("MWG"), which amount shall be calculated and determined on a favored nations basis with all other authors of the Musical.

    b.    Amortization: The above royalty percentages will be subject to any pre-recoupment amortization and reduction schedules agreed to by the other creative parties. Such amortization and reduction schedules, and the recovery of such amortization and reduction, shall be on a most favored nations basis, pro rata, with all other authors of the Musical.

4)    Royalties for Other Productions: In the event Hello produces, co-produces, presents or licenses the Musical as written by Berger outside of Broadway or the West End, Berger shall be entitled to 37.5% of the bookwriter royalty for all such productions on a favored nations basis with all other authors of the Musical for the amount of the MWG and royalty in terms of calculation and determination.,

5)    Subsidiary Rights: 1/7TH of overall author's subsidiary rights participation net of customary agency commissions and all other third party participations, including Marvel, will go to Julie Taymor. Thereafter, the remainder of author's net share of subsidiary rights proceeds as between the authors will be divided 2/3 to Bono and Edge as composer/lyricist and 1/3 to bookwriter (of which Berger shall receive 37.5% of said 1/3).

6)    Delivery and Vesting Schedule:

    a. Berger will deliver to Hello the Treatment by July 1, 2005. Berger shall receive a status report regarding approval or disapproval from Hello within thirty (30) days of receipt of the completed Treatment and overall approval/disapproval with detailed notes specifying the

reasons for disapproval, if pertinent, within sixty (60) days of such receipt. If either Marvel, or Hello and Julie Taymor disapproves the Treatment, Berger will have up to seven (7) days from receipt of such written and detailed notes to submit another draft of the Treatment for approval. Notwithstanding the foregoing, Hello shall have the option to exercise the treatment buyout right set forth in paragraph 2 at any step in this process.

b. Following Hello's approval of the Treatment, Hello shall have the right to request that Berger co-write and deliver the Book. Berger shall deliver at least eighty (80) pages of the Book (if song lyrics are included, otherwise a reasonable amount of pages, but not less than the first act) by sixty (60) days from Hello's written request and the completed Book by sixty (60) days thereafter. In the event, after Berger delivers the first draft of the completed Book to Hello, that Hello, in its sole and absolute discretion, decides not to approve the Book and to replace Berger with another co-bookwriter or to hire an additional co-writer, Berger's royalty percentages hereunder shall be reduced dollar for dollar of any amount paid to the other co-writer to a floor of 50% and Berger shall receive a pro rata share of any advances or MWGs on the same reduced basis. In such instance, Producer shall have the unfettered right to use all material created and/or developed by Berger for the Musical, whether in the Treatment, the Book or otherwise, without further compensation to Berger other than that set forth above and herein. The decision regarding whether a replacement or other writer is needed will be made within ninety (90) days of receiving the first draft of the completed Book.

7) <u>Billing</u>: If Berger co-writes the Book, the credit accorded to Berger (which shall be negotiated in good faith) shall be no less than the size of the credit accorded to the other bookwriter(s) of the Musical and shall appear whenever credits appear for the other bookwriter(s).

8) <u>Payments</u>: All royalties, advances, and fees paid to Berger under the terms and conditions of this deal memo shall be paid pro rata with other creatives based on the same definitions as used in Hello's agreements with such creatives.

9) <u>Commercial Use Products</u>: Berger acknowledges and agrees that Producer will have the exclusive right to exploit the merchandising rights in the Musical in connection with each presentation of the Musical hereunder. In connection with exploitation of the Producer's merchandising rights, Producer will pay Berger 37.5% of the bookwriter's share of the authors' income from the exploitation of commercial use products, net of any and all payments to other third parties, including Julie Taymor as director or designer, if applicable.

10) <u>Film Adaptation</u>: Berger acknowledges and agrees that Sony Entertainment, Inc. shall have a right of first negotiation and last refusal regarding a film adaptation of the Musical and that Julie Taymor shall have the right of first refusal to direct such adaptation on customary terms for a director of her stature for a film such as this adaptation. No promises have been made to Berger that he can write the screenplay for such film adaptation.

11) <u>Consultation on Bookwriter/Creative Decisions</u>: Berger shall collaborate with Julie Taymor on bookwriter related and other creative decisions for the Musical; provided, however, Julie Taymor, in her sole and absolute discretion, shall have final approval on all such decisions, including her directing of any film adaptation of the Musical.

12) <u>Confidentiality</u>: Berger hereby agree to keep secret and confidential indefinitely (except as may be necessary to reveal to his legal, business and financial representatives) the following: (a) the amount, terms, provision and promises contained in this deal memo and (b) any information

revealed to him orally or in written form by Producer, the director or any related third party regarding the current or intended content, structure, story, music and form of the Musical or any element thereof and/or any other information regarding the creative development of the Musical or the business structure or deals related to the Musical.  Berger additionally agrees that he will not, either directly or indirectly, seek or give publicity to, or cooperate in same, the fact of this deal memo or any other information about the Musical without the prior written approval of Producer.

13) Entire Agreement/Governing Law.  This deal memo constitutes the entire agreement between the parties concerning the subject matter hereof and shall not be modified or amended except in a writing signed by the parties.  This agreement shall be governed by and construed in accordance with the laws of the State of New York.

The parties will enter into a long form agreement which is within the terms allowed under the Marvel Agreement and which incorporates the above stated terms as well as other terms that are found in authors agreements, including terms regarding grant of rights, warranties, representations and indemnification, subsidiary rights, additional territories, merger, cast album, commercial use products and expenses.

**Agreed and acknowledged:**

**Hello Entertainment, LLC**                    **Bookwriter**

By: _____          By: _____
        Tony Adams                                       Glen Berger

Date:_____          Date:_____


By: _____
        David L. Garfinkle

Date:_____

# EXHIBIT C

Spider-Man Musical

Acknowledgement Between LOH, Inc. ("Lender") f/s/o Julie Taymor ("Taymor") and Hello
Entertainment, LLC ("Hello" or "Producer")

Hello acknowledges and agrees that in Lender's position as a co-owner of the book of the
musical currently entitled Spider-Man: A Musical Web (the "Musical"), Lender shall have
approval (to be shared with the composer and lyricist, and, if such parties and Lender agree,
with the bookwriter) over dispositions of rights to the Musical, and all other decisions
customarily reserved to the authors of a Musical, and the foregoing, and the first sentence of
Paragraph 5 and the provisions of Paragraph 6 in Lender's directing terms with Hello dated
July 12, 2005 will be agreed in a writing or writings signed by Lender and all authors prior to
performances of the Musical. Lender will use all good faith efforts to secure such an
agreement between Lender and all authors as soon as possible. In addition, Hello and
Lender acknowledge and agree that in Lender's position as a co-owner/co-writer of the book
of the Musical, Lender will receive, in addition to the director and collaborator royalties set
forth in Lender's directing agreement, one-half of the aggregate remaining shares of the
bookwriter royalty and subsidiary rights participation (after accounting for the participation
of Neil Jordan). Specifically, subject to Marvel's approval of Lender as a co-bookwriter, she
and her co-writer will each receive (1) 37.5% of the bookwriter's share of weekly operating
profit, which amount is equal to 1.945% of weekly operating profit pre-recoupment
increasing to 2.2225% post recoupment; (2) 37.5% of the bookwriter royalty for all
productions of the Musical that Hello produces, co-produces, presents or licenses outside of
Broadway; and (3) 50% of the bookwriters 1/3 portion of authors' net share of subsidiary
rights proceeds (i.e. net of customary agency commissions and all third party participations
agreed to by Lender; third party participations currently agreed to are Marvel as set forth in
Marvel's March 25, 2004 agreement with Hello and Lender's 1/7[th] share of authors
participation as set forth in Lender's director agreement). In addition, Taymor and her co-
writer will each receive equal credit as a co-bookwriter of the Musical.

Agreed and acknowledged as of August 4, 2005:

Hello Entertainment, LLC                         LOH, Inc. f/s/o Julie Taymor

By: _____           By: _____
    Tony Adams                                     Julie Taymor

By: _____
    David L. Garfinkle

# EXHIBIT D

July 12, 2005

Spider-Man Musical

Summary of Material Terms Between LOH, Inc. ("Lender") f/s/o Julie Taymor ("Taymor" or "Director") and Hello Entertainment, LLC ("Hello" or "Producer")

The summary of material terms set forth below, when countersigned by Lender and Hello, outlines material terms upon which the parties have agreed Taymor will direct and collaborate on the creation of a dramatico-musical work for the legitimate stage presently entitled "Spider-Man: A Musical Web" (the "Musical") and grant Hello the right to produce and present the Musical.

The parties acknowledge that Hello entered into an agreement with Marvel Enterprises, Inc. dated March 25, 2004 (the "Marvel Agreement") pursuant to which Hello has acquired the right to cause to be created a stage musical based on certain intellectual property owned by Marvel (including the comic book character known as Spider-Man), which intellectual property is defined in the Marvel Agreement as the "Work".

1) Fee: In consideration for the Lender furnishing the direction and collaboration services of Director for the initial first class production of the Musical on Broadway in New York City or on the West End of London (in either case, the "Initial First Class Production") and any developmental productions prior to the opening of the Initial First Class Production, Hello will pay Lender a non-recoupable total fee of $125,000 (the "Fee").

Upon the execution of this deal memo, Hello shall pay Lender $25,000 of the Fee ($12,500 of which has already been paid). The additional payments for the remainder of the Fee will be in three equal payments with the payment schedule to be negotiated in good faith between the parties.

2) Net Profit Participation: With respect to each company of the Musical produced or licensed by Hello, Lender will receive 2.5% of 100% of net profits of each such company, if any.

3) Broadway Royalties: Lender shall be entitled to the following royalties from performances of the Broadway production of the Musical:

   a. Royalty as Director: a minimum guaranteed weekly advance (to be negotiated in good faith) against 6.5% of Weekly Operating Profit pre-recoupment increasing to 7.4274% post recoupment.

   b. Royalty as Collaborator: a minimum guaranteed weekly advance (to be negotiated in good faith) against 2.5933% of Weekly Operating Profit pre-recoupment increasing to 2.9633% post recoupment.

   c. Amortization: The above royalty percentages will be subject to any pre-recoupment amortization and reduction schedules as agreed by Lender and all of the other creative parties.

4) Royalties for Other Productions and Right of Lender to Furnish the Services of Director: In the event Hello or any affiliate of Hello or of a controlling party of Hello produces, presents or licenses any first-class production of the Musical outside of Broadway, Lender will be given the first opportunity to furnish the services of Director to direct

same provided she has directed the Initial First Class Production of the Musical. If Taymor directs, Lender shall be entitled to a director royalty for such productions in an amount to be negotiated in good faith taking into account the financial needs of such productions, the prominence of Director, the standards in the theater industry and other relevant circumstances including the venue, provided, however, that Hello may calculate the royalties for any touring production of the Musical on a "company share" basis when Producer is paid on such basis; and provided further that Lender, in relation to authors, shall receive royalty treatment with regard to such productions on a proportionate basis to the royalties received by Lender and the authors on Broadway. Unless an agreement is reached with Lender with respect to such royalty for any performance of the Musical, Producer will have no right to use Director's directorial contribution to the Musical for such performance. Further, Lender must agree to any reductions, deferrals, waivers or other calculations of the foregoing royalties, and of the royalty set forth in paragraph 3. If Lender declines to furnish the services of Director to direct any such additional company referred to above, Producer will be entitled to deduct from the aforesaid royalty payable to Lender, an amount equal to the royalty paid by Producer to any replacement director who actually re-stages such company. The royalty so paid to the replacement director will not reduce Lender's royalty by more than thirty percent (30%).

5) <u>Subsidiary Rights</u>: Per the current verbal agreement of Neil Jordan, Glen Berger and Bono and Edge of U2 (together, "Authors"), 1/7TH of overall author's subsidiary rights participation, net of customary agency commissions and other third party participations, will go to Lender. In addition, Lender shall be entitled to 2.5% of gross retail sales (less only taxes) of any merchandise using any of Taymor's designs that Taymor is specifically hired to create for the Musical (i.e., costume or puppet designs, to the extent that she is a costume or puppet designer). No royalty shall apply, however, to use of the show logo, key art, the design used on the windowcard or the cover of the souvenir book regardless whether such was designed by Taymor.

6) <u>Film</u>: To the extent that Hello has control over same, Hello agrees that it will accord Taymor the right of first refusal to direct a film version of the Musical, subject to her good faith negotiation with the appropriate entities. Hello will also cause Sony and the Authors to agree to the same. Taymor acknowledges and agrees that insofar as she is concerned Sony Entertainment, Inc. shall have a right of first negotiation and last refusal regarding a film adaptation of the Musical.

7) <u>Approvals</u>: Taymor will have the following approvals (not to be unreasonably withheld) with respect to each production of the Musical directed by her, subject also to the approval of Hello, the Authors and Marvel (where applicable):

      (a)    the entire original cast;
      (b)    replacements of the principal members of the cast;
      (c)    the stage manager;
      (d)    the scenic designer and the designs and models for the sets;
      (e)    if Taymor is not engaged as the costumer designer, then the costume designer and the designs for the costumes;
      (f)    if Taymor is not engaged as the puppet designer, then the puppet designer and the puppet designs, if any;
      (g)    the sound designer and the sound designs;
      (h)    the choreographer;
      (i)    the orchestrator and arrangers;

(j)     the conductor;

(k)     casting agents;

(l)     music supervisor;

(m)     lighting designer;

(n)     assistant director, and all replacements;

(o)     Broadway theater;

(p)     West End Theater; and

(q)     Bookwriter/treatment writer and/or co-bookwriter/co-treatment writer
        (Glen Berger is hereby approved) .

Hello also agrees to accord Taymor approval, not to be unreasonably withheld or delayed, with
respect to the show logo and master advertising artwork for the Musical.

The parties will enter into a long form agreement which is within the terms allowed under the
Marvel Agreement and which incorporates the above stated terms as well as other terms that are
found in director/collaborator agreements, including terms regarding billing, fees and/or advances
related to the right of first refusal to direct other first class companies, timing of approvals and
expenses.

Agreed and acknowledged:

Hello Entertainment, LLC                          LOH, Inc. f/s/o Director/Collaborator

By: _____                      By: _____
        Tony Adams                                        Julie Taymor

By: _____
        David L. Garfinkle

# EXHIBIT E

# AMENDMENT

This amendment ("Amendment") is dated as of August 24th, 2010, by and among 8 Legged Productions, LLC, as successor in interest to Hello Entertainment LLC ("Hello"), LOH, Inc. f/s/o Julie Taymor ("Taymor"), Paul Hewson (professionally known as BONO) ("Bono"), David Evans (professionally known as THE EDGE) ("Edge") and Glen Berger ("Berger").

WHEREAS, Hello and Taymor have entered into that certain signed Director and Co-Writer Agreement dated July 12, 2005 (the "Taymor Agreement");

WHEREAS, Hello on the one hand and Bono and Edge on the other hand, have entered into that certain Signed Composer/Lyricist Agreement dated October 5, 2005 (the "BONO/EDGE Agreement");

WHEREAS, Hello and Berger have entered into that certain Signed Co-Bookwriter Agreement dated June 22, 2005 (the "Berger Agreement");

WHEREAS, Hello on the one hand and Taymor, Bono, Edge and Berger on the other hand, have been negotiating that certain Production Agreement, draft dated as of June 6, 2008 (the "Production Agreement" and together with the Taymor Agreement, the Bono/Edge Agreement and the Berger Agreement, the "Agreements").

WHEREAS, In connection with the production of a live dramatic-musical stage play based on the comic book character known as "Spider-Man" (the "Musical"), the Agreements (including all exhibits, schedules and attachments thereto) contain certain provisions setting forth the royalties for the New York Production of the Musical.

WHEREAS, Prior to the initial opening of the Musical, Hello, as original producer, exhausted the capital raised for the purposes of producing the Musical and was unable to raise additional capital.

WHEREAS, Certain new investors have agreed to contribute additional capital towards the production of the Musical provided that Taymor, Bono, Edge and Berger agree to certain amendments to the royalty payments as provided in the Agreements.

NOW THEREFORE, in consideration of the foregoing and the mutual covenants set forth in this Agreement, the parties, intending to be bound, hereby mutually covenant and agree as follows:

1. Notwithstanding anything contained in the Agreements to the contrary, the parties hereto agree to accept in lieu of the royalty payments and profit

#2395435 v4 \021391 \0001

participation payments set forth in the Agreements (the "Contractual Payments"), their pro rata share of the royalty pool (such pro rata share based on the full contractual royalties of all royalty pool participants), and all deferred royalties, profit participations and other amounts, payable to such parties at the time and in the amounts as set forth in that certain Spider-Man Broadway Royalty and Profit Agreement, dated as of July 28, 2010, attached hereto as Schedule A (the "Restructured Payments"), to the extent the timing and/or amount of the Restructured Payments differ from the timing and/or amount of the Contractual Payments.

Except as expressly modified herein, the Agreements (to the extent they have been executed by the parties hereto) shall remain in full force and effect. This letter agreement shall be governed by and construed under the laws of the State of New York without regard to principles of conflicts of law. This letter agreement may be executed in any number of counterparts, any one of which need not contain the signatures of more than one party, but all of such counterparts together shall constitute one agreement. One or more counterparts of this Agreement may be delivered via telecopier, facsimile, or e-mail (pdf), and they shall have the same effect as an original counterpart hereof. This letter agreement may not be amended, or any provision thereof waived, unless each undersigned party consents thereto. If the foregoing constitutes your understanding of the new Royalty arrangements and Royalty Pool allocations, kindly execute next to your name and this shall be deemed a binding Amendment to all of the aforementioned Agreements.

[Signature page follows]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed as of the day and year first written above.

8 LEGGED PRODUCTIONS, LLC, as successor to Hello Entertainment LLC

By:   Goodbye Entertainment LLC, its manager

By: _____
Name:
Title:

| | |
|---|---|
| Paul Hewson<br>(professionally known as BONO) | David Evans<br>(professionally known as THE EDGE) |
| LOH, Inc. f/s/o Julie Taymor<br><br>By: _____<br>Name:<br>Title: | <br><br>_____<br>Glen Berger |

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed as of the day and year first written above.

8 LEGGED PRODUCTIONS, LLC, as successor to Hello Entertainment LLC

By:    Goodbye Entertainment LLC, its manager

By: _____
Name:
Title:

| | |
|---|---|
| Paul Hewson<br>(professionally known as BONO) | David Evans<br>(professionally known as THE EDGE) |
| LOH, Inc. f/s/o Julie Taymor<br><br>By: _____<br>Name:<br>Title: *President* | _____<br>Glen Berger |

Spider-Man Broadway
Royalty & Profit Agreement

| | 28-Jul-10 |
|---|---|
| Royalties while New Eq recoups | 20% |
| Weeks to recoup New Equity at sellout | 86 |
| Week #  to 150% recoup New Equity at sellout | 128 |
| Week # to Recoup Mezzanine Equity at sellout | 174 |
| Week # to Recoup Original Equity at sellout | 303 |
| Week # to recoup deferred royalties at sellout | 273 |
| Royalties deferred & repaid at sellout | $9,312,849 |

*All weeks calculated from Opening to milestone.*

1

**SPIDER-MAN Broadway**

**CAPITALIZATION**

| | |
|---|---|
| NEW EQUITY | $25,000,000 |
| NEW CAPITAL (LOAN) | $5,000,000 |
| MID EQUITY | $5,100,000 |
| ORIGINAL EQUITY | $15,406,000 |
| | |
| OPERATING COSTS | $926,483 |

## PRE & POST RECOUPMENT PROJECTIONS with Deferred Royalties

| HILTON | pre | post |
|---|---|---|
| Seating Capacity | 1,830 | 1930 |
| Performances Per Week | 8 | 8 |
| Average Ticket Price | $ 128.85 | $ 129.42 |

**BOX 1**

| Gross Sales as Percentage of Gross Potential | | | 100% | 90% | 85% | 80% | Break-Even 67.3% |
|---|---|---|---|---|---|---|---|
| **RECOUPMENT CAPITAL LOAN/NEW EQUITY** | | | | | | | |
| Net Weekly Box Office Receipts (NWBOR) | NO PREMIUMS | | $1,705,176 | $1,534,658 | $1,449,399 | $1,364,140 | $1,148,085 |
| EXPENSES | | | | | | | |
| U/R (Marvel) share of Net Weekly Box Office Revenue ( based on contractual sliding scale) | | | | | | | |
| 8% | > $1,075,000 | | $136,414 | $122,773 | $115,952 | $109,131 | $91,847 |
| Company & Theatre Fixed Expenses | | | $926,483 | $926,483 | $926,483 | $926,483 | $926,483 |
| Rent | 6% | | $102,311 | $92,079 | $86,964 | $81,848 | $68,885 |
| Sub-Total | | | $1,165,208 | $1,141,335 | $1,129,399 | $1,117,463 | $1,087,215 |
| Operating Profit/(Loss) Before Royalties | | | $539,968 | $393,323 | $320,000 | $246,678 | $60,870 |
| ROYALTIES | $33,038 min wkly guar x 2 | 20.0000% | $107,994 | $78,665 | $66,076 | $66,076 | $66,076 |
| two times MWG or 20% WOP whichever is greater | | | | | | | |
| plus: Merchandising | $8,000 pw (at sellout) | | $8,000 | $7,200 | $6,800 | $6,400 | $5,206 |
| Sub-Total Operating Profit/(Loss) After Royalties | | | $439,974 | $321,858 | $260,724 | $187,002 | $0 |
| Herrick Share of Operating Profit based on seats (repay loan): | | | $108,000 | $108,000 | $108,000 | $108,000 | $108,000 |
| Total Operating Profit/(Loss) After Loan repayment | | | $331,974 | $213,858 | $152,724 | $79,002 | |
| New Equity to Recoup $25m | | | $25,000,000 | $25,000,000 | $25,000,000 | $25,000,000 | |
| Preferred return @ 15% pa | | | $5,441,279 | $7,383,259 | $7,785,634 | $13,039,433 | |
| | | | $30,441,279 | $32,383,259 | $32,785,634 | $38,039,433 | |
| Weeks to recoup Herrick Loan | | | 69 | 69 | 69 | 69 | |
| New Equity recouped | | | 23,053,779 | 14,851,273 | 10,605,859 | 5,486,237 | |
| Total Royalties Deferred | | | 7,499,556 | 5,462,816 | 4,300,288 | 2,263,551 | |

**BOX 2**

| Gross Sales as Percentage of Gross Potential | | | 100% | 90% | 85% | 80% | 67.3% |
|---|---|---|---|---|---|---|---|
| **RECOUPMENT BALANCE OF NEW EQUITY** | | | | | | | |
| Net Weekly Box Office Receipts (NWBOR) | NO PREMIUMS | | $1,705,176 | $1,534,658 | $1,449,399 | $1,364,140 | $1,148,085 |
| EXPENSES | | | | | | | |
| U/R share of Net Weekly Box Office Revenue( based on contractual sliding scale) | | | | | | | |
| 8% | > $1,075,000 | | $136,414 | $122,773 | $115,952 | $109,131 | $91,847 |
| Company & Theatre Fixed Expenses | | | $926,483 | $926,483 | $926,483 | $926,483 | $926,483 |
| Rent | 6% | | $102,311 | $92,079 | $86,964 | $81,848 | $68,885 |
| Sub-Total | | | $1,165,208 | $1,141,335 | $1,129,399 | $1,117,463 | $1,087,215 |
| Operating Profit/(Loss) Before Royalties | | | $539,968 | $393,323 | $320,000 | $246,678 | $60,870 |
| ROYALTIES | $33,038 min wkly guar | 20.0000% | $107,994 | $78,665 | $66,076 | $66,076 | $66,076 |
| two times MWG or 20% WOP whichever is greater | | | | | | | |
| plus: Merchandising | $8,000 pw (at sellout) | | $8,000 | $7,200 | $6,800 | $6,400 | $5,206 |
| Total Operating Profit/(Loss) After Royalties | | | $439,974 | $321,858 | $260,724 | $187,002 | $0 |
| New Equity to Recoup $25m | | | $25,000,000 | $25,000,000 | $25,000,000 | $25,000,000 | |
| Preferred return @ 15% pa | | | $5,441,279 | $7,383,259 | $7,785,634 | $13,039,433 | |
| | | | $30,441,279 | $32,383,259 | $32,785,634 | $38,039,433 | |
| Weeks to recoup New Equity | | | 86 | 124 | 155 | 244 | |
| Total Royalties Deferred | | | 9,312,849 | 9,747,767 | 9,568,164 | 7,937,696 | |

2

BOX 3

| Gross Sales as Percentage of Gross Potential | | | | 100% | 90% | 85% | 80% | 70.2% |
|---|---|---|---|---|---|---|---|---|
| **NEW EQUITY TO RECOUP x 1.5** | | | | | | | | |
| Net Weekly Box Office Receipts | NO PREMIUMS | | | $1,705,176 | $1,534,658 | $1,449,399 | $1,364,140 | $1,196,791 |
| EXPENSES | | | | | | | | |
| U/R (Marvel) share of Defined Net Receipts | *(based on contractual sliding scale)* | | | | | | | |
| 8% | from | $1,075,000 | on up | $136,414 | $122,773 | $115,952 | $109,131 | $95,743 |
| 7% | from | $1,025,000 | to < | $1,075,000 | $0 | $0 | $0 | $0 | $0 |
| 6% | from | $975,000 | to < | $1,025,000 | $0 | $0 | $0 | $0 | $0 |
| 5% | from | $925,000 | to < | $975,000 | $0 | $0 | $0 | $0 | $0 |
| Goodbye Fee (Gross) | | | 2.0% | $34,104 | $30,693 | $28,988 | $27,283 | $23,936 |
| B/E & JT Fee (Gross) | | | 1.5% | $25,578 | $23,020 | $21,741 | $20,462 | $17,952 |
| Company & Theatre Fixed Expenses | | | | $926,483 | $926,483 | $926,483 | $926,483 | $926,483 |
| Rent | | | 6% | $102,311 | $92,079 | $86,964 | $81,848 | $71,807 |
| Sub-Total | | | | $1,224,889 | $1,195,048 | $1,180,128 | $1,165,208 | $1,135,921 |
| Operating Profit/(Loss) Before Royalties | | | | $480,287 | $339,610 | $269,271 | $198,933 | $60,870 |
| ROYALTIES | $33,038 min wkly guar x 2 | | 40.0000% | $192,115 | $135,844 | $107,709 | $79,573 | $66,076 |
| two times MWG or 40% WOP whichever is greater | | | | | | | | |
| plus: Merchandising | | | $8,000 pw (at sellout) | $8,000 | $7,200 | $6,800 | $6,400 | $5,206 |
| Operating Profit/(Loss) After Royalties | | | | $296,172 | $210,966 | $168,363 | $125,760 | $0 |
| NEW EQUITY | | | 100.00% | 12,500,000 | 12,500,000 | 12,500,000 | 12,500,000 | |
| | | | | $42,941,279 | $44,883,259 | $45,285,634 | $50,539,433 | |
| Weeks to 1.5 recoupment | | | | 42 | 59 | 74 | 99 | |
| TOTAL WEEKS to 1.5 recoup | | | | 128 | 183 | 229 | 343 | |

*BOX 4*

## RECOUP DEFERRED ROYALTIES/ORIGINAL EQUITY (POST NEW EQUITY)

| | | | | | | | | Break-Even |
|---|---|---|---|---|---|---|---|---|
| Gross Sales as Percentage of Gross Potential | | NO PREMIUMS | | | 100% | 90% | 85% | 80% | 65.1% |

| | | | | | 100% | 90% | 85% | 80% | 65.1% |
|---|---|---|---|---|---|---|---|---|---|
| Net Weekly Box Office Receipts | | | | | $1,806,430 | $1,625,787 | $1,535,466 | $1,445,144 | $1,175,238 |
| EXPENSES | | | | | | | | | |
| U/R (Marvel) share of Net Weekly Box Office Revenue *(based on contractual sliding scale)* | | | | | | | | | |
| 9% | from | $1,100,000 | on up | | $162,579 | $146,321 | $138,192 | $130,063 | $105,771 |
| 8% | from | $1,025,000 | to < | $1,100,000 | $0 | $0 | $0 | $0 | $0 |
| 7% | from | $950,000 | to < | $1,025,000 | $0 | $0 | $0 | $0 | $0 |
| 6% | from | $850,000 | to < | $950,000 | $0 | $0 | $0 | $0 | $0 |
| Goodbye Fee (Gross) | | | 2.0% | | $36,129 | $32,516 | $30,709 | $28,903 | $23,505 |
| B/E & JT Fee (Gross) | | | 1.5% | | $27,096 | $24,387 | $23,032 | $21,677 | $17,629 |
| Company & Theatre Fixed Expenses | | | | | $926,483 | $926,483 | $926,483 | $926,483 | $926,483 |
| Rent | | 6% | 8% | | $124,514 | $110,063 | $102,837 | $95,612 | $74,019 |
| Sub-Total | | | | | $1,276,801 | $1,239,769 | $1,221,253 | $1,202,738 | $1,147,407 |
| Operating Profit/(Loss) Before Royalties | | | | | $529,629 | $386,018 | $314,212 | $242,407 | $27,831 |
| ROYALTIES | $33,038 min wkly guar | | 45.7200% | | $242,146 | $176,487 | $143,658 | $110,828 | $33,038 |
| plus Merchandising | | $8,000 pw (at sellout) | | | $8,000 | $7,200 | $6,800 | $6,400 | $5,206 |
| Operating Profit/Loss after Royalties | | | | | $295,483 | $216,731 | $177,354 | $137,978 | $0 |
| Creative & Marvel Profit Shares | | | | | 0 | 0 | 0 | 0 | 0 |
| Net Operating Profit /Loss to Investors/Producers | | | | | $295,483 | $216,731 | $177,354 | $137,978 | $0 |
| | New Equity | 37.500% | | | 110,806 | 81,274 | 66,508 | 51,742 | 0 |
| | Mid + Original | 37.500% | | | 110,806 | 81,274 | 66,508 | 51,742 | 0 |
| | Deferred Royalties | 25.000% | | | 73,871 | 54,183 | 44,339 | 34,495 | 0 |
| | | 100.000% | | | | | | | |
| | Weeks to recoup deferred royalties x 115% | | | | $10,709,777 | $11,209,932 | $11,003,389 | $9,128,351 | |
| | | | | | 145 | 207 | 248 | 265 | |
| | Mezzanine Equity recoups | $5,100,000 | | | 46 | 63 | 77 | 99 | |
| | Original Equity recoups | $15,406,000 | | | $10,964,665 | $11,714,897 | $11,405,083 | $8,592,526 | |
| | Total Weeks from opening to recoup  def roys | | | | 273 | 390 | 477 | 608 | |
| | Total Weeks from opening to recoup Mezzanine Equity | | | | 174 | 246 | 305 | 441 | |

Spider-Man FINAL AGREEMENT

08/02/2010

*BOX 5*

## RECOUP BALANCE OF ORIGINAL EQUITY (POST DEFERRED ROYALTIES)

| | | | | | | | | | Break-Even |
|---|---|---|---|---|---|---|---|---|---|
| Gross Sales as Percentage of Gross Potential | | | | | 100% | 90% | 85% | 80% | 65.1% |
| | | | | | | | | | |
| Net Weekly Box Office Receipts | | NO PREMIUMS | | | $1,806,430 | $1,625,787 | $1,535,466 | $1,445,144 | $1,175,238 |
| EXPENSES | | | | | | | | | |
| | | | | | | | | | |
| U/R (Marvel) share of Net Weekly Box Office Revenue ( *based on contractual sliding scale*) | | | | | | | | | |
| 9% | from | $1,100,000 | on up | | $162,579 | $146,321 | $138,192 | $130,063 | $105,771 |
| 8% | from | $1,025,000 | to < | $1,100,000 | $0 | $0 | $0 | $0 | $0 |
| 7% | from | $950,000 | to < | $1,025,000 | $0 | $0 | $0 | $0 | $0 |
| 6% | from | $850,000 | to < | $950,000 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | | |
| Goodbye Fee (Gross) | | | 2.0% | | $36,129 | $32,516 | $30,709 | $28,903 | $23,505 |
| B/E & JT Fee (Gross) | | | 1.5% | | $27,096 | $24,387 | $23,032 | $21,677 | $17,629 |
| | | | | | | | | | |
| Company & Theatre Fixed Expenses | | | | | $926,483 | $926,483 | $926,483 | $926,483 | $926,483 |
| | | | | | | | | | |
| Rent | | 6% | | 8% | $124,514 | $110,063 | $102,837 | $95,612 | $74,019 |
| | | | | | | | | | |
| Sub-Total | | | | | $1,276,801 | $1,239,769 | $1,221,253 | $1,202,738 | $1,147,407 |
| | | | | | | | | | |
| Operating Profit(Loss) Before Royalties | | | | | $529,629 | $386,018 | $314,212 | $242,407 | $27,831 |
| | | | | | | | | | |
| ROYALTIES | | $33,038 min wkly guar | 45.7200% | | $242,146 | $176,487 | $143,658 | $110,828 | $33,038 |
| | | | | | | | | | |
| plus Merchandising | | $8,000 pw (at sellout) | | | $8,000 | $7,200 | $6,800 | $6,400 | $5,206 |
| | | | | | | | | | |
| Operating Profit/Loss after Royalties | | | | | $295,483 | $216,731 | $177,354 | $137,978 | $0 |
| Creative & Marvel Profit Shares | | | | | 0 | 0 | 0 | 0 | 0 |
| Net Operating Profit /Loss to Investors/Producers | | | | | $295,483 | $216,731 | $177,354 | $137,978 | $0 |
| | | | | | | | | | |
| | | New Equity | 50.000% | | 147,741 | 108,365 | 88,677 | 68,989 | 0 |
| | | Original | 50.000% | | 147,741 | 108,365 | 88,677 | 68,989 | 0 |
| | | Deferred Royalties | n.a | | 0 | 0 | 0 | 0 | 0 |
| | | | 100.000% | | | | | | |
| | | | | | | | | | |
| | | Original Equity recoups | | | 30 | 34 | 45 | 99 | |
| | | Total Weeks from opening to recoup Original Equity | | | 303 | 424 | 522 | 706 | |

*BOX 6*

## POST-RECOUP EQUITY + POST RECOUP DEF ROYS

| | | | | | | 100% | 90% | 85% | 80% | Break-Even 65.1% |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Sales as Percentage of Gross Potential | | | | | | 100% | 90% | 85% | 80% | 65.1% |
| Net Weekly Box Office Receipts | | | NO PREMIUMS | | | $1,806,430 | $1,625,787 | $1,535,466 | $1,445,144 | $1,175,239 |
| EXPENSES | | | | | | | | | | |
| U/R (Marvel) share of Net Weekly Box Office Revenue *( based on contractual sliding scale)* | | | | | | | | | | |
| 9% | from | $1,100,000 | on up | | | $162,579 | $146,321 | $138,192 | $130,063 | $105,771 |
| 8% | from | $1,025,000 | to < | $1,100,000 | | $0 | $0 | $0 | $0 | $0 |
| 7% | from | $950,000 | to < | $1,025,000 | | $0 | $0 | $0 | $0 | $0 |
| 6% | from | $850,000 | to < | $950,000 | | $0 | $0 | $0 | $0 | $0 |
| Goodbye Fee (Gross) | | | | | 2.0% | $36,129 | $32,516 | $30,709 | $28,903 | $23,505 |
| B/E & JT Fee (Gross) | | | | | 1.5% | $27,096 | $24,387 | $23,032 | $21,677 | $17,629 |
| Company & Theatre Fixed Expenses | | | | | | $926,483 | $926,483 | $926,483 | $926,483 | $926,483 |
| Rent | | | | 6% | 8% | $124,514 | $110,063 | $102,837 | $95,612 | $74,019 |
| Sub-Total | | | | | | $1,276,801 | $1,239,769 | $1,221,253 | $1,202,738 | $1,147,407 |
| Operating Profit/(Loss) Before Royalties | | | | | | $529,629 | $386,018 | $314,212 | $242,407 | $27,832 |
| ROYALTIES | | $33,038 min wkly guar | | | 45.7200% | $242,146 | $176,487 | $143,658 | $110,828 | $33,038 |
| plus Merchandising | | $8,000 pw (at sellout) | | | | $8,000 | $7,200 | $6,800 | $6,400 | $5,206 |
| Operating Profit/Loss after Royalties | | | | | | $295,483 | $216,731 | $177,354 | $137,978 | $0 |
| Creative & Marvel Profit Shares | | | | | 17.3800% | 51,355 | 37,668 | 30,824 | 23,981 | 0 |
| Bonus Royalty Participants | | | | | 5.0000% | 14,774 | 10,837 | 8,868 | 6,899 | 0 |
| Net Operating Profit /Loss to Investors/Producers | | | | | | $229,354 | $179,063 | $146,530 | $113,998 | $0 |
| | | New Equity | 72.000% | | | 165,135 | 128,925 | 105,502 | 82,078 | |
| | | O + M Equity | 25.000% | | | 57,338 | 44,766 | 36,633 | 28,499 | |
| | | Halo | 3.000% | | | 6,881 | 5,372 | 4,396 | 3,420 | |
| | | | 100.000% | | | 229,354 | 179,063 | 146,530 | 113,998 | |
| | | Annual ROI new equity | | | | 34.35% | 26.62% | 21.94% | 17.07% | |
| | | Annual ROI old equity | | | | 14.54% | 11.35% | 9.29% | 7.23% | |

Spider-Man FINAL AGREEMENT

08/02/2010

# EXHIBIT F

| | |
|---|---|
| **From:** | Lustbader, Aaron [ALustbader@Wasserworld.com] |
| **Sent:** | Tuesday, April 13, 2010 6:13 PM |
| **To:** | Seth Gelblum |
| **Cc:** | Williams, Allan |
| **Subject:** | RE: Julie Taymor - Puppet & Mask Designer/SPIDER-MAN |
| **Attachments:** | SM Royalties-04.pdf |

Dear Seth,

We can agree to the $20,000 provided it incorporates expenses.

Attached please find the current royalty pool chart.  As you'll see, we offered the full royalty contemplated for this area. We are fine to attribute both the royalty and the billing as Mask Design only (rather than incorporating the phrase Puppet Design).  There is no room for improvement in this area and you'll see the offer compares quite favorably to the other principal design agreements.

None of the production's designers have a billing trigger with certain types or sized advertising so it does not seem appropriate here.

The bulk of Julie's design work here should be easily replicated for additional companies; we can agree to a full royalty but the fee should be negotiated in good faith with a floor of 50%.

No problem on indemnification and insurance requests.

Please review with Julie and get back to us at your earliest convenience.  I understand you are anxious to receive the author/director agreements which are far more pressing than this but at the moment this is all I can provide.

All best,
Aaron

Aaron Lustbader
AWA Management Services
1650 Broadway, Suite 800
New York, NY 10019
212.307.0800
212.307.5936 fax
alustbader@wasserworld.com


---

**From:** Seth Gelblum [mailto:sgelblum@loeb.com]
**Sent:** Friday, April 02, 2010 2:19 PM
**To:** Lustbader, Aaron
**Cc:** Williams, Allan
**Subject:** RE: Julie Taymor - Puppet & Mask Designer/SPIDER-MAN

Aaron -

I have set forth below in CAPS Julie's comments on your offer below.

Please also remind the producers and lawyers that I have received nothing more on the authors and director agreements since meeting with the producers on March 18. I was assured at that meeting that I would receive redrafts of those far more important agreements within a week.

Seth

**Seth Gelblum, Esq.**
**Loeb & Loeb LLP**
**345 Park Avenue**
**20th Floor**
**New York, New York 10022**
**(212)407-4931**

<u>Circular 230 Disclosure</u>:  To assure compliance with Treasury Department rules governing tax practice, we inform you that  any advice (including  in  any attachment) (1) was not written and is not intended to be used, and cannot be used, for the purpose of avoiding any federal tax penalty that may be imposed on the taxpayer,  and  (2) may not be used in connection with promoting, marketing or recommending to another person any transaction or matter addressed herein.

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

**From:** Lustbader, Aaron
**Sent:** Monday, March 22, 2010 11:48 AM
**To:** 'Seth Gelblum'
**Cc:** Williams, Allan
**Subject:** Julie Taymor - Puppet & Mask Designer/SPIDER-MAN

Dear Seth,

Hope this finds you well.  Prior to the hiatus, we had prepared an offer for Julie Taymor as Puppet & Mask Designer for SPIDER-MAN: Turn Off The Dark which never made its way to you while the capital was being re-structured.  Herewith please find that offer and we welcome any comments you may have:

Fee:     $10,000 plus reimbursement of expenses

    $20,000

Royalty:   0.375% wnop rising to 0.429% post-recoupment against a MWG of $500/week (pro rata)

    JULIE SHOULD BE RECEIVING A ROYALTY BASED ON GROSS OF 0.375%, AND THE COMPARABLE SHARE OF THE PROFIT POOL. PLEASE SEND ME THE CURRENT POOL CHART.

This royalty would be all inclusive for any creative participants in this area.  As we currently understand it, there are no other participants in this royalty.  However, since Julie wears multiple hats on the production there could come a time where she requests greater participation from an associate or vendor that elevates them to co-designer. If this were the case, we would need to negotiate in good faith with Julie and this third party to carve out an appropriate piece of the royalty.

    THIS ONLY APPLIES TO HER ROYALTY AS MASK DESIGNER; ANY PUPPET DESIGNER MUST BE COMPENSATED INDEPENDENTLY. SHE WILL BE WILLING TO DISCUSS SHARING WITH ANY OTHER MASK DESIGNER.

Billing:    Puppet & Mask Designer

Julie Taymor

JULIE SHOULD ONLY RECEIVE MASK DESIGN CREDIT, NOT MASK AND PUPPET

Billing would be on title page, house boards, etc but in no paid advertising.

THE CREDIT SHOULD BE IN HALF PAGE ADS OR BIGGER

Additional companies:  Negotiated in good faith.

NO - SAME DEAL

House seats and other miscellany covered in Julie's contracts as co-bookwriter and Director.

FINE

PLEASE ALSO PROVIDE THAT SHE WILL BE INDEMNIFIED BY THE COMPANY FROM ANY CLAIMS ARISING FROM THE USE OF THE MASKS, AND THAT HER COVERAGE UNDER THE E & O AND GENERAL LIABILITY POLICIES AS A WRITER AND DIRECTOR WILL ALSO APPLY TO HER SERVICES AS A MASK DESIGNER.

Please review and get back to us at your earliest convenience.

All best,
Aaron

Aaron Lustbader
AWA Management Services
1650 Broadway, Suite 800
New York, NY 10019
212.307.0800
212.307.5936 fax
alustbader@wasserworld.com

3

## SPIDER-MAN
## ROYALTIES & PROFIT POOL

13-Apr-10

| Royalty participant | Name | Minimum Weekly Guarantee | Pre-Recoupment Share of Operating Profits Profits | Post-Recoupment Share of Operating Profits Profits |
|---|---|---|---|---|
| Authors: Music & Lyrics | Bono & The Edge | $7,780.00 | 10.373% | 11.857% |
| Authors: Book | Neil Jordan | $972.50 | 1.297% | 1.482% |
| " | Julie Taymor | $1,458.75 | 1.945% | 2.223% |
| " | Glen Berger | $1,458.75 | 1.945% | 2.223% |
| Collaborator | Julie Taymor | $1,945.05 | 2.593% | 2.964% |
| Publicity | Bono & The Edge | $1,458.84 | 1.945% | 2.223% |
| Director | Julie Taymor | $4,875.00 | 6.500% | 7.430% |
| Choreographer | Danny Ezralow | $975.00 | 1.300% | 1.486% |
| Scenic Designer | George Tsypin | $1,250.00 * | 0.750% | 0.857% |
| Costume Designer | Eiko Ishioka | $1,250.00 * | 0.750% | 0.857% |
| Lighting Designer | Donald Holder | $1,250.00 * | 0.750% | 0.857% |
| Sound Designer | Jonathan Deams | $750.00 * | 0.500% | 0.572% |
| Puppet Designer | To be Determined (Estimate) | $500.00 * | 0.375% | 0.429% |
| Orchestrator | David Campbell | $500.00 * | 0.375% | 0.429% |
| Arranger | David Campbell | $350.00 * | 0.250% | 0.286% |
| Producer | Goodbye Entertainment | $2,772.24 | 3.696% | 4.225% |
| Producer | Hello Entertainment | $1,386.12 | 1.848% | 2.113% |
| Investors | Various | $980.25 | 1.307% | 1.493% |
| Development Royalty | Hello Entertainment | $1,125.00 | 1.500% | 1.715% |
| | | $33,037.50 | 40.000% | 45.720% |
| | | | | |
| Royalty Entitlement per One (1) Pool Point | | $750.00 | 1.000% | 1.143% |

Note:  Minimum Weekly Guarantees are $750.00 per one percent (1%) profit entitlement based on pre-recoupment shares, applicable only to pool participants having one percent (1%) profit entitlement or higher.  Minimum guarantees for pool participants having less than one percent (1%) profit entitlement may be disproportionate, but not more than $1,250.00 per week.  (Note:  Asterisked [*] pool participants' Minimum Weekly Guarantees already negotiated.)

# **<u>EXHIBIT G</u>**

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Maria A. Pallante*

Register of Copyrights, United States of America

**Registration Number**

## PAu 3-576-391

**Effective date of
registration:**

October 11, 2011

---

## Title

**Title of Work:** Spider-Man: Turn Off the Dark

## Completion/Publication

**Year of Completion:** 2011

## Author

■ **Author:** Julie Taymor

**Author Created:** text

**Work made for hire:** No

**Citizen of:** United States

■ **Author:** Glen Berger

**Author Created:** text

**Work made for hire:** No

**Domiciled in:** United States

## Copyright claimant

**Copyright Claimant:** Julie Taymor

874 Broadway, New York, NY, 10003, United States

**Copyright Claimant:** Glen Berger

## Limitation of copyright claim

**Material excluded from this claim:** lyrics, (1) Characters and setting from the Spider-Man comic books; (2) the
"Swiss Miss" and "Arachne" characters, comprised of the appearance and/or
attributes of such characters as portrayed in the musical; and (3) the
"Spiderman/caught" treatment for a play script (copyright registration #
PAu002942150).

**New material included in claim:**   text of storyline, scenes, and dialogue and text describing theatrical elements and stage activity

## Certification

**Name:**   Patrick C. Toomey

**Date:**   October 11, 2011

**Correspondence:**   Yes



# EXHIBIT H



## CREATIVE TEAM & CAST

### Julie Taymor

**Original Direction, Co-Book Writer, Mask Design**

In 1998, Taymor became the first woman to win the Tony® award for Best Direction of a Musical, and also won a Tony® for Best Costumes, for her groundbreaking production of *The Lion King*. The musical has won three Molière Awards including Best Musical and Best Costumes, garnered Drama Desk, Outer Critics Circle and Drama League awards for Taymor's direction, and myriad awards for her original costume, mask and puppet designs. Taymor made her Broadway debut in 1996 with *Juan Darién: A Carnival Mass*, nominated for five Tony® Awards. Other theatre work includes *The Green Bird*, *Titus Andronicus*, *The Tempest*, *The Taming of the Shrew*, *The Transposed Heads* and *Liberty's Taken*. Taymor's feature film directorial debut, *Titus*, starred Anthony Hopkins, Jessica Lange and Alan Cumming. In 2002, her biographical film *Frida*, starring Salma Hayek and Alfred Molina, earned six Academy Award® nominations, winning two. She took on the music of the Beatles, and earned a Golden Globe® nomination for Best Motion Picture – Musical or Comedy, in *Across the Universe*. Julie's next film, *The Tempest*, will have its North American premiere at the 48th New York Film Festival in October 2010, following a world premiere at the 67th Venice International Film Festival. Taymor's visually exhilarating adaptation of the William Shakespeare play features an all-star cast including Helen Mirren, Russell Brand, Djimon Hounsou and Alfred Molina, and will be released by Touchstone Pictures on December 10. Beyond the theatre and screen, Taymor has directed five operas internationally including *Oedipus Rex* with Jessye Norman, for which she earned the International Classical Music Award for Best Opera Production. A subsequent film version premiered at the Sundance Film Festival and won her an Emmy® award. Taymor also directed *Salome*, *The Flying Dutchman*, *Die Zauberflöte* (which has been in repertory at The Met for six years), *The Magic Flute* (the abridged English version of *Die Zauberflöte*, which inaugurated a new PBS series entitled "Great Performances at The Met") and Eliot Goldenthal's *Grendel*. Taymor is a 1991 recipient of the MacArthur "genius" Fellowship.

# EXHIBIT I



## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that he caused true and correct copies of the foregoing Amended Complaint to be served on the 9th day of July 2012, via e-mail upon all counsel of record.

Dated:   July 9, 2012                    LANKLER SIFFERT & WOHL LLP

                                        By    _____
                                              Patrick C. Toomey

                                              500 Fifth Avenue
                                              New York, New York 10110
                                              Telephone: (212) 921-8399
                                              Facsimile: (212) 764-3701
                                              ptoomey@lswlaw.com